IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
Eastern Division

| | |
|---|---|
| SKYWORKS, LTD., CEDARWOOD VILLAGE APARTMENTS I & II OWNER B, LLC, MONARCH INVESTMENT AND MANAGEMENT GROUP, LLC, TOLEDO PROPERTIES OWNER B, LLC and NATIONAL ASSOCIATION OF HOMEBUILDERS,<br><br>Plaintiffs,<br><br>v.<br><br>CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director, Centers for Disease Control and Prevention; NINA B. WITKOFSKY, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention; DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX AZAR, in his official capacity as Secretary of Health and Human Services; WILLIAM P. BARR, in his official capacity as Attorney General of the United States,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT** |

## INTRODUCTION

1. On August 8, 2020, the President issued an "Executive Order on Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners." Among other things, the executive order directed the Secretary of Health and Human Services and the Director of the

1

Centers for Disease Control and Prevention to consider whether a moratorium on evictions would help stem the spread of COVID-19.

2. Referring to the expiration of a moratorium on certain evictions under the CARES Act, the executive order states, "With the failure of the Congress to act, my Administration must do all that it can to help vulnerable populations stay in their homes in the midst of this pandemic."

3. The result was an Order issued by the CDC that took effect on September 4, 2020. The Order imposes a nationwide ban on evictions of certain tenants until at least December 31, 2020 "unless modified or extended."

4. Whether the President was correct that Congress "fail[ed] to act" or simply chose not to act, the executive order was surely correct that Congress has not, in fact, imposed an eviction moratorium since the expiration of the one that existed under the CARES Act. Congress certainly did not authorize the CDC to impose such a moratorium in the Health Services Act, the law from which the CDC purports to derive its authority for the moratorium.

5. That law and the regulations adopted under it, allow the CDC to take certain actions—inspection, fumigation, disinfection, and sanitation, among others—to stop the spread of infectious disease across state lines. Nowhere does it authorize the CDC to impose a nationwide eviction moratorium.

6. The pandemic poses a significant threat to many Americans and a serious challenge to government at all levels. But that threat—whether termed an "emergency" or not—does not suspend the normal operations of constitutional government. Under our Constitution, Congress makes the law and the executive branch enforces it.

7. The CDC's eviction moratorium represents a sweeping assumption of power by an administrative agency that it simply does not possess. The moratorium alters the contractual

relationships of perhaps millions of people across the country. It suspends legal proceedings in every state. It forces one segment of the population—landlords—to bear a disproportionate share of the costs of the pandemic because they provide the rental housing that so many Americans need.

8. If the federal government possesses the legitimate power to impose a nationwide eviction moratorium, that power must be exercised by Congress. Until Congress acts, the executive branch may not.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

10. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of the action is situated in this district. Venue is also proper under 28 U.S.C § 1391(e)(1)(B) because the defendants are officers, employees, and agencies of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of property that is the subject of the action is situated in this district. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act generally proper in "a court of competent jurisdiction").

## PARTIES

12. Skyworks, Ltd. is a limited liability company organized in the State of Ohio, owned and operated by married business partners Lila J. and Eric M. Wohlwend. It owns residential rental properties in Stark County, Ohio.

13. Cedarwood Village Apartments I & II Owner B, LLC ("Cedarwood Village") is a Delaware-based LLC, registered to do business on Ohio. Cedarwood owns residential units in Summit County, Ohio.

14. Monarch Investment and Management Group ("Monarch") is a Colorado-based LLC, registered to do business in Ohio. Monarch manages residential apartment complexes in numerous states, including in Ohio.

15. Toledo Properties Owner B, LLC ("Toledo Properties") is a Delaware-based LLC, registered to do business in Ohio. Toledo Properties owns residential units in Lucas County, Ohio.

16. National Association of Homebuilders ("NAHB") is a non-profit 501(c)(6) corporation incorporated in the State of Nevada. NAHB is a federation of more than 700 state and local associations, including the Ohio Homebuilders Association. NAHB has member companies in all 50 states, including companies that own and manage multi-family housing units. NAHB has approximately 3,300 members in Ohio, including members owning multi-family housing units.

17. Defendant CDC is an agency of the United States government within the Department of Health and Human Services.

18. Robert R. Redfield is the Director of the CDC. The CDC's public statement announcing its eviction moratorium, which is the agency action challenged in this case, states that the order was issued by Director Redfield. He is sued in his official capacity.

19. Nina B. Witkofsky is the Acting Chief of Staff for the CDC and the CDC employee under whose name the CDC eviction moratorium was issued. She is sued in her official capacity.

20. Alex Azar is the Secretary of Health and Human Services (HHS). He is sued in his official capacity.

21. HHS is an agency of the United States government.

4

22. William P. Barr is the Attorney General of the United States and the head of the Department of Justice, which has enforcement authority under the Order implementing the CDC eviction moratorium. He is sued in his official capacity.

## GENERAL ALLEGATIONS

*The CDC's Eviction Moratorium*

23. On September 4, 2020, the CDC published an agency order in the Federal Register entitled "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19." 85 Fed. Reg. 55,292 (Sep. 4, 2020).

24. The Order imposes a nationwide moratorium on covered residential evictions from September 4, 2020, until December 31, 2020, unless the order is "extended, modified, or rescinded[.]" *Id*. at 55,297.

25. During this time period, according to the Order, "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any State or U.S. territory in which there are documented cases of COVID-19 that provide a level of public-health protections below the requirements listed in this Order." *Id*. at 55,296.

26. A "covered person" under the Order is any residential tenant who "provides to their landlord" a declaration (known as a "Renter's or Homeowner's Declaration," a sample of which is appended to the Order) stating, under penalty of perjury, that they meet the following conditions:

> 1) The individual has used best efforts to obtain all available government assistance for rent or housing;
>
> 2) The individual either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), (ii) was not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;

5

3) the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;

4) the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

5) eviction would likely render the individual homeless or force the individual to move into and live in close quarters in a new congregate or shared living setting because the individual has no other available housing options.

*Id*. at 55,293.

27. Although the Order and declaration state that tenants who avail themselves of the eviction moratorium are "still required to pay rent and follow all the other terms of their lease" and may be assessed "fees, penalties or interest for not paying rent," *id*. at 55,297, the Order deprives landlords of one of the primary means of holding tenants to the obligations of their lease—the right to evict.

28. The Order defines "evict" and "eviction" broadly to include "*any action* by a landlord . . . to remove or cause the removal of a covered person from a residential property." *Id*. at 55,293 (emphasis added).

29. The Order does not define "any action." It does, however, impose stiff *criminal* penalties on landlords who initiate any such (undefined) action "to remove or cause the removal" of a tenant from the landlord's property. Individuals who violate the order face a fine of up to $100,000, up to a year in jail, or both. Organizational landlords face fines of up to $200,000 per event. *Id*. at 55,296.

30. Nor does the Order explain how a landlord—or a local court—is to determine whether a tenant who has signed a declaration has used "best efforts" to obtain government assistance, or is "unable to pay full rent" due to "substantial loss of household income" or "extraordinary out of pocket medical expenses," or has used "best efforts" to make partial

payments that are "as close to the full payment as the individuals circumstances may permit, taking into account other nondiscretionary expenses," or whether eviction would render a tenant "homeless" or force him to live with others, or whether the tenant has "no other available" options for housing.

31. The Order does not indicate whether a landlord is permitted to challenge any of the claims in a Renter's Declaration or in what venue that might be done. On October 9, 2020, however, the CDC issued non-binding "guidance"— in the form of "Frequently Asked Questions"— that purports to clarify whether local courts can entertain eviction actions at all under the Order. The FAQ states that "The Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court" and that the Order is not "intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." It also states, however, that the process for adjudicating issues the Order presents "will be carried out according to state and local laws and rules" and that "State and local courts may take judicial notice of the CDC Order, and the associated criminal penalties that may be imposed for non-compliance in making a formal judgment about any pending or future eviction action filed while this Order remains in effect." Accordingly, even where there may be grounds to challenge a Renter's Declaration, CDC's Order forces landlords to choose between either suspending efforts to evict non-paying tenants or spending significantly more on attorney's fees for an evidentiary hearing that would not otherwise be necessary.

32. The putative purpose of the Order is to reduce the spread of COVID-19 transmission. According to the CDC, "[e]viction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical

7

condition" and will help "State and local authorities to more easily implement stay-at-home and social distancing directives..." *Id*. at 55,292. The Order, according to the CDC, may also help reduce homelessness, which can result in congregate living circumstances and unsheltered conditions that raise transmission risks. *Id.*

33. The Order cites, as legal authority for the eviction moratorium, section 361 of the Public Health Service Act (42 U.S.C. § 264) and 42 CFR 70.2. Neither the statute nor the regulation purports to give the CDC or HHS the authority to impose a nationwide eviction moratorium.

34. Instead, these provisions authorize HHS and the CDC to prevent the spread of communicable diseases from foreign countries and from state to state through such measures as quarantine, inspection, disinfection and licensing, among others.

35. The relevant section of the statute, 42 U.S.C. § 264(a), authorizes the Secretary of HHS[1] to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" from foreign countries into a state or possession of the United States from one state into another. The statute then elaborates on the measures that may be taken toward that end, stating, "[f]or purposes of carrying out and enforcing such regulations, the [Secretary of HHS] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings and other measures, as in his judgment may be necessary."

---

[1]The statute actually authorizes the Surgeon General, with the Secretary's approval, to issue relevant regulations, but the Surgeon General's authority was transferred to the Secretary in 1966. *See* Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855. *See also* 20 U.S.C. § 3508.

36. The remaining subsections of Section 264 pertain to the issuance of regulations dealing with the apprehension, detention or conditional release of individuals believed to be infected with communicable diseases and preemption. *See* 42 U.S.C. § 264(b)–(e).

37. The regulation, 42 CFR 70.2, reflects this statutory language. It is found in a subchapter of the Public Health code entitled "Quarantine, Inspection, and Licensing." The subpart within that chapter where section 70.2 is found is entitled "Interstate Quarantine." Section 70.2 is entitled "Measures in the event of inadequate state control." It states in full:

> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.

38. The CDC contends that the Order is not a "rule" under the Administrative Procedure Act that must be promulgated according to the notice and comment rulemaking procedures in 5 U.S.C. § 553. Instead, according to the CDC, the Order is "an emergency action taken under the existing authority of 42 CFR 70.2." 85 Fed. Reg. at 55,296. But even if the Order is a rule, the CDC contends that it is exempt from notice and comment rulemaking under 5 U.S.C. § 553(b)(3)(B), because, due to "the public health emergency created by COVID-19, it would be impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order." *Id*.

39. The CDC does not explain why it chose to issue this "emergency" Order on September 4, 2020, which was more than seven months after the beginning of the pandemic in the U.S. CDC said only that delay "could have potentially significant consequences" if "evicted individuals become homeless and unsheltered" *Id*.

*Impact of the CDC Eviction Moratorium on the Plaintiffs*

40. On September 14, 2020, the Canton Municipal Court entered an order titled "In Re Temporary Halt in Evictions to Prevent the Further Spread of COVID-19." The order states that, based on the CDC's eviction moratorium, "The Canton Municipal Court will stay the issuance of orders furthering the removal of a person from any residential premises by eviction, set out, or other action of a landlord, owner of a residential property, or other person with legal right to pursue eviction or possessionary action."

41. Likewise, the Akron Municipal Court has pronounced that "[a]ny eviction filing where a [CDC] Declaration Form has been properly served will be dismissed."

42. Skyworks, Ltd. has a tenant, located in the City of Canton who has not paid rent due on October 1st, 2020, in violation of her lease.

43. This tenant has been informed of her need to pay or vacate under the terms of her lease but has not done either. Instead, she sent an executed copy of the Renter's Declaration to Skyworks, Ltd.

44. But for receiving this declaration, Skyworks, Ltd., through its property manager, would proceed through an eviction filing in Canton Municipal Court to remove the tenant and regain possession of its property.

45. Skyworks, Ltd. relies on the property management company, Clear Sky Realty, Inc. to manage several properties, including the one at issue here. Clear Sky Realty, Inc. is also owned and operated by Eric M. Wohlwend and Lila J. Wohlwend.

46. Because of the CDC Order, Skyworks, Ltd. is unable to reclaim its property or rent the unit to other tenants who are just as deserving of housing as the current, non-paying, tenants.

47. Cedarwood Village has a tenant, located in the City of Akron who is behind on rent by over $3,500. Cedarwood Village would evict this tenant, but for the CDC Order.

48. Because of the CDC Order, Cedarwood Village is unable to reclaim its property or rent the unit to other tenants who are just as deserving of housing as the current, non-paying, tenant.

49. Monarch manages rental properties in numerous states, including in Ohio. Monarch manages Cedarwood Villages' property in Akron, Ohio.

50. Monarch has a legal right to evict non-paying tenants for the properties it manages, including Cedarwood Village's non-paying tenant.

51. Monarch has received Renter's Declarations from tenants in properties under its management in numerous other jurisdictions. Monarch is unable to evict covered tenants.

52. Toledo Properties has a tenant, located in the City of Toledo, who is behind on rent by $1,443. Toledo Properties has won an eviction proceeding against the tenant, but the execution of the writ has been stayed until December 31, 2020, because of the CDC Order and the tenant's declaration that he qualified for the Order's protection.

53. Because of the CDC Order, Toledo Properties is unable to reclaim its property or rent the unit to other tenants who are just as deserving of housing as the current, non-paying, tenants.

54. NAHB has a member in Ohio who has received two Renter's Declarations from non-paying tenants whom they would like to evict.

55. NAHB members are harmed when tenants refuse to pay rent because their members use that money to maintain their units, buildings, common areas, and grounds of their communities. Rent proceeds are also used to pay taxes and mortgage payments, and to pay the salaries of employees.

56. NAHB members suffer injury when a non-paying tenant submits a Renter's Declaration under CDC's Order because they cannot take action to evict such tenant without the risk of incurring criminal liabilities.

57. Because of the CDC Order, NAHB's members are unable to reclaim their property or rent the units to other tenants who are just as deserving of housing as their current, non-paying, tenants.

## COUNT I
## THE CDC'S ORDER EXCEEDS ITS STATUTORY AND REGULATORY AUTHORITY
## (VIOLATION OF 42 U.S.C. § 264, 42 CFR 70.2, AND 5 U.S.C. § 706(2)(A) AND (C))

58. The preceding paragraphs are incorporated herein by reference.

59. The Administrative Procedure Act provides for judicial review of final agency action. *See* 5 U.S.C. § 704. The Order is a final agency action because it represents the consummation of CDC's decision to impose an eviction moratorium, and because it affects legal rights and obligations by preventing Skyworks, Ltd., Cedarwood Village, Monarch, NAHB's members and other landlords throughout the nation from asserting and protecting their property rights by evicting tenants who have not paid their rent.

60. Under the Administrative Procedure Act, this Court is authorized to set aside and hold unlawful agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or that is in excess of statutory authority, or limitations, or short of statutory right. *See* 5 U.S.C. § 706(2)(A), (C).

61. The CDC's Order purports to prohibit "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action" from evicting "any

covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order." 85 Fed. Reg. at 55,292.

62. Skyworks, Ltd., Cedarwood Village, Monarch and NAHB's members (collectively "Plaintiffs") own or manage rental properties and currently have the right under their leases and under Ohio law, O.R.C. § 1923.02 and O.R.C. § 5321.03, or the law applicable wherever they have received Renter's Declarations, to pursue eviction against their tenants for non-payment of rent.

63. Plaintiffs' tenants are "covered" persons under the Order because they have submitted an executed Renter's or Owner's Declarations.

64. The Order applies in jurisdictions that do not "provide[] the same or greater level of public-health protection than the requirements listed in" the Order. 85 Fed. Reg. at 55,292.

65. There are no eviction moratoria in place in Ohio, Stark County, Lucas County, or Summit County applying greater protections to Plaintiffs' tenants than the CDC eviction moratorium.

66. The Order defines "eviction" broadly to include "*any action* by a landlord . . . to remove or cause the removal of a covered person from a residential property." 85 Fed. Reg. at 55,293.

67. Plaintiffs are not able to exercise their rights to enforce their contracts because of the CDC eviction moratorium.

68. Because of the CDC eviction moratorium, the Canton Municipal Court has ceased proceedings to evict tenants for nonpayment of rent.

69. Because of the CDC eviction moratorium, the Akron Municipal Court has ceased proceeding to evict tenants for nonpayment of rent.

70. Because of the CDC eviction moratorium, the Toledo Municipal Court has not allowed Toledo Properties to reclaim their property.

71. The Order purports to derive its statutory and regulatory authority from 42 U.S.C. § 264 and 42 CFR 70.2.

72. Section 264 nowhere authorizes anyone within HHS to make or enforce regulations that impose eviction moratoria, much less eviction moratoria on a national scale.

73. 42 CFR 70.2 nowhere authorizes anyone within the CDC to impose eviction moratoria at all, much less eviction moratoria on a national scale.

74. Those who violate the Order are subject to criminal penalties, including fines and jail time, under 18 U.S.C. §§ 3559 and 3571, 42 U.S.C. § 271, and 42 CFR 70.18.

75. None of the relevant statutes or regulations purport to authorize CDC to criminalize otherwise lawful behavior.

76. The Order is not in accordance with law and is in excess of statutory authority and is therefore invalid.

77. As a result of the Order, Plaintiffs are unable to evict their tenants. Plaintiffs are thus unable to avail themselves of a legal means of asserting and protecting their rights to property, to contract, and to due process of law, as guaranteed under O.R.C. § 1923.02 and O.R.C. § 5321.03, and other applicable state law where they have received Renter's Declarations.

## COUNT II
## THE CDC'S ORDER IS AN UNCONSTITUTIONAL
## EXERCISE OF LEGISLATIVE POWER
## (VIOLATION OF THE NONDELEGATION DOCTRINE,
## U.S. CONST. ART. I, § 1)

78. The preceding paragraphs are incorporated herein by reference.

79. If the CDC's eviction moratorium does not exceed its authority under the relevant statutes and regulations, then 42 U.S.C. § 264 constitutes a breathtakingly broad, and therefore unconstitutional, delegation of Congress's power to make law.

80. Article I, section 1 of the U.S. Constitution states: "All legislative powers herein granted shall be vested in a Congress of the United States."

81. Often referred to as the "vesting clause," this provision provides one of the cornerstones of the Constitution's separation of powers by ensuring that Congress, and Congress alone, makes the law.

82. Accordingly, Congress may not delegate its lawmaking power to other branches of government, particularly the executive branch and executive agencies such as HHS and CDC. Otherwise, the same branch of government that enforces the law would also possess the power to make the law.

83. When passing a law, therefore, Congress must make the fundamental policy decisions with which the law is concerned and leave to the executive branch only the job of filling in the details or applying the law to a given set of facts. In other words, Congress must provide a sufficiently intelligible principle that guides the executive branch in determining to what the law applies and to what it does not or when the executive branch is authorized to take particular actions and when it is not so authorized.

84. The CDC, by issuing an Order imposing a nationwide eviction moratorium, made precisely the sort of policy decision that is, under the vesting clause of Article I, reserved for Congress. The CDC's Order halts a legal process that exists in every state in the nation and whose purpose is to provide a civil and orderly means of adjudicating, and thus protecting, the rights of both landlords and tenants. The CDC's order thus reorders the legal and contractual relations of

many millions of people across the nation. If the federal government possesses the power to take such an action, it is one that may be authorized only by an act of Congress.

85. Congress, however, did not list eviction moratoria among the actions HHS may take in 42 U.S.C. § 264 and HHS did not list it among the actions the CDC may take in 42 CFR 70.2. Nor did Congress provide any intelligible principle that would reasonably lead HHS or CDC to the conclusion that they were authorized to impose a nationwide eviction moratorium or that would guide these agencies in determining how to fashion an eviction moratorium, to whom it should apply, where, and under what conditions.

86. If, however, 42 U.S.C § 264 or 42 CFR 70.2 were interpreted to permit HHS or CDC to impose an eviction moratorium such as CDC has done, then these provisions would confer virtually unlimited power and discretion upon HHS and CDC to use any means they deemed reasonable to prevent the spread of infectious diseases anywhere in the United States. Under such an interpretation, for example, HHS and CDC would possess the power to shut down businesses, prevent gatherings of people, or impose social distancing measures anywhere in the nation, because all of these actions could conceivably help prevent the transmission of COVID-19 (or any infectious disease) into or among the states.

87. Accordingly, if 42 U.S.C § 264 or 42 CFR 70.2 were interpreted to permit HHS or CDC to impose an eviction moratorium such as CDC has done, then these provisions constitute unconstitutional delegations of Congress's lawmaking power to HHS and/or CDC and are invalid.

## COUNT III
## THE CDC FAILED TO FOLLOW NOTICE AND COMMENT RULEMAKING
## (VIOLATION OF 5 U.S.C. §§ 553 AND 706(2)(D))

88. The preceding paragraphs are incorporated herein by reference.

89. The APA requires that agencies issue rules through a statutorily prescribed notice-and-comment process. *See* 5 U.S.C. § 553.

90. The purpose of this process is to ensure a degree of accountability and transparency within the rulemaking process. Toward that end, agencies must publish a notice of proposed rulemaking in the federal register, give interested parties an opportunity to comment, and include in the final rule an explanation of the basis and purpose of the rule. *See id*. § 553(b), (c).

91. The APA defines "Rule," broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." *See id*. § 551(4). Although not all agency actions that fit the definition of "rule" in the APA must be issued through notice and comment rulemaking, rules that prescribe generally applicable standards of conduct or that affect the rights and liabilities of individuals—known as "legislative rules," because they have the force and effect of law—typically must follow the APA's procedures for notice and comment rulemaking.

92. The CDC's eviction moratorium is a legislative rule because it prescribes generally applicable rules for all landlords in the nation; it affects their rights and legal liabilities, and it has the force and effect of law.

93. There is one exception to the APA's notice-and-comment requirements for legislative rules. Under 5 U.S.C. § 553(b)(3)(B), an agency may bypass the notice-and-comment process "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Because the CDC has known about

17

the COVID-19 pandemic since at least January 2020, and it has known about the impact of COVID-19 on evictions since, at the latest, May 2020, it cannot establish good cause for its decision not to follow notice and comment procedures for its eviction moratorium.

94. Accordingly, the Order violates 5 U.S.C. § 553 and must be held unlawful and set aside under 5 U.S.C. § 706(2)(D) because the CDC failed to observe procedure required by law.

## COUNT IV
## THE CDC'S ORDER IS ARBITRARY AND CAPRICIOUS
### (Violation of 5 U.S.C. § 706)

95. The preceding paragraphs are incorporated herein by reference.

96. The Administrative Procedure Act provides that a reviewing court shall hold unlawful and set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

97. CDC cited speculative concerns that local jurisdictions had failed to take measures necessary to prevent the spread of COVID-19. There was no substantial evidence supporting CDC's conclusion that a temporary national eviction mortarium was necessary, or that local measures were inadequate.

98. While CDC had known about the COVID-19 pandemic since January, 2020, CDC waited until September, 2020 to issue a four-month moratorium on evictions. The cited justification was a tenuous assertion that: (a) there would be "mass evictions" in the absence of a four-month national moratorium; (b) this supposed wave of evictions would result in a significant rise in "homelessness," and; (c) (c) this would, in turn, contribute to the spread of COVID-19.

99. The Order shifts economic hardships to property owners—exacerbating their cash flow problems—without substantial evidence that a temporary moratorium will substantially advance CDC's cited public health goals.

100. CDC failed to consider whether the Order might adversely affect low-income prospective tenants in need of housing, and or whether the Order might contribute to the very problems it purports to mitigate.

101. Accordingly, the CDC Order lacks substantial evidence and is therefore arbitrary and capricious.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiffs pray for relief as follows:

1. A judgment declaring that the CDC Eviction Moratorium is unlawful and/or unconstitutional;

2. Preliminary and permanent injunctions setting aside the CDC Eviction Moratorium and forbidding Defendants from enforcing it;

3. An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

5. Any other relief that the Court deems just and proper.

DATED: October 22, 2020.

Respectfully submitted:

*/s/* MAURICE A. THOMPSON
MAURICE A. THOMPSON
(0078548)
1851 Center for Constitutional Law
122 E Main St.
Columbus, OH 43215
Tel: (614) 340-9817
mthompson@ohioconstitution.org

STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA, 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*

        Washington State Bar No. 52692
        Pacific Legal Foundation
        930 G Street
        Sacramento CA 95814
        Tel: (916) 419-7111
        Fax: (916) 419-7747
        LWake@pacificlegal.org
        EBlevins@pacifclegal.org
        HMarcley@pacificlegal.org

        *Pro hac vice* applications to be filed

*Attorneys for Plaintiffs*