IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SKYWORKS, LTD.; CEDARWOOD VILLAGE APARTMENTS I & II OWNER B, LLC; MONARCH INVESTMENT AND MANAGEMENT GROUP, LLC; TOLEDO PROPERTIES OWNER B, LLC and NATIONAL ASSOCIATION OF HOME BUILDERS, | Case No. 5:20-cv-02407-JRA |
| | JUDGE JOHN R. ADAMS |
| Plaintiffs, | **MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director, Centers for Disease Control and Prevention; NINA B. WITKOFSKY, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention; DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX AZAR, in his official capacity as Secretary of Health and Human Services;  WILLIAM P. BARR, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs file this motion for a preliminary injunction. Plaintiffs submit that a preliminary injunction is warranted because they are likely to prevail on the merits, they will otherwise suffer irreparable harm, the balance of equities favors an injunction and an injunction is in the public interest.

In support of this motion, Plaintiffs submit the following concurrently filed documents:

1. Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction;

2. Declaration of Lila J. Wohlwend in Support of Plaintiffs' Motion for Preliminary

   Injunction;

3. Declaration of Neal Cusick in Support of Plaintiff's Motion for Preliminary Injunction;

4. Declaration of Richard DiBianca in Support of Plaintiffs' Motion for Preliminary

   Injunction;

5. Declaration of Dean Schwanke in Support of Plaintiff's Motion for Preliminary

   Injunction.

DATED: November 2, 2020.

Respectfully submitted:

/s/ MAURICE A. THOMPSON
MAURICE A. THOMPSON
(0078548)
1851 Center for Constitutional Law
122 E Main St.
Columbus, OH 43215
Tel: (614) 340-9817
Mthompson@ohioconstitution.org

STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA, 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*
Washington State Bar No. 52692
Pacific Legal Foundation
930 G Street
Sacramento CA 95814
Tel: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org
EBlevins@pacifclegal.org
HMarcley@pacificlegal.org

*Pro hac vice applications pending
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SKYWORKS, LTD.; CEDARWOOD VILLAGE APARTMENTS I & II OWNER B, LLC; MONARCH INVESTMENT AND MANAGEMENT GROUP, LLC; TOLEDO PROPERTIES OWNER B, LLC; and NATIONAL ASSOCIATION OF HOME BUILDERS, | Case No. 5:20-cv-02407-JRA |
| Plaintiffs, | |
| v. | JUDGE JOHN R. ADAMS |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director, Centers for Disease Control and Prevention; NINA B. WITKOFSKY, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention; ALEX AZAR, in his official capacity as Secretary of Health and Human Services; DEPARTMENT OF HEALTH AND HUMAN SERVICES; WILLIAM P. BARR, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ................................................................................................................ 5

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................ 6

   A.   The order exceeds the CDC's statutory and regulatory authority................................. 6

     1.    The text of the statute and regulation confine the CDC's action to conventional, specific disease-prevention measures that do not involve extensive control over human activity. ................................................................ 8

     2.    Interpretive presumptions regarding congressional intent favor a narrow reading of the statute. ...................................................................... 15

       a.    Congress did not clearly state that it intended to alter the state-federal balance. ..................................................................... 15

       b.    The CDC's broad interpretation of its authority would create severe constitutional concerns. ................................................................. 16

       c.    The CDC's broad interpretation of its authority would violate the rule of lenity. ............................................................................. 19

   B.   If the statute can be read broadly enough to authorize an eviction moratorium, then it violates the non-delegation doctrine.............................................. 19

   C.   The CDC's Eviction Moratorium Violates the APA's Notice and Comment Requirement ......................................................................................... 22

   D.   The CDC's Eviction Moratorium is Arbitrary and Capricious................................... 23

II.    Without an Injunction, Plaintiffs will Suffer Irreparable Harm....................................... 25

III.   The Public Interest and Balance of Equities Weigh in Plaintiffs' Favor. ......................... 27

CONCLUSION............................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)..............................................................................20, 22

*Abramski v. United States*, 573 U.S. 169 (2014) ........................................19

*Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) .................28

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008)..............................8

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ...............................................................25

*Armstrong v. United States*, 364 U.S. 40 (1960) .......................................28

*Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) ...............................23

*Basicomputer Corp. v. Scott*, 791 F. Supp. 1280 (N.D. Ohio 1991),
*aff'd*, 973 F.2d 507 (6th Cir. 1992)........................................................27

*BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002)...................................18

*Bond v. United States*, 564 U.S. 211 (2011) .........................................25, 26

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) .....................18

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................25

*Brown v. Azar*, 1:20-CV-03702-JPB, 2020 WL 6364310 (Oct. 29, 2020)...14

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)................................................................................24

*California Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)................................................................................18

*Carpenter Tech. Corp. v. City of Bridgeport*,
180 F.3d 93 (2d Cir. 1999).....................................................................26

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ...................................................................6

*Christopher v. Harbury*, 536 U.S. 403 (2002)......................................26, 28

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ........................................22

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)............................9

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)................................................................................22

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................25

*Crowell v. Benson*, 285 U.S. 22 (1932) ...............................................15, 16

ii

*CSX Transp., Inc. v. Alabama Dep't of Revenue*,
   562 U.S. 277 (2011).............................................................................11

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*,
   274 F.3d 377 (6th Cir. 2001) ............................................................27

*East Tennessee Nat. Gas Co. v. Sage*,
   361 F.3d 808 (4th Cir. 2004) ............................................................27

*Economou v. Physicians Weight Loss Centers of America*,
   756 F. Supp. 1024 (N.D. Ohio 1991).................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).........................................................................6, 7

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010)...........................................................................25

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
   23 F.3d 1071 (6th Cir. 1994) ............................................................27

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
   549 F.3d 1079 (7th Cir. 2008) ..........................................................26

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .................................27

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)..............................................15

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ....................................20

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934).............................................................................2

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)............................29

*K-Mart Corp. v. Oriental Plaza, Inc.*,
   875 F.2d 907 (1st Cir. 1989).............................................................26

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)...............................27

*Kungys v. United States*, 485 U.S. 759 (1988).........................10–11, 14, 15

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986).............................................................................7

*McBoyle v. United States*, 283 U.S. 25 (1931) .......................................10

*Midwest Institute of Health v. Governor of Michigan*,
   No. 161492, slip op. (Mich. S. Ct. Oct. 2, 2020) ..............................22

*Minard Run Oil Co. v. U.S. Forest Service*,
   670 F.3d 236 (3d Cir. 2011)..............................................................26

*Moltan Co. v. Eagle Picher Indus., Inc.*,
   55 F.3d 1171 (6th Cir. 1995) ............................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).............................................................................24

*New York v. United States*, 505 U.S. 144 (1992) ........................................................18

*NFIB v. Sebelius*, 567 U.S. 519 (2012).......................................................................18

*Norfolk & Western R. Co. v. Train Dispatchers*,
    499 U.S. 117 (1991)................................................................................................8

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ...............................................................................27

*Overstreet v. Lexington-Fayette Urban County Gov't*,
    305 F.3d 573 (6th Cir. 2002) ..................................................................................6

*Owen of Georgia, Inc. v. Shelby County*,
    648 F.2d 1084 (6th Cir. 1981) ............................................................................8, 9

*P.J.E.S. v. Wolf*, No. 1:20-cv-2245,
    2020 WL 5793305 (D.D.C. Sept. 25, 2020) ........................................................16

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935).............................................................................................20

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)...............................................................................................23

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
    52 F.3d 1373 (6th Cir. 1995) ...............................................................................27

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .......................................................28

*State ex rel. Pizza v. Rezcallah*,
    702 N.E.2d 81 (Ohio 1998) .................................................................................29

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) .............................................................................28

*Rewis v. United States*, 401 U.S. 808 (1971) .............................................................19

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ...................................26

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)....................................24

*Salinas v. United States*, 522 U.S. 52 (1997).............................................................15

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001).............................................................................................16

*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) ...........................................................18

*Synar v. United States*, 626 F. Supp. 1374 (D.D.C. 1986) .........................................22

*Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029 (6th Cir. 2018) .................................23

*United States v. Butler*, 297 U.S. 1 (1936).................................................................14

*United States v. Cain*, 583 F.3d 408 (6th Cir. 2009) .................................................23

*United States v. Lopez*, 514 U.S. 549 (1995)..............................................................17

*United States v. Robel*, 389 U.S. 258 (1967) .............................................................22

iv

*United States v. Santos*, 553 U.S. 507 (2008) ..............................................................19

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ...........................................................................................2, 8, 22

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) ..................................................................................................6, 25

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*,
    274 F.3d 1085 (6th Cir. 2001) ...................................................................................26

*Yates v. United States*, 574 U.S. 528 (2015) ...........................................8, 9, 11, 14, 19

**Statutes**

5 U.S.C. § 706 ...................................................................................................................24

20 U.S.C. § 3508 .................................................................................................................6

42 U.S.C. § 264 ...........................................................................................6, 12, 16, 21

42 U.S.C. § 264(b)–(d) ......................................................................................................12

42 U.S.C. § 264(e) .......................................................................................................13, 16

42 U.S.C. § 265 .................................................................................................................16

Ohio Rev. Code Ann. § 5321.03 .......................................................................................26

Ohio Rev. Code Ann. tit. XIX, Ch. 1923 ..........................................................................26

Pub. L. No. 116-136, § 4024 (2020) (CARES Act) ..........................................................11

Public Health Service Act section 361, 42 U.S.C. § 264(a) .................1, 6, 7, 9, 11–13, 17, 20, 21

**Constitutional Provisions**

U.S. Const. amend. I .........................................................................................................18

U.S. Const. amend. X ........................................................................................................17

U.S. Const. art I, § 1 .........................................................................................................20

**Rule**

Fed. R. Civ. P. 65 ..............................................................................................................29

**Other Authorities**

42 C.F.R. § 70.2 ..................................................................................1, 6, 7, 10, 11, 13

31 Fed. Reg. 8855 (June 25, 1966) .....................................................................................6

85 Fed. Reg. 55,292 (Sept. 4, 2020) ..........................................................................3, 4, 13

H.R. Rep. No. 78-1364 (1944).............................................................................................10

Kelley, William K., *Avoiding Constitutional Questions as a Three-Branch
    Problem*, 86 Cornell L. Rev. 831 (2001) ...................................................................19

Scalia, Antonin & Garner, Bryan, *Reading Law: The Interpretation of Legal Texts*
    (Thompson/West 2012) ..........................................................................................8, 19

Schumaker, Erin, Timeline: How Coronavirus Got Started, ABC News,
    https://abcnews.go.com/Health/timeline-coronavirus-
    started/story?id=69435165................................................................................23

Van Someren Greve, Robert, *Protecting Tenants Without Preemption*, 25 Geo. J.
    on Poverty L. & Pol'y 135 (2017) ........................................................................16

## INTRODUCTION

On September 4, 2020, the CDC imposed a ban on evictions that purports to reorder the contractual relationships between landlords and tenants nationwide and to suspend the legal processes designed to provide efficient and orderly adjudication of their rights. The CDC's eviction moratorium represents a sweeping assumption of power that the CDC does not possess. The laws and regulations on which the CDC relies, primarily section 361 of the Public Health Service Act, 42 U.S.C. § 264(a), and 42 C.F.R. § 70.2, allow the CDC to take the sorts of actions one would expect from a federal agency that was established to research public health matters, provide public health education, and help prevent the spread of infectious diseases. For example, the CDC is permitted to inspect, fumigate, disinfect, sanitize, exterminate pests, and destroy animals or articles believed to be sources of infection in humans when the Director determines that actions taken by states are insufficient to prevent the spread of disease across state lines. *See* 42 C.F.R. § 70.2.

Like many statutes and regulations, these provisions allow the CDC Director to take other measures including those mentioned above that he believes are "reasonably necessary" to accomplish the laws' purposes. 42 C.F.R. § 70.2. But if such commonplace language can be read to allow the CDC to impose a nationwide eviction moratorium, then it would allow the CDC to do anything to stem the spread of COVID-19, including any of the actions that state and local governments have taken since the beginning of the pandemic. Such an interpretation would not only render superfluous the enumerated powers HHS and CDC are given under the law, it would constitute a grant of authority to the CDC and HHS to make law, rather than to implement it. It would also expand the federal government's power far beyond what the Constitution allows—effectively creating a federal police power.

1

But Congress did not grant the CDC the breathtakingly broad power it asserts. As the Supreme Court has stated in a related context, "Congress does not hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Nor does an "emergency," whether health-related or otherwise, create powers that agencies or the federal government do not otherwise possess. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("While emergency does not create power, emergency may furnish the occasion for the exercise of power.").

Our Constitution ensures, to the extent possible, that our government remains accountable to the people and that the laws and policies it follows are based on the consent of the governed. The CDC's eviction moratorium short-circuited that process, not only by usurping the power of Congress to make law, but by failing even to follow the notice and comment rulemaking procedures under the Administrative Procedure Act. One of the many purposes of this process is to ensure that those most directly affected by agency actions that have the force of law—here, the force of criminal law—be permitted to comment on the agency rules, which makes the process of agency rulemaking open and accountable and, often, renders the resulting rules more just and more effective.

Plaintiffs are landlords who have held up their end of their lease agreements with their tenants, only to be told, fully eight months after the pandemic began, that the CDC has decided their tenants need not hold up their end of the bargain under those same agreements. Plaintiffs recognize that the pandemic has presented an extreme challenge for Americans and governments nationwide. They, like every American, have felt the impact of the pandemic. Unlike most Americans, however, they are now being singled out by the federal government and told to bear disproportionate costs of fighting the pandemic because they have chosen to rent their properties

2

to others. This treatment would be unjust under any circumstance, but it is particularly unjust when imposed by an agency for which the Plaintiffs did not vote and about whose policies the Plaintiffs had no say.

## STATEMENT OF FACTS

In early September, the CDC promulgated an Order titled "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," which took effect on September 4, 2020, and lasts until December 31, 2020, unless extended. 85 Fed. Reg. 55,292 (Sept. 4, 2020). During this time period, landlords are prohibited from evicting qualifying tenants from their residential rental properties in any state that provides a level of public-health protections below the requirements listed in the Order. *Id*. at 55,296. Landlords who violate the Order face stiff criminal penalties, including fines of up to $100,000, up to a year in jail, or both. For organizational landlords, fines can go up to $200,000 per event. *Id*.

To qualify for the moratorium, tenants must execute a declaration (known as a "Renter's or Homeowner's Declaration") stating, under penalty of perjury, that: (1) they have used best efforts to obtain government housing assistance; (2) they make less than $99,000 annually (or $198,000 if filing jointly); (3) they are unable to pay full rent due to a substantial loss of income, a lay-off, or extraordinary medical expenses; (4) they have used their best efforts to make partial rent payments; and (5) if evicted, they are likely to be rendered homeless or have to live in close quarters with others. *Id*. at 55,293.

The Order defines "evict" and "eviction" broadly to include "*any action* by a landlord . . . to remove or cause the removal of a covered person from a residential property." *Id*. (emphasis added). The Order does not define "any action," nor does it state whether landlords may initiate an eviction proceeding or challenge a tenant's declaration in such a proceeding. On October 9, 2020, however, the CDC issued non-binding "guidance"—in the form of "Frequently Asked

Questions"—that purports to clarify whether local courts can entertain eviction actions at all under the Order. The FAQ states that "[t]he Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court" and that the Order is not "intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." Center for Disease Control and Prevention, HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19: Frequently Asked Questions at 4 (Oct. 12, 2020).[1] It also states, however, that the process for adjudicating issues the Order presents "will be carried out according to state and local laws and rules" and that "State and local courts may take judicial notice of the CDC Order, and the associated criminal penalties that may be imposed for non-compliance in making a formal judgment about any pending or future eviction action filed while this Order remains in effect." *Id.*

Plaintiffs are landlords and a building association that are directly affected by the CDC eviction moratorium. Plaintiff Skyworks, Ltd. owns and operates residential rental properties in Stark County, Ohio. Declaration of Lila Wohlwend ¶ 5, attached hereto as Exhibit A, ("Wohlwend Decl."). In one of the properties Skyworks owns in Canton, a tenant refused to pay rent for October, despite Skyworks' efforts to work with the tenant. *Id.* ¶¶ 12–15. Skyworks informed her that, under the terms of the lease, she must either continue to pay rent or vacate the premises. The tenant did neither. Instead, she sent Skyworks an executed copy of a Renter's Declaration invoking the CDC eviction moratorium. *Id.* Because the Canton Municipal Court has

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf.

stayed the issuance of orders furthering eviction as a result of the CDC's moratorium, Skyworks is unable to evict the tenant and regain possession of its property. *Id.* Appendix A.

The other property-owning/managing plaintiffs are in the same position. Plaintiff Monarch Investment and Management Group ("Monarch") manages the assets for Plaintiffs Toledo Properties Owner B, LLC (d/b/a "Abbey Run") and Cedarwood Village Apartments I & II Owner B, LLC ("Cedarwood Village"). On behalf of Abbey Run, Monarch commenced eviction proceedings against a non-paying tenant in Toledo Municipal Court on September 22, 2020. Declaration of Richard DiBianca ¶ 5, attached hereto as Exhibit B ("DiBianca Decl."). However, the tenant presented a Renter's Declaration at a hearing on October 6, 2020. *Id*. at ¶ 6. While the court entered judgment for possession of the property in Abbey Run's favor, Judge Howe stayed issuance of the writ through December 31, 2020, because of the CDC Order. *Id.* Appendix A. Monarch had a similar issue in Akron Municipal Court when it initiated eviction proceedings against a non-paying tenant at Cedarwood Village; the court dismissed that action because the tenant submitted a Renter's Declaration on October 8, 2020. Declaration of Neal Cusick, Appendices A and B, attached hereto as Exhibit C ("Cusick Decl."). And, finally, the National Association of Home Builders represents over 200 member companies that own and rent housing units. Declaration of Schwanke ¶ 6, attached hereto as Exhibit D ("Schwanke Decl."). Many of those members cannot evict non-paying tenants because the tenants have invoked the protections of the CDC eviction moratorium. *Id.* ¶¶ 10, 13. The moratorium thus forces these and many other landlords throughout the nation to bear the costs of the pandemic while depriving them of their property rights and the benefits of their lease agreements.

## ARGUMENT

A plaintiff seeking a preliminary injunction must show that she is likely to succeed on the merits, that she is likely to suffer irreparable harm if an injunction is not granted, that the balance

of equities tips in her favor, and that an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008); *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 573 (6th Cir. 2002).

I.     **Plaintiffs Are Likely to Succeed on the Merits**

  A.    **The order exceeds the CDC's statutory and regulatory authority.**

Agency actions "must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Here, the CDC Order exceeds the authority granted by 42 U.S.C. § 264 and 42 C.F.R. § 70.2, the statute and regulation on which the Order relies. These provisions authorize the CDC to do what anyone might expect a federal disease-prevention-and-control agency to do: prevent and control the interstate spread of disease by conventional means, such as disinfection, fumigation, and pest extermination. The laws do not, however, authorize an action as extraordinary and unexpected as a nationwide ban on evictions.

Section 264(a) authorizes the Secretary of HHS[2] to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" from foreign countries into the United States or between states. The statute then elaborates on permissible measures toward that end, stating:

> For purposes of carrying out and enforcing such regulations, the [Secretary] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

---

[2] The statute actually authorizes the Surgeon General, with the Secretary's approval, to issue relevant regulations, but his authority was transferred to the Secretary in 1966. *See* Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966). *See also* 20 U.S.C. § 3508.

42 U.S.C. § 264(a). The regulation, adopted pursuant to section 264(a), largely tracks the statutory language. It states in full:

> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.

42 C.F.R. § 70.2.

The Secretary, of course, cannot grant the CDC more authority than Congress granted to him, for an administrative agency "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). *See also Brown & Williamson Tobacco Corp.*, 529 U.S. at 161. The relevant statutory question is therefore whether the language in either the statute or the regulation that allows the CDC Director or the Secretary to take measures that are "reasonably necessary" in addition to those listed in the statute and regulation authorizes the CDC to enact a nationwide eviction moratorium. The answer is "no." If it were otherwise, the CDC would possess the authority to take actions that would render the other measures listed in the regulation and statute—inspection, disinfection, fumigation, and the like—superfluous. It would also mean the CDC possessed the breathtakingly broad authority to control virtually any action taken by private parties or state and local governments that could in some way contribute to the spread of disease. As the Supreme Court has said in a related context, Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. A closer look at the statute and regulation confirm that there are no elephants in sight.

1.    **The text of the statute and regulation confine the CDC's action to conventional, specific disease-prevention measures that do not involve extensive control over human activity.**

Common canons of statutory construction illustrate that the statute and regulation on which the CDC relies cannot be interpreted broadly enough to authorize a nationwide eviction moratorium. For example, under ejusdem generis, a general term following an enumerated list is limited to those things related in kind to the list: "[W]hen a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991)). The rationale behind the rule is that "Congress remained focused on the common attribute when it used the catchall phrase." *Id.* at 225. Similarly, under noscitur a sociis, or the associated-words canon, words in a list are interpreted to have a similar meaning because they are associated in a similar context. *See Yates v. United States*, 574 U.S. 528, 544 (2015) (applying both noscitur a sociis and ejusdem generis in the interpretation of a criminal statute). *See also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199–213, 107–11, 195–98, 93–100, 174–79 (Thompson/West 2012).

The Sixth Circuit has applied these canons to legal provisions that are similar to sections 264(a) and 70.2. For instance, in *Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084 (6th Cir. 1981), the Sixth Circuit employed the ejusdem generis canon to limit the scope of "good cause" for rejecting a low bidder on a public project. Under Shelby County law, lowest bidders were entitled to a contract if they were "financially responsible, taking into consideration the qualities of the article to be supplied, their conformity to specifications, their suitability to the requirements of the County government, and the delivery terms." *Id.* at 1087–88. The law then provided a catch-all: "Any and all bids may be rejected for good cause." *Id.* The County had

8

rejected a low bid because the company was out-of-state and had fewer minority employees than another low bidder. *Id.* at 1090. The court, applying ejusdem generis, held "good cause" was constrained by the factors listed before it: "While a bid may be rejected for reasons other than those enumerated, the County must cite factors similar to the ones listed, i.e., factors which go to the heart of the contract." *Id.* at 1092.

Similarly, Section 264(a) lists permissible agency actions to prevent disease transmission. That list offers a window into the kinds of action that Congress envisioned: "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [the agency's] judgment may be necessary." 42 U.S.C. § 264(a). The "other measures," under ejusdem generis and noscitur a sociis, are limited to the types of action akin to the list that precedes it: conventional, localized disease-prevention measures directly aimed at prevention of interstate transmission, which do not involve substantial control over human activity. *See, e.g.*, *Yates*, 574 U.S. at 544 ("'Tangible object' is the last in a list of terms that begins 'any record [or] document.' The term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, i.e., objects used to record or preserve information."); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 115 (2001) ("contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" held to include only transportation workers in foreign or interstate commerce); *McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" held not to apply to an airplane). The same analysis applies to 42 C.F.R. § 70.2, whose language closely tracks the

statute. Ejusdem generis and noscitur a sociis thus demonstrate that the CDC has strayed far from its statutory authority for several reasons.

First, all the measures listed involve conventional disease mitigation measures, such as the inspection and disinfection of train cars, the fumigation of an airport, or the destruction of contaminated articles or animals. The statute authorizes what a reasonable person would expect an organization like the CDC to do. Indeed, legislative history confirms this by noting that the legislation was intended to sanction "the use of *conventional* public-health enforcement methods." H.R. Rep. No. 78-1364, at 24–25 (1944) (emphasis added). Nothing in the list even hints at allowing the HHS or the CDC to control the contractual relationships of potentially millions of Americans, to say nothing of legal processes in every county and municipality in the nation.

If the statute and regulation authorize such sweeping measures as a nationwide eviction ban, it is hard to understand what these agencies would not be authorized to do. Almost every human activity—from gatherings of people, to vacations, to business meetings, to purchasing or renting of cars, and much more—carries some risk that people will transmit an infectious disease across state lines. Surely if Congress had meant to grant such sweeping authority to these agencies, it would have included in the list of measures they are authorized to take something more than conventional methods for discovering and eliminating disease. Given the nature of the measures Congress did choose to include in the statute, courts should not conclude that a broad grant of authority was hidden in general language such as "other measures," for that would render the remainder of the statute meaningless surplusage. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion) (stating that under the non-surplusage canon, "no provision should be construed to be entirely redundant"). *See also Yates*, 574 U.S. at 546

("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.") (quoting *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 295 (2011)).

Second, the list contemplates actions limited to specific sites, objects, or animals that are, or could be, infected with a disease. Inspection, disinfection, fumigation, sanitation, and pest extermination all occur at particular locations with limited geographic scope. One does not sanitize a nation. And the list follows a logical progression, beginning with "inspection," indicating that some factual basis for believing that disease is actually present is incorporated into the actions that follow. This is affirmed by the phrase "found to be so infected or contaminated as to be sources of dangerous infection." 42 U.S.C. § 264(a). *See also* 42 C.F.R. § 70.2 (using the phrase "believed to be the sources of infection"). The targeted and fact-based nature of the items in the list supports the conclusion that Congress's intent was to authorize conventional, fact-based disease mitigation strategies, rather than broad, prophylactic measures that control activities in huge swaths of the nation. Clearly, Congress knows how to enact an eviction moratorium, as it did so in the CARES Act. Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 4024 (2020). Given the limited nature of the items listed in sections 264(a) and 70.2, it is inconceivable that Congress intended to hide such sweeping authority in the catch-all phrase "other measures."

Third, none of the listed items in section 264(a) or 70.2 contemplate substantial control over human activity or property. Indeed, the only power to restrict human activity in section 264 is contained in separate subsections and involves apprehension and detention of people who pose a transmission risk on a case-by-case basis. *See* 42 U.S.C. § 264(b)–(d). And those sections place careful limitations on HHS's authority to detain people. For example, the HHS must operate

11

pursuant to an executive order, *id.* § 264(b), and the agency must make specific factual findings as to the particular person to be detained. *Id.* § 264(d) (requiring, among other things, a reasonable belief that an individual is infected and contagious and that the person is or will be moving state-to-state or is a probable source of infection to individuals who will be moving state-to-state). Nor do these sections contain a catch-all provision that would leave the scope of such authority to agency discretion. In short, when Congress gave significant control to the HHS over the activities of individuals, that authority was limited in scope and the amount of discretion it gave the agency, and it included significant protections for individual liberty.

Likewise, where Congress gave the HHS the authority to affect an individual's property in section 264(a), it limited that authority to circumstances where the facts show a direct threat to human welfare. Thus, before the agency can undertake the "destruction of animals or articles," it must make a finding that the animals or objects are "so infected or contaminated as to be sources of dangerous infection to human beings." 42 U.S.C. § 264(a). This finding of high risk to human health is not required for less intrusive actions, such as disinfection. The reason is easy to infer: destruction of livestock or goods is likely to have a greater impact on property interests than the other enumerated actions like fumigation, so such action can only be taken where there is a clearer risk to human health.

The CDC Order makes no such finding. Instead, the CDC speculates on a broad level that evictions could lead to homelessness, which could lead to increased risk of transmission, which might result in someone (someday) crossing a border who might pose a serious risk of infection. *See* 85 Fed. Reg. at 55,296 (speculating on "potentially" increased transmission if evictions "potentially" increase in number). The CDC's sweeping assault on landlords' property interests,

12

based only on conjecture, clashes with the statute's demanding standards of individualized evidence when imposing burdens on property and liberty interests.

Fourth, the statute and regulation authorize actions that are directly connected to "prevent[ing] the introduction, transmission, or spread of communicable diseases" from foreign countries or from one state into another. *See* 42 U.S.C. § 264(a); 42 C.F.R. § 70.2. The authority granted to the agency does not include regulation of intrastate activity, such as eviction proceedings, that bear only a tenuous and speculative connection to interstate transmission of disease. Indeed, the regulation is even more specific in this regard than the statute, as it requires the CDC Director to act only when he finds that "measures taken by health authorities in any State or possession . . . are insufficient to prevent the spread of" a communicable disease from state to state.[3] 42 C.F.R. § 70.2. The CDC has made no findings about the insufficiency of any particular state health measures. Instead, the Order simply declares that any state eviction moratorium with lesser protections than the CDC moratorium is insufficient to prevent the spread of COVID-19. *See* 85 Fed. Reg. at 55,294.

If the CDC can regulate wholly intrastate activity like an eviction proceeding on the speculation that it might prompt an individual to move out of state, then any human activity, however attenuated, would fall within the CDC's regulatory crosshairs. This would, in turn, render both the statute's and the regulation's focus on cross-border transmission pointless surplusage. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be

---

[3] The statute's savings clause affirms this narrower reading of the CDC's authority by creating a presumption that the statute should not be interpreted to conflict with state law. *See* 42 U.S.C. § 264(e) (stating that nothing in the section or its implementing regulations "may be construed as superseding any provision under State law . . . except to the extent that such a provision conflicts with an exercise of Federal authority under this section"). As noted, nothing on the face of the statute creates a conflict between the CDC's authority and state eviction proceedings. It is only the CDC's interpretation of its authority that creates such a conflict.

meaningless, else they would not have been used."). *See also Kungys*, 485 U.S. at 778; *Yates*, 574 U.S. at 546.

The CDC's action—banning evictions nationwide—is not related in kind to the list of actions permitted under the statute or regulation. It does not fit within a conventional understanding of typical disease control measures. It is a sweeping, nationwide action, not limited to specific hot spots. It is not an action aimed directly at the prevention of disease—rather, it deals with matters that are several causal steps removed from the spread of disease. And, unlike the traditional disease mitigation measures listed, the CDC order is a breathtaking exercise of control over human activity. Given how far removed the CDC's action is from the list of activities contemplated by Congress, the CDC order cannot be authorized by the statute.

A federal district court in the Northern District of Georgia recently adopted CDC's remarkably broad reading of its authority in the court's denial of a motion for preliminary injunction in a similar challenge to the CDC Order. *See Brown v. Azar*, 1:20-CV-03702-JPB, 2020 WL 6364310 (Oct. 29, 2020). The district court declined to apply canons of construction like ejusdem generis because "there is no ambiguity to which they could be applied," because Congress had demonstrated an "unambiguous intent to delegate broad authority to the CDC to enter an order such as the one at issue here." *Id.* at *9. This conclusion runs contrary to numerous other canons of statutory construction. For example, if it is true that "other measures" unambiguously allow the CDC to simply do whatever it thinks best to mitigate transmission, then the enumerated list preceding "other measures" is mere surplusage, an outcome that courts are obligated to avoid. *See Kungys*, 485 U.S. at 778 ("[N]o provision should be construed to be entirely redundant."). The court, moreover, ignored important interpretive presumptions that disfavor the reading proposed by CDC, which are discussed at length below. First, the CDC

reading of the statute raises serious constitutional concerns, which courts are counseled to avoid under the longstanding doctrine of constitutional avoidance. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932). Second, the Supreme Court has long required that Congress speak with clear statements when meddling with the federal-state balance, and no clear statement to that effect exists here. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

**2.  Interpretive presumptions regarding congressional intent favor a narrow reading of the statute.**

Courts employ a variety of canons of construction to avoid imputing to Congress intentions that may clash with important policy or legal standards unless Congress has spoken with a high degree of clarity. These include the federalism canon, the constitutional-avoidance canon, and the rule of lenity. Here, all three canons favor a reading of the statute that would not authorize the sweeping power wielded by the CDC.

**a.  Congress did not clearly state that it intended to alter the state-federal balance.**

"[I]f Congress intends to alter the usual balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). Where a court faces multiple "plausible interpretations" of a statute, "the proper course [is] to adopt a construction which maintains the existing balance" between federal and state power "absent a clear indication of Congress' intent to change the balance." *Salinas v. United States*, 522 U.S. 52, 59 (1997).

In 42 U.S.C. § 264, Congress has said nothing about evictions, much less that HHS or the CDC may meddle in state property and contract law, longstanding areas of state primacy. *See* Robert Van Someren Greve, *Protecting Tenants Without Preemption*, 25 Geo. J. on Poverty L. & Pol'y 135, 157 (2017) ("[H]ousing is an area of law traditionally left to the states."). In addition

15

to lacking a clear intent to override state prerogatives in contract and property law, the savings clause of section 264(e) confirms the opposite intent. *See supra* note 2.

### b. The CDC's broad interpretation of its authority would create severe constitutional concerns.

Courts must prefer a reasonable reading of a statute that avoids serious constitutional concerns. This "cardinal principle" applies "if a serious doubt of constitutionality is raised," requiring the court to "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001) (explaining that when an agency interpretation of a statute raises serious constitutional questions, the Supreme Court expects to find a "clear statement from Congress" supporting the interpretation). This canon was recently employed to narrow the neighboring statutory provision in 42 U.S.C. § 265, rejecting a "breathtakingly broad" interpretation of the CDC's authority over non-citizens because the interpretation "would raise serious constitutional issues." *P.J.E.S. v. Wolf*, No. 1:20-cv-2245 (EGS/GMH), 2020 WL 5793305, at *14 (D.D.C. Sept. 25, 2020).

Here, as discussed above, any reading of the statute that would authorize a nationwide ban on evictions would place no meaningful limits or guidance on what "other measures" the CDC might deem necessary to prevent transmission of disease state-to-state. This interpretation would raise serious constitutional concerns under the non-delegation doctrine, the Commerce Clause, and the Tenth Amendment.

The non-delegation issue is discussed at length in subsection B, below, but it merits a summary here. A non-delegation concern arises because a broad reading of the statute leaves it without any intelligible principle to guide the agency's discretion. If the statute allows the CDC eviction moratorium, then it effectively would allow any action that the agency may consider to

16

be necessary in its "judgment" to prevent transmission of communicable disease. Since disease transmission is an ever-present risk, the CDC's interpretation offers no guidance to the exercise of agency authority—effectively delegating the legislative power reserved to Congress under Article I of the Constitution to the HHS and the CDC. The Court should opt for a narrower reading of the statute to evade the serious constitutional question raised by the CDC's interpretation.

For similar reasons, the CDC's interpretation raises Commerce Clause concerns. While Congress can regulate economic activity that substantially affects interstate commerce, the Supreme Court has repeatedly held that the Commerce Clause does not create a federal police power. *See United States v. Lopez*, 514 U.S. 549, 567 (1995). Yet section 264(a), if read broadly enough to allow the CDC to impose an eviction moratorium, would effectively allow the CDC to adopt any of the measures that state governors and legislatures have adopted to fight the pandemic—from eviction bans, to business closures, to limits on church and social gatherings. In short, the statute as interpreted by the CDC would create a federal police power, allowing a federal agency to control activity on a nationwide basis, however distant its impact on interstate commerce.

Such a federal police power would likewise run afoul of the Tenth Amendment, which provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The states thus "retain a significant measure of authority to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *New York v. United States*, 505 U.S. 144, 156 (1992) (cleaned up). The police power is the most fundamental reservation of all, intended to allow for more accountable and localized exercise of

17

authority to watch after the common welfare: "Because the police power is controlled by fifty different states instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). The statute should not be read to grant the CDC a roving authority to override the localized model of governance built into our constitutional structure.

Finally, the First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has explained that "'[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896–97 (1984)). *See also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (providing a short history of the Court's jurisprudence concerning the right to access the courts); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (explaining that "[t]he right of access to the courts is indeed but one aspect of the right of petition"). The CDC's interpretation of sections 264(a) and 70.2 halts landlords that have legally cognizable claims under state law from bringing those claims to their own state courts. Clearly, the CDC's interpretation implicates those landlords right to access the courts.

This Court need not even decide the merits of these constitutional questions to apply the constitutional avoidance doctrine. It suffices that the doubts raised as to the constitutionality of a particular interpretation are "substantial." Scalia & Garner, *supra* § 38 (quoting William K. Kelley, *Avoiding Constitutional Questions as a Three-Branch Problem*, 86 Cornell L. Rev. 831, 871 (2001)). The constitutional concerns with a broad reading of the statute are more than substantial.

18

### c.     The CDC's broad interpretation of its authority would violate the rule of lenity.

The rule of lenity is a "venerable rule" designed to protect citizens from being "held accountable for a violation of a statute whose commands are uncertain or subjected to punishment that is not clearly prescribed." *United States v. Santos*, 553 U.S. 507, 514 (2008). The rule therefore requires that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 528, 544 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)).

The CDC's interpretation of sections 264(a) and 70.2 trigger lenity because that interpretation creates an ambiguity in the statute that HHS or the CDC are then entitled to fill with whatever measures these agencies believe might prevent the spread of disease. As noted, above, this would not just be limited to an eviction moratorium, but would cover virtually anything that might help prevent the spread of COVID-19 or any other disease. Those in the position of Plaintiffs would face criminal liability based on nothing more than the ad hoc interpretation of these provisions by the CDC or the HHS. The rule of lenity does not permit such a flexible and wide-ranging interpretation of criminal laws. As the Supreme Court has stated, "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014).

### B.     If the statute can be read broadly enough to authorize an eviction moratorium, then it violates the non-delegation doctrine.

Article I of the United States Constitution vests "[a]ll legislative power" in Congress. U.S. Const. art I, § 1. This assignment implies a "bar on [the legislative power's] further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Statutes that grant too much discretion to agencies tasked with enforcing them effectively hand the task of lawmaking to the

agency. Hence, statutes must contain "an intelligible principle to guide the delegee's use of discretion." *Id.*

Congress can authorize executive officers and agencies to determine facts and can delegate "the duty to carry out the declared legislative policy." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 426 (1935). Congress cannot, however, "[leave] the matter to the [executive] without standard or rule, to be dealt with as he please[s]." *Id.* at 418. For instance, in *Panama Refining*, the Supreme Court struck down a statute granting the President authority to outlaw the transportation of excess oil without providing "definition of circumstances and conditions in which the transportation is to be allowed or prohibited." *Id.* at 430. Similarly, in *A.L.A Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935), the Court struck down a statute enabling the President to approve codes of fair competition, leaving him free to "exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable."

As noted above, neither section 264(a) nor 70.2 can be read broadly enough to allow the CDC to impose a nationwide eviction moratorium. But if they can be, then they grant even broader authority than the statutes in *Panama Refining* and *Schechter*. Almost *any* activity that causes people to come into close proximity to each other can contribute to the introduction, transmission, or spread of communicable disease, which, in turn, can then travel easily across borders. If the CDC's interpretation is correct, then it has the ability to regulate, control, or outlaw any such activity, which is to say that the CDC possesses the limitless discretion to make law concerning any of the wide range of activities that could conceivably lead to the transmission of disease in the United States. If the CDC is right, the roving power to control spread of disease is left entirely to the agency's "judgment." 42 U.S.C. § 264(a).

20

The fathomless scope of the statute under the CDC's interpretation is exacerbated by the statute's failure to define "communicable disease." *See* 24 U.S.C. § 264. Communicable diseases, from the common cold to conjunctivitis, are always with us. Yet the statute does not limit itself to uncommon or particularly virulent or dangerous diseases. As a result, any activity that may end up passing the sniffles from one person to another would appear to fit within the agency's discretion to regulate.

Further, the statute does not limit the agency's authority to times of emergency, such as an outbreak or epidemic. Rather, the agency has authority to limit spread where no clear danger of a serious epidemic exists. Since the risk of disease transmission never sleeps, the statute appears to give the agency extraordinary authority to wield however it wants, whenever it wants. The result is an ever-ready font of power that the CDC may draw from at will.

This reading of the statute goes far beyond determining facts or carrying out an articulated legislative policy. The statute does not, for instance, give the agency instructions on what to do should a certain set of circumstances arise, leaving the agency to decide when those circumstances eventuate. Rather, it fails to limit the factual conditions under which the authority can be exercised, since transmission of communicable disease is an ever-present risk, and it offers no guidance on the nature of actions that can be taken when factual conditions are met, leaving that to the agency's "judgment." *Id.*

Consequently, the statute, under the CDC's reading, delegates "an unfettered discretion to make whatever laws [the agency] thinks may be needed or advisable." *Schechter*, 295 U.S. at 537–38. The statute would allow the agency to shut down widespread and commonplace activity at any time, given that communicable disease is always lurking, however small the risk or minor the disease. The statute's lack of specific standards by which to guide the agency is all the more

21

troubling given the extraordinary scope of power the CDC's interpretation assumes and the criminal sanctions the eviction moratorium imposes. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2001) (stating that "the degree of agency discretion that is acceptable varies according to the scope of the power . . . conferred"); *Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986) (stating that where the scope of power "increases to immense proportions (as in *Schechter*) the standards must be correspondingly more precise"); *United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring in the result) (stating that courts should exercise less tolerance for nebulous grants of power "when the regulation invokes criminal sanctions and potentially affects fundamental rights"); *Midwest Institute of Health v. Governor of Michigan*, No. 161492, slip op. at 29 (Mich. S. Ct. Oct. 2, 2020) (striking down legislative delegation of emergency powers to a governor in part of because of the breadth of the power delegated, which granted "power to reorder social life and to limit, if not altogether displace, the livelihoods of residents across the state and throughout wide-ranging industries").

## C. The CDC's eviction moratorium violates the APA's notice and comment requirement.

The CDC Order is void because it was issued without a notice and comment period in violation of the Administrative Procedure Act (APA).[4] The Order is unquestionably a "rule" subject to the APA's notice and comment requirements because it has the *force of law*—affecting the rights and legal relations of people nationwide. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). And the CDC's choice to label this rule as an "order" is irrelevant. "[C]ourts have long looked to the contents of the agency's action, not the agency's self-serving label, when

---

[4] The APA's notice and comment requirements serve vital functions. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979).

deciding whether statutory notice-and-comment demands apply." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).

The CDC cannot issue a rule reshuffling the legal rights of millions of landlords and tenants without—at the very least—going through notice and comment. *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) ("If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid."). Nonetheless, the CDC claims that it could bypass notice and comment procedures because it had "good cause." The CDC claims that it was impractical to provide a notice and comment because immediate action was necessary. But this argument is pretextual. *See United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

COVID-19 represents a serious public health threat. However, the CDC has known about COVID-19 since January 2020.[5] The CDC's publication in the Federal Register fails to provide any justification for why it was *suddenly* necessary to issue the Order on an "emergency" basis nine months into this pandemic. The fact is that the CDC had plenty of time to provide a public notice and comment period.

**D.    The CDC's eviction moratorium is arbitrary and capricious.**

The CDC Order should also be set aside under the APA because the decision to issue the Order was arbitrary and capricious. 5 U.S.C. § 706. First, the CDC asserts that a four-month nationwide moratorium was necessary because the states and local authorities had taken inadequate action to prevent the spread of COVID-19. But there is no substantial evidence in the record supporting that conclusion. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

---

[5] The first confirmed COVID-19 case on American soil was confirmed on January 21, 2020. But the CDC knew even before then that we were facing a global pandemic. Erin Schumaker, Timeline: How Coronavirus Got Started, ABC News, https://abcnews.go.com/Health/timeline-coronavirus-started/story?id=69435165.

Cir. 2007) (defining "substantial evidence" to mean "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). The CDC assumes that in the absence of an evictions moratorium there will be a wave of evictions that will result in more individuals becoming homeless, and therein contributing to the spread of COVID-19 among homeless populations. Yet, nothing in the record establishes that landlords were moving to evict tenants en masse, that those tenants would become homeless, or that the newly vacant units would not immediately be put to use housing others in need of a home.

The Order is also arbitrary and capricious because it does not substantially advance the CDC's cited public concern. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (emphasizing that there must be a "rational connection between the facts found and the choice made"). On the contrary, the Order may affirmatively undermine the CDC's cited public health goals because it is possible that, with a moratorium on evictions in place, landlords may be more selective in screening out prospective tenants with questionable credit—which would make it more difficult for low-income individuals to secure housing. But the CDC failed to even consider this possibility because it failed to consult experts in the field of housing or to solicit public comment from landlords. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (affirming that agency action is arbitrary and capricious where the agency fails to consider an important aspect of the problem). And in any event, there is no way that a four-month moratorium on evictions will do anything meaningful here; if anything, the Order has just forestalled evictions that would otherwise take place until the dead of winter, while all indications remain that the COVID-19 pandemic will continue into 2021.

24

## II.    Without an Injunction, Plaintiffs Will Suffer Irreparable Harm.

The CDC eviction moratorium causes Plaintiffs irreparable harm for three independent reasons.

First, the eviction moratorium violates the Constitution. Where constitutional claims are alleged, courts "presume irreparable harm." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). *See also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Here, the CDC eviction moratorium violates the separation of powers because it amounts to the CDC making law. As the Supreme Court has made clear, the separation of powers "serves not only to make Government accountable but also to secure individual liberty." *Boumediene v. Bush*, 553 U.S. 723, 742 (2008). *See also Bond v. United States*, 564 U.S. 211, 222 (2011) (recognizing "an injured person's standing to object to a violation of a constitutional principle that allocates power within government" where "individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations"); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) (recognizing parties' right to ensure that laws will be enforced only by "a constitutional agency accountable to the Executive" under Article II); *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."). The CDC eviction moratorium also interferes with the relationship between the federal government and the states by imposing criminal liability on Plaintiffs' use of an entirely legal method of addressing violations of their lease agreements and property rights. Ohio law specifically protects the right to access the courts in order to evict tenants and protect property rights. *See* Ohio Rev. Code Ann. tit. XIX, Ch. 1923; Ohio Rev. Code Ann. § 5321.03. Yet the eviction moratorium effectively closes the courthouse door on Plaintiffs, thus preventing them from redressing the violation of their property and contract rights. *See Christopher v. Harbury*,

536 U.S. 403, 413–15 (2002) (holding that a person is denied their right of access to courts where (1) they have a sound underlying cause of action; and (2) an official action has frustrated that litigation). Federalism, just as the separation of powers, protects liberty. *See Bond*, 564 U.S. at 222.

Second, Plaintiffs face irreparable injury because they cannot regain possession of their property. *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001) (finding that a plaintiff would sustain irreparable injury through loss of a unique real property, but denying a preliminary injunction on other grounds); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (holding that "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity"); *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 256 (3d Cir. 2011) ("[W]here 'interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest.'") (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (holding that where loss of real property was at issue, irreparable harm existed); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (finding that damage to real estate, because of its inherent uniqueness, constituted irreparable harm). The Order affects Plaintiffs' property rights by abrogating their right to exclude, a fundamental aspect of property rights. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (recognizing the right to exclude as "universally held to be a fundamental element of the property right"). Accordingly, disallowing possession of one's property constitutes irreparable injury. *See East Tennessee Nat.*

*Gas Co. v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004) (gas company's inability to immediately possess condemned property was irreparable harm).

Third, harm is irreparable "when it is shown that the defendant is likely to be insolvent at the time of judgement." *Performance Unlimited, Inc. v. Questar Publishers*, *Inc*., 52 F.3d 1373, 1382 (6th Cir. 1995). *See also Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1292 (N.D. Ohio 1991), *aff'd*, 973 F.2d 507 (6th Cir. 1992) (holding that where a defendant may become insolvent before a final judgment can be collected, harm is irreparable); *Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024, 1038 (N.D. Ohio 1991) (same). Tenants who have executed Renter's Declarations and invoked the CDC eviction moratorium are necessarily insolvent, as they have sworn in their declarations that they cannot make their full rental payments due to the loss of employment or extraordinary expenses. Thus, by definition, Plaintiffs will be unable to collect the back payments.

## III.   The Public Interest and Balance of Equities Weigh in Plaintiffs' Favor

It is well settled that the public interest always supports enforcing the Constitution. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]t is always in the public interest to prevent violation of a party's constitutional rights.") (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). *See also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest.") (citation omitted); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (preliminary injunction issued to protect First Amendment rights). The same basic principle applies to the balance of equities. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (concluding that, where there is a likelihood of success on the merits in a case involving a constitutional question, the balance of

equities favors an injunction because it is "questionable whether [there can be] any 'valid' interest in enforcing" an unconstitutional rule); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 928 (6th Cir. 2020) (finding that speculative claims about COVID-19 risks cannot outweigh concrete harms to constitutional liberties). Because this case involves serious questions concerning the CDC's statutory and constitutional authority and Plaintiffs have demonstrated a likelihood of success on the merits, the public interest and the equities weigh in favor of enjoining the eviction moratorium.

The government will no doubt argue that preventing the spread of disease is within the public interest and therefore the balance of equities weighs in its favor. While it is true that preventing disease serves the public interest, it does not follow that foisting the costs of preventing the spread of disease on a small minority of the public is either equitable or within the public interest. Indeed, forcing landlords to bear the costs of preventing a public health problem is the very definition of inequitable. *Cf. Armstrong v. United States*, 364 U.S. 40, 49 (1960) (The Fifth Amendment's Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). Likewise, it is neither equitable nor in the public interest to cut off Plaintiffs' access to a legal process for enforcing their rights under state law. *Cf. Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (affirming that state statutes generally serve legitimate public interests for which federal law must generally respect); *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) (affirming the right of access to courts for legitimate legal claims). Indeed, a large part of the reason eviction proceedings exist is to prevent "self-help" and to ensure that individuals can regain possession of their land through a civil process governed by law. *See State ex rel. Pizza v. Rezcallah*, 702 N.E.2d 81, 131 (Ohio 1998) ("[L]andowners are not completely free to act as

28

they choose due to landlord-tenant laws and other limitations on self-help evictions."). By denying all landlords the right to utilize this process, the CDC has not only abrogated state law, it has acted contrary to the State of Ohio's view of what is, in fact, in the public's interest.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted.

---

[6] This Court should also waive any bond requirement, under Rule 65. A district waives the bond requirement when it concludes there is no realistic likelihood of harm to the defendant based on the injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1089 (9th Cir. 2009). *See also Moltan Co. v. Eagle Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (holding that "[t]he rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security").

DATED: November 2, 2020.

Respectfully submitted:

<u>/s/ MAURICE A. THOMPSON</u>
MAURICE A. THOMPSON
(0078548)
1851 Center for Constitutional Law
122 E Main St.
Columbus, OH 43215
Tel: (614) 340-9817
Mthompson@ohioconstitution.org

STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*
Washington State Bar No. 52692
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Tel: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org
EBlevins@pacifclegal.org
HMarcley@pacificlegal.org

*_Pro hac vice_ applications pending

_Attorneys for Plaintiffs_

30

**CERTIFICATE OF SERVICE**

I certify that on this 2nd day of November, 2020, I served copies of the foregoing on

counsel for all Defendants in this action pursuant to Federal Rule of Civil Procedure

5(b)(2)(C) delivering copies to the U.S. Postal service to be sent by mail to:

Leslie Cooper Vigen
Steven A. Meyers
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-0727
Fax:  (202) 616-8470
E-mail:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

By */s/* MAURICE A. THOMPSON
MAURICE A. THOMPSON