IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SKYWORKS, LTD, ET AL.,          :
                                :        CIVIL ACTION NO.:
                                :        5:20-CV-2407-JRA
                                :
            Plaintiffs,         :
                                :
        v.                      :
                                :
U.S. CENTERS FOR DISEASE        :
CONTROL AND PREVENTION, ET AL., :
                                :
            Defendants.         :

### *AMICI CURIAE* THE NEW CIVIL LIBERTIES ALLIANCE, THE NATIONAL APARTMENT ASSOCIATION AND THE NATIONAL ASSOCIATION OF RESIDENTIAL PROPERTY MANAGERS MOTION FOR LEAVE TO FILE AMICUS BRIEF

The New Civil Liberties Alliance, the National Apartment Association and the National Association of Residential Property Managers request leave to file a brief in support of Plaintiffs' motion for a preliminary injunction. In support *amici curiae* state as follows:

1.    The New Civil Liberties Alliance (NCLA) is a nonpartisan, nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, the right to be tried in front of an impartial and independent judge, and the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication— precisely because Congress, federal administrative agencies like CDC, and sometimes even the courts have trampled them for so long.

2.    NCLA views the administrative state as an especially serious threat to civil liberties. No other current aspect of American law denies more rights to more Americans. Although Americans still enjoy

the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concerns.

3.     The National Apartment Association (NAA) is the leading national advocate for quality rental housing. NAA is a federation of more than 170 state and local affiliated associations, representing more than 85,000 members responsible for more than 10 million rental units throughout the United States. NAA has members in all 50 states. NAA is the largest broad-based organization dedicated solely to rental housing. In addition to providing professional industry support and education services, NAA and its affiliated state and local associations advocate for fair governmental treatment of multifamily residential businesses nationwide.

4.     The National Association of Residential Property Managers (NARPM) was founded in 1988, and represents over 5,000 residential property managers nationwide, by providing a permanent trade association for the residential property management industry. The organization is dedicated to its members' high standard of business ethics and professionalism, while offering quality education and enhanced fair housing practices throughout the industry.

5.     *Amici* write separately to emphasize two critical points. First, CDC's Order is a breathtaking arrogation of power by an administrative agency under a flimsy pretense of protecting public health. The Order upends constitutional order and runs roughshod over the civil liberties the Founders held dear. Indeed, CDC has tried to do something that should be unimaginable in our system of Federalism—An administrative agency has unilaterally *criminalized* the use of state court processes in all 50 states.

6.     Second, the irreparable harm suffered by Plaintiffs will devastate the nationwide rental market. Property owners will lose their livelihoods. Employees will lose their jobs. And rental properties across the country will be taken off the market. This will trickle down to all tenants—making rental housing

more scarce and more expensive. The CDC Order will usher in a new housing crisis, all because CDC has departed from its core function as a public health organization and cast itself as the sole arbiter of national housing policy.

7.    Counsel for *amici* has contacted counsel for all parties concerning this Motion. Counsel for Plaintiffs consent to the filing of this brief. Counsel for Defendants take no position.

8.    No counsel for any party authored the brief in whole or in part and no party made any monetary contribution intended to fund the preparation or submission of this motion and proposed brief.

9.    *Amici*'s proposed brief is attached as Exhibit A.

WHEREFORE this Court should grant *amici* leave to file the attached brief in support of Plaintiffs' motion for a preliminary injunction.

November 17, 2020

                              Respectfully,


                              */s/ Cory J. Martinson*
                              **MICHAEL R. RASOR (0086481)**
                              mrasor@cavitch.com
                              **CORY J. MARTINSON (0095586)**
                              cmartinson@cavitch.com
                              CAVITCH, FAMILO & DURKIN CO., L.P.A.
                              1300 East Ninth Street
                              Twentieth Floor
                              Cleveland, Ohio 44114
                              T:      216.621.7860
                              F:      216.621.3415

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
Motion for Admission *Pro Hac Vice* Forthcoming
Counsel for Proposed *Amici*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of

record.

*/s/ Cory J. Martinson*
**CORY J. MARTINSON (0095586)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SKYWORKS, LTD, ET AL.,                    :
                                          :        CIVIL ACTION NO.:
                                          :        5:20-CV-2407-JRA
                                          :
                 Plaintiffs,              :
                                          :
            v.                            :
                                          :
U.S. CENTERS FOR DISEASE                  :
CONTROL AND PREVENTION, ET AL.,  :
                                          :
                 Defendants.              :

### BRIEF OF *AMICI CURIAE* THE NEW CIVIL LIBERTIES ALLIANCE, THE NATIONAL APARTMENT ASSOCIATION AND THE NATIONAL ASSOCIATION OF RESIDENTIAL PROPERTY MANAGERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The CDC Eviction Moratorium Order is an unprecedented exercise of claimed agency power that far exceeds what Congress bestowed upon the agency. With the stroke of a pen, and without even using notice-and-comment rulemaking, the agency *criminalized* the use of state laws across the country. The Order is a gross abuse of, and wildly exceeds, the agency's legitimate authority. In the process, the Order has violated the constitutional right to access the courts for housing providers across the country.

The Order will also devastate the nationwide rental housing market. Property owners could incur *billions* of dollars in unrecouped losses, causing many of them to go out of business and eliminate jobs for hardworking people. Housing stock will fall, and renters, particularly those in the neediest communities, will be unable to find available homes. This Court should not allow CDC to deprive housing providers of the right to access courts, nor to create a new housing crisis through its unlawful Order.

## I. THE INTERESTS OF *AMICI CURIAE*

The New Civil Liberties Alliance (NCLA) is a nonpartisan, nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, the right to be tried in front of an impartial and independent judge, and the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, federal administrative agencies like CDC, and sometimes even the courts have trampled them for so long.

NCLA views the administrative state as an especially serious threat to civil liberties. No other current aspect of American law denies more rights to more Americans. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concerns.

The National Apartment Association (NAA) is the leading national advocate for quality rental housing. NAA is a federation of more than 170 state and local affiliated associations, representing more than 85,000 members responsible for more than 10 million rental units throughout the United States. NAA has members in all 50 states. NAA is the largest broad-based organization dedicated solely to rental housing. In addition to providing professional industry support and education services, NAA and its affiliated state and local associations advocate for fair governmental treatment of multifamily residential businesses nationwide.

The National Association of Residential Property Managers (NARPM) was founded in 1988 and represents over 5,000 residential property managers nationwide, by providing a permanent trade association for the residential property management industry. The organization is dedicated to its

members' high standard of business ethics and professionalism, while offering quality education and enhanced fair housing practices throughout the industry.

*Amici* write separately to emphasize two critical points. First, CDC's Order is a breathtaking arrogation of power by an administrative agency under a flimsy pretense of protecting public health. The Order upends constitutional order and runs roughshod over the civil liberties the Founders held dear. CDC has tried to do something that should be unimaginable in our system of Federalism—an administrative agency has unilaterally *criminalized* the use of state court processes in all 50 states.

Second, the Order could devastate the nationwide rental market. Property owners will lose their livelihoods. Employees will lose their jobs. And rental properties across the country will be taken off the market. This will trickle down to all tenants—making rental housing more scarce and more expensive. The CDC Order will usher in a new housing crisis, all because CDC has departed from its core function as a public health organization and cast itself as the sole arbiter of national housing policy.

## II. Plaintiffs Are Likely to Succeed on the Merits

CDC's attempt at rebalancing the economic hardship caused by the pandemic is all the more offensive to liberty because it was enacted in defiance of core constitutional limits, and, indeed, is an *ultra vires* agency action. CDC's action departs from constitutional order and exceeds appropriate limits on the actions of an administrative agency. This Court must reject CDC's arrogation of power and enjoin the Order.

### A. The CDC Order Is *Ultra Vires*

"Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 756-57 (1996). Thus, "an agency literally has no power to act … unless and until

3

Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

CDC's Order is purportedly authorized by 42 U.S.C. § 264 and 42 C.F.R. § 70.2, but neither grants the agency the authority to unilaterally void state laws nationwide. Section 264(a) says that the Surgeon General may "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" between states. In particular, the statute allows for "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.*

The regulation, in turn, allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection" when she "determines that the measures taken by health authorities of any State" "are insufficient to prevent the spread of any of the communicable diseases [.]" 42 C.F.R. § 70.2.

Neither § 264(a) nor § 70.2 authorizes CDC to issue a nationwide eviction moratorium. At most, those provisions allow limited orders related to certain disease control measures, but they do not justify a wholly unrelated ban on legal eviction proceedings. Traditional canons of construction show that CDC lacks the authority it needs to hold out the Order as the supreme law of the land.

Both the statute and regulation speak in terms of "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," 42 U.S.C. § 264(a); 42 C.F.R. § 70.2, all of which are far afield from *eviction procedures under state law*. "The *noscitur a sociis* canon instructs that when a statute contains a list, each word in that list presumptively has a 'similar' meaning." *Yates v. United States*, 574 U.S. 528, 549 (2015) (Alito, J., concurring) (citing *Gustafson v. Alloyd Co.*, 513 U.S.

561, 576 (1995)). "A related canon, *ejusdem generis* teaches that general words following a list of specific words should usually be read in light of those specific words to mean something 'similar.'" *Id.* at 550 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012)). Together, these principles "ensure[] that a general word will not render specific words meaningless," as "Congress would have had no reason to refer specifically" to an enumerated act but then allowed "dissimilar" acts to come along for the ride. *Yates*, 574 U.S. at 546 (plurality op.). "Had Congress intended [an] all-encompassing meaning" "it is hard to see why it would have needed to include the examples at all." *Id.* (citation omitted). While the text speaks in term of "fumigation," "pest extermination," and "destruction of animals … found to be so infected," 42 U.S.C. § 264(a), rewriting property laws nationwide bears no relationship with the disease-control measures envisioned in the text. Voiding state eviction laws, of course, bears no relationship to "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," and thus would extend the term "other measures as … may be necessary" far beyond the outer limits of any rational reading. *See* 42 U.S.C. § 264(a).

Further, because the Order comes with the threat of *criminal prosecution* for those who attempt to use state law, if this Court concludes that the text ambiguously empowers CDC's actions, it must apply the rule of lenity and limit the scope of the Order. "When, in criminal cases, the tools of statutory interpretation do not resolve a question, where significant doubt or uncertainty lingers, we must construe the provision in favor of the defendant." *United States v. Canelas-Amador*, 837 F.3d 668, 674 (6th Cir. 2016). "This principle—the rule of lenity—has roots deep within the Anglo–American legal tradition, and it 'embodies the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should.'" *Id.* (quoting *United States v. Bass*, 404 U.S. 336, 348 (1971). As Chief Justice John Marshall explained nearly two centuries ago,

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the

5

legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).

To the extent that there is any ambiguity in the phrasing "inspection, fumigation, disinfection," etc., the language must be construed against CDC given the criminal penalties the Order imposes. If the language were read to allow the eviction moratorium, CDC could consolidate both legislative and executive functions in a single branch and create new criminal law where none existed before. CDC is explicit that those who violate the Order face criminal consequences, including up to a year in prison and hundreds of thousands of dollars in fines. *Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19*, 85 Fed. Reg. 55292, 55296 (Sept. 4, 2020). But processing evictions under state law is undoubtedly a lawful exercise of the states' legislative judgment. And it is certainly not *criminal* in the eyes of Congress. Vesting unilateral authority to say otherwise and to imprison citizens for *following state law* based on the thinnest reed of being "necessary" for disease control violates lenity. *See Yates*, 574 U.S. at 548. Indeed, just as in *Yates*, where the Court concluded that a discarded fish was not a "tangible object" under the Sarbanes-Oxley Act, "if our recourse to traditional tools of statutory construction leaves any doubt about the meaning of 'tangible object,' as that term is used in [the statute], we would invoke the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* (citation omitted).

Even if the provisions *could* be read so broadly as to allow the Order, CDC's actions fail the textual limit of being "reasonably necessary." Section 70.2 requires CDC to first determine that "measures taken by health authorities of any State … are insufficient to prevent the spread of any of the communicable diseases from such State." But CDC's findings are woefully inadequate. CDC relies on the outlandish leap in imagination that because "mass evictions" and "homelessness" might increase the likelihood of COVID-19 infection, then allowing any number of evictions in any state is

insufficient to prevent the spread of the disease. *See* 85 Fed. Reg. at 55294-96. Such catastrophizing hardly follows basic logic. Why should a single eviction following ordinary process necessarily result in "mass evictions," much less mass homelessness? And why should courts assume that newly evicted individuals will not find less expensive (or perhaps fully subsidized) housing? CDC has not established a factual basis for its assumption that newly evicted individuals might mingle with others in a way dangerous to public health.

CDC hardly bothers to suggest that states have undertaken "insufficient" measures by simply allowing eviction processes, irrespective of other mitigation strategies. CDC asserts that because a nationwide halt to evictions could help slow spread of the disease, jurisdictions "that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19." 85 Fed. Reg. at 55296. That is a fallacy. Even if an eviction moratorium *could* prevent infections, that hardly means a jurisdiction allowing evictions has had an "insufficient" response to the disease.

CDC's inadequate explanation breaks down even more when considering what it omits. Nowhere does CDC even mention any of the efforts taken by *any* jurisdiction to combat COVID-19. Nowhere does it explain why allowing eviction proceedings, more than any other purported lacuna in prevention strategies, represents the line that states may not cross. CDC has cited *no* evidence that any infection has arisen because of an eviction proceeding.[1]

CDC also fails to show that the Order is "reasonably necessary" to prevent the spread of disease. Even if one accepts the premise that mass homelessness could create an uptick in COVID-19 infections, why is an eviction moratorium "necessary" to stop it? There is no evidence that allowing normal processes to play out would cause "mass evictions," much less catastrophic homelessness.

---

[1] Instead, CDC asserts that COVID-19 infection rates are concerning in homeless populations. 85 Fed. Reg. at 55295. This hardly proves that eviction proceedings *must* be stopped, and that state mitigation strategies are inadequate if they also allow for evictions.

And there is even less evidence that suspending all evictions nationwide is "necessary" to stop this imagined wave of mass homelessness. There are simply too many leaps in logic and evidence to support such an overwhelming show of federal authority. CDC has made little effort to show the *necessity* of its eviction ban. If that is all "necessity" means, then CDC can take any action it can conceive of as long as it theoretically might benefit public health.

In fact, CDC is careful never to actually say that the moratorium is necessary—the closest it comes is saying that "[i]n the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease." 85 Fed. Reg. at 55294. But even this tepid statement has no real evidentiary support. As discussed, CDC relies on hyperbole—saying that "mass evictions" and "homelessness" might increase the likelihood of COVID-19, and thus that that the *only* appropriate course of action is to halt evictions nationwide. *See* 85 Fed. Reg. at 55294-96. CDC does not explain why other remedial measures are inadequate. Attending school in person and patronizing bars might increase the risk of infection. Yet CDC's Order addresses only evictions as if they were the sole—or even a significant—factor in the spread of the disease.

CDC's data actually suggests that evictions are hardly the most pressing concern for virus containment. CDC says the obvious—"The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks." 85 Fed. Reg. at 55293. And it says "quarantine, isolation, and social distancing" are sound strategies for reducing transmission. *Id.* at 55294. But that evidentiary thread could only be sufficient to support restrictions that actually address "people who are in close contact with one another." CDC has simply not shown that an eviction leads to homelessness and, in turn, makes close contact more likely. But

many daily activities, like shopping, dining, school, worship, etc., clearly do implicate physical proximity.

In short, CDC's Order cannot be justified by its statutory and regulatory source. The members of NAA and NARPM must not be subjected to the threat of crippling fines and criminal prosecution from this unlawful Order, and this Court should enter an injunction.

**B. The CDC Order Violates Plaintiffs' Right to Access the Courts**

"The Constitution promises individuals the right to seek legal redress for wrongs reasonably based in law and fact." *Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020); *see also Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."). The right is grounded in Article IV's Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth and Fourteenth Amendment Due Process Clauses, and the Fourteenth Amendment's Equal Protection Clause. *Christopher*, 536 U.S. at 415 n.12. Regardless of the specific source, citizens have a fundamental right of "access to the courts." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *accord Christopher*, 536 US. at 414.

Typically, claims of denial of access to the courts involve "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher*, 536 U.S. at 413. Such a claim "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415. When a government official erects barriers that constitute a "complete foreclosure of relief" for a valid underlying action, the government has denied a plaintiff's right to access the courts. *Harer*, 962 F.3d at 311-12. After all, "[o]f what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom door can be hermetically sealed against him by a functionary who, by refusal or neglect, impedes the filing of his papers?" *McCray v. State of Md.*, 456 F.2d 1, 6 (4th Cir. 1972).

Perhaps the most famous case involving the right to access is also the most applicable here. In *Boddie v. Connecticut*, 401 U.S. 371, 372, 374, 380 (1971), the Supreme Court invalidated a state law requiring prepayment of filing fees for divorce proceedings because it foreclosed the "sole means … for obtaining a divorce" for indigent litigants. "[D]ue process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id.* at 374; *see also Christopher*, 536 U.S. at 413 (citing *Boddie* as an access-to-courts case).

The *Boddie* decision ensures that classes of litigants are not locked out of the courthouse. A law requiring a litigant to post a bond to access a trial in a court of record was invalid, because it was "the only effective means of resolving the dispute at hand." *Lecates v. Justice of Peace Court No. 4 of State of Del.*, 637 F.2d 898, 908 (3d Cir. 1980) (citation omitted). So too was a public school barred from requiring a tenured teacher to pay for the costs of a disciplinary proceeding, as there was no way for a teacher to "exercise" his rights "other than in a manner penalizing those seeking to assert it." *Rankin v. Indep. Sch. Dist. No. I-3, Noble Cty., Okla.*, 876 F.2d 838, 841 (10th Cir. 1989). Courts have recognized that the constitutional guarantee does not rely "solely on the fundamental nature of the marriage relationship" but instead turns on whether "(1) resort to the courts is the sole path of relief, and (2) governmental control over the process for defining rights and obligations is exclusive." *Lecates*, 637 F.2d at 908-09. Indeed, even a limited property interest in continuing employment as a teacher was of equal weight as the interest in obtaining a divorce in *Boddie. Rankin*, 876 F.2d at 841.

While Plaintiffs rightly argue that the CDC Order raises "severe constitutional concerns" concerning the non-delegation doctrine, the Commerce Clause and the Tenth Amendment (*see* Pl. Mem. of Law, ECF No. 12 at 16-17), the Order also deprives housing providers of their constitutional right to access the courts. Indeed, the members of NAA and NARPM have suffered, and will continue to suffer from having been unconstitutionally deprived of state court process. Many of these members have undisputed rights to evict their tenants under state law but have been totally barred by the Order

from exercising those rights. If not for CDC's Order, these members would be fully entitled to have their tenants ejected from their properties so that they could either use them or seek solvent tenants.

Moreover, the Order constitutes a "complete foreclosure of relief" for these affected housing providers because it denies them the *only* lawful means of regaining possession of their property. *See Harer*, 962 F.3d at 311-12. Across the country jurisdictions have forbidden property owners from evicting tenants, either physically or constructively, outside of the court process. "[T]he growing modern trend holds that self-help is never available to dispose of a tenant." Shannon Dunn McCarthy, *Squatting: Lifting the Heavy Burden to Evict Unwanted Company*, 9 U. Mass. L. Rev. 156, 178 (2014). Eviction proceedings are the sole means for nearly all of NAA's 85,485 members and NARPM's more than 5,000 member companies to retake possession of their property.

The CDC Order has thus deprived these housing providers of their only path for recovery of their property. Because the "governmental control over the process for defining rights and obligations" for evictions "is exclusive," see *Lecates*, 637 F.2d at 908-09, and the Order has closed the "only effective means of resolving the dispute at hand," see *Boddie*, 401 U.S. at 376, this Court should enjoin the Order to stop this massive constitutional violation.

## III. HOUSING PROVIDERS ACROSS THE COUNTRY HAVE SUFFERED IRREPARABLE INJURY BY BEING UNLAWFULLY DEPRIVED OF THEIR PROPERTY

Plaintiff housing providers are correct that, as individual entities affected by the CDC Order they are suffering "irreparable harm" from being subjected to CDC's unlawful and unconstitutional Order. (*See* Pl. Mem. of Law, ECF No. 12 at 25). *Amici* write separately to emphasize that housing providers throughout the United States are being subjected to dire harms. NAA and NARPM have members across the country who have suffered the loss of their unique property and all associated economic value until the Order is no longer in effect. At the same time, these members must incur additional costs by housing the tenants who are in wrongful possession. They are trapped in a one-

sided agreement with no remedy and they will never be able to recover their losses from the tenants or anyone else. And these economic harms spring from a fundamentally unlawful government action, which deprives housing providers of their constitutional right to access the courts.

Even more than the irreparable harms suffered by the individual members of NAA and NARPM, the entire housing market will also suffer serious hardship because of the CDC Order. Housing providers face an estimated $30 *billion* shortfall in rental payments through the end of the year, that, because of the Order, they will be unable to mitigate. Many of the members of NAA and NARPM will be forced to eliminate jobs for hardworking Americans and in some instances, declare bankruptcy. Many more will be forced to sell rental properties. All of this will create an economic catastrophe as well as a looming shortage of rental housing. These serious, irreparable, consequences, must be mitigated by a preliminary injunction against the CDC Order.

"An injury is irreparable if it cannot be undone through monetary remedies." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (citation omitted). "The impending loss or financial ruin of [a] business constitutes irreparable injury." *Id.* So too is the likely loss of business and customer good will. *See Southern Glazer's Distrib. of Ohio v. Great Lakes Brewing*, 860 F.3d 844, 853 (6th Cir. 2017) ("loss of customer goodwill is a prime example of intangible, irreparable harm."). Harm is also irreparable when "it is shown that the defendant is likely to be insolvent at the time of judgement." *Performance Unlimited, Inc.*, 52 F.3d at 1382 (citation omitted).

Further, courts across the country have recognized that being deprived of your residential property is a *per se* irreparable injury. "Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citing authorities); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) ("Because real property is at issue and because [the plaintiff] cannot raise its claim for injunctive relief

12

to prevent the taking of its property in the valuation proceeding, [the plaintiff] has shown a threat of irreparable injury."). "As for the adequacy of potential remedies, it is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *Brooklyn Heights Ass'n, Inc. v. National Park Service*, 777 F.Supp.2d 424, 435 (E.D.N.Y.2011); *see also Watson v. Perdue*, 410 F. Supp. 3d 122, 131 (D.D.C. 2019) (same).

The members of NAA and NARPM have already faced irreparable injuries from the CDC Order because they have been unlawfully deprived of their unique real property, while being forced to incur additional costs of providing housing for renters who have declared under penalty of perjury that they are incapable of paying any of these costs back to the property owners. Worse, the numbers of housing providers nationwide who suffer from these harms will rise dramatically in the coming months, threatening the viability of the industry, forcing companies to reduce staff and even declare bankruptcy. These harms will be felt in communities across the nation.

There are currently an estimated 43,811,786 renter-occupied housing units in the United States. Approximately 86% of those units are occupied by tenants with annual household incomes below $100,000. Recent studies have estimated that because of the economic downturn associated with COVID-19, there will be a nationwide shortfall of rental payments over the next four months of up to $28,821,000,000. Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction*, https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjFmOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsImMiOjN9 (last visited November 16, 2020).

NAA and NARPM have members in jurisdictions across the country with tenants in default of their leases for nonpayment of rent. Overwhelmingly, these members are unable to access lawful

eviction proceedings because of the CDC Order. Because of the CDC Order, the members of both organizations have suffered significant economic damages, including unpaid rent and fees, as well as monthly maintenance costs, damages to their property and the lost opportunity to rent or use their properties at fair market value. These members will be unlikely to obtain any economic relief or damages from their tenants once the CDC Order expires at the end of December because, by definition, any tenant presenting an appropriate attestation will be insolvent. Indeed, the CDC Order *requires* the tenant to be insolvent and "unable to pay the full rent … due to a substantial loss of household income" and using "best efforts to make timely partial payments" before it applies. 85 Fed. Reg. at 55293. NAA and NARPM's members, however, have tenants who have paid *nothing* at all in reliance on this Order. They have sworn, therefore, that they have no means to repay their housing providers. The only opportunity the members of NAA and NARPM have to mitigate their losses will be from ousting their tenants who are in wrongful possession of the premises.

As the CDC Order continues, the long-term viability of the rental market will be at risk. NAA's members, particularly those who provide Class C properties, will face an existential crisis if they are required to carry the approximately $28 *billion* rent shortfall through the end of the year while continuing to incur substantial costs to provide housing to tenants who refuse to pay anything at all. This will limit the availability of rental units for everyone. Moreover, it will eventually force many property owners to make the difficult decision to leave the rental market entirely—permanently eliminating the availability of housing, particularly in low-income communities that desperately need affordable housing. Hardworking people who pay their rent will be forced to leave their homes when housing providers go out of business or sell their properties but will then find it more difficult to find new housing. Americans will face a new housing crisis, but one *caused* by CDC's Order.

NARPM's members will likewise face a threat to their entire industry. Many of NARPM's more than 5,000 members are small businesses that specialize in the management of single-family

detached homes. The Urban Institute, citing Investability, estimates that 45% of the owners in this asset class own just 1 property and just under 60% own 1 or 2 properties. Urban Wire, Urban Institute, *Five Things That Might Surprise You About the Fastest-growing Segment of the Housing Market* (Oct. 3, 2017), *available at* https://www.urban.org/urban-wire/five-things-might-surprise-you-about-fastest-growing-segment-housing-market. Moreover, the same study estimates that over 75% of the owners in this class own 5 properties or less. *See id.*

Because many of NARPM's members manage property held by individual owners, if the owners are forced to go months on end without rent would represent an overwhelming hardship. Even one unit represents a significant portion of the income stream for smaller owners. These owners are still responsible for mortgages, taxes, and maintenance of the residential unit. With expenses remaining, the loss of revenue could force some of these owners to declare bankruptcy.

Rent also comprises the source of management fees critical to NARPM members' business. These fees keep their businesses afloat, allowing them to meet their business obligations, including payroll. When tenants have no obligation to pay rent, every person who supports rental housing suffers. In the end, leasing agents, maintenance workers, and others will lose their jobs because CDC has decided that their economic security should be traded for that of tenants.

CDC has no business setting housing policy, and it shows. Under the pretext of protecting public health, CDC has created a perfect storm for an economic collapse in the rental market. This Court should enjoin CDC's unlawful Order to stop these harms from spiraling out of control.

## IV. CONCLUSION

For the reasons set out above, the Court should grant Plaintiffs' motion and enter a preliminary injunction against the CDC Order.

November 17, 2020

Respectfully,

*/s/ Cory J. Martinson*
**MICHAEL R. RASOR (0086481)**
mrasor@cavitch.com
**CORY J. MARTINSON (0095586)**
cmartinson@cavitch.com
CAVITCH, FAMILO & DURKIN CO., L.P.A.
1300 East Ninth Street
Twentieth Floor
Cleveland, Ohio 44114
T:      216.621.7860
F:      216.621.3415


*/s/ Caleb Kruckenberg*
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
Motion for Admission *Pro Hac Vice Forthcoming*
Counsel for Proposed *Amici*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of

record.

/ s/ Cory J. Martinson
**CORY J. MARTINSON (0095586)**