**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SKYWORKS, LTD., *et al.*,

    Plaintiffs,

        v.

CENTERS FOR DISEASE CONTROL AND
PREVENTION, *et al.*,

    Defendants.

Case No. 5:20-cv-2407-JRA

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................2

   I.   Statutory and Regulatory Background ................................................................2

   II.  The COVID-19 Pandemic .............................................................................4

   III. The CDC Order ........................................................................................6

   IV. Plaintiffs' Claims .......................................................................................9

ARGUMENT ..........................................................................................................9

   I.   Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief. .............................9

      A.   Plaintiffs Have Not Shown Irreparable Injury. ..........................................10

         1.   The Mere Assertion of Constitutional Theories Does Not Establish Irreparable Injury. ...............................................................................................10

         2.   The Order Does Not Interfere With Plaintiffs' Right of Possession Of Their Property. ............................................................................................11

         3.   Plaintiffs' Alleged Economic Losses Are Compensable. ...........................12

      B.   Plaintiffs Have Not Shown A Likelihood of Success on the Merits. ................14

         1.   CDC Acted within Its Statutory and Regulatory Authority. .......................14

            a.   The Order falls within CDC's broad authority under the PHSA to prevent the spread of disease. ..........................................................................15

            b.   Canons of construction do not negate Congress's clear intent to provide public health experts with broad authority to prevent the spread of disease. ..........18

            c.   The interpretive presumptions to which Plaintiffs point do not apply here. ..............25

         2.   Section 361(a) Contains an Intelligible Principle and Is Thus a Valid Delegation. ........28

         3.   The Order Does Not Violate the APA's Notice-and-Comment Requirements. ...........30

         4.   The Order Is Not Arbitrary or Capricious. ..........................................32

      C.   The Injunction Plaintiffs Seek Is Contrary to the Public Interest. ...................34

   II.  Any Relief Granted Should Be Narrowly Tailored. ........................................36

CONCLUSION..................................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014) ........................................................................................28

*Air Transport Ass'n of Am. v. FAA,*
169 F.3d 1 (D.C. Cir. 1999) ..................................................................... 31, 33

*Ali v. Fed. Bureau of Prisons,*
552 U.S. 214 (2008) ...................................................................... 19, 20, 21, 22

*Auracle Homes, LLC v. Lamont,*
No. 20-00829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) .................... 23, 34

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.,*
515 U.S. 687 (1995) ................................................................................ 19, 22

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) .........................................................................................32

*Basicomputer Corp. v. Scott,*
791 F. Supp. 1280 (N.D. Ohio 1991) .............................................................13

*Bauman v. Twp. of Tittabawassee,*
No. 14-12841, 2014 WL 5499285 (E.D. Mich. Oct. 30, 2014) ......................11

*Brown v. Azar,*
No. 20-3702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) .................... passim

*Castillo v. Whitmer,*
823 F. App'x 413 (6th Cir. 2020) ...................................................................13

*Chickasaw Nation v. United States,*
534 U.S. 84 (2001) .........................................................................................20

*City of Arlington v. FCC,*
569 U.S. 290 (2013) .......................................................................................15

*Clark v. Martinez,*
543 U.S. 371 (2005) .......................................................................................26

*Council of S. Mountains, Inc. v. Donovan,*
653 F.2d 573 (D.C. Cir. 1981) .......................................................................31

*D.T. v. Sumner Cty. Sch.,*
942 F.3d 324 (6th Cir. 2019) .................................................................... 10, 13

*Davidson v. U.S. Dep't of Energy*,
    838 F.2d 850 (6th Cir. 1988) .................................................................32

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .............................................................10

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) .................................................................14

*Economou v. Physicians Weight Loss Center of America*,
    756 F. Supp. 1024 (N.D. Ohio 1991) ...................................................13

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    No. 20-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...........12, 13

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ...............................................................................33

*Friendship Materials, Inc. v. Michigan Brick, Inc.*,
    679 F.2d 100 (6th Cir. 1982) .................................................................10

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...........................................................................36

*Gonzales v. Raich*,
    545 U.S. 1 (2005) ...................................................................................27

*Gonzalez v. Oregon*,
    546 U.S. 243 (2006) ...............................................................................15

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) ...............................................................................20

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ...............................................................................26

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) .....................................................................28, 29

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*,
    960 F. Supp. 160 (C.D. Ill. 1997) .........................................................11

*Holland v. Nat'l Mining Ass'n*,
    309 F.3d 808 (D.C. Cir. 2002) .............................................................37

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1997) ...............................................................................36

*Indep. Turtle Farmers of La. v. United States*,
    703 F. Supp. 2d 604 (W.D. La. 2010) .................................................. 16, 19, 24, 25

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ......................................................................................29

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961) ......................................................................................19

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) .....................................................................31

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
    814 F. App'x 125 (6th Cir. 2020) ............................................................. 22, 35

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ................................................................... 10, 36

*Louisiana v. Mathews*,
    427 F. Supp. 174 (E.D. La. 1977) ........................................................... 15, 24

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ......................................................................................36

*Marshall v. United States*,
    414 U.S. 417 (1974) ......................................................................................17

*McNeilly v. Land*,
    684 F.3d 611 (6th Cir. 2012) .........................................................................11

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011) ..........................................................................12

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...........................................................................27, 28, 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................32

*Mount Clemens Inv. Grp., LLC v. Borman's Inc.*,
    No. 10-12679, 2010 WL 3998095 (E.D. Mich. Oct. 12, 2010) ........................12

*N.Y. Cent. Secs. Corp. v. United States*,
    287 U.S. 12 (1932) ........................................................................................29

*Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*,
    654 F.3d 654 (6th Cir. 2011) .........................................................................36

*Nat'l Broadcasting Co. v. United States,*
319 U.S. 190 (1943) ..................................................................................................29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ..................................................................................................15

*Nken v. Holder,*
556 U.S. 418 (2009) ..................................................................................................34

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
499 U.S. 117 (1991) ..................................................................................................19

*Northland Family Planning Clinic, Inc. v. Cox,*
487 F.3d 323 (6th Cir. 2007) ...................................................................................26

*N.Y. Cent. Secs. Corp. v. United States,*
287 U.S. 12, 24 (1932) ..............................................................................................29

*Overstreet v. Lexington-Fayette Urban Cty. Gov't,*
305 F.3d 566 (6th Cir. 2002) ............................................................................. 9, 10

*Owen of Georgia, Inc. v. Shelby County,*
648 F.2d 1084 (6th Cir. 1981) .................................................................................22

*Performance Unlimited v. Questar Pubs., Inc.,*
52 F.3d 1373 (6th Cir. 1995) ...................................................................................13

*P.J.E.S. v. Wolf,*
No. 20-2245, 2020 WL 5793305 (D.D.C. Sept. 25, 2020) .....................................27

*Republic Steel Corp. v. Costle,*
621 F.2d 797 (6th Cir. 1980) ...................................................................................32

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo,*
No. 20-4844, 2020 WL 6120167 (E.D.N.Y. Oct. 16, 2020) ...................................36

*Rural Cellular Ass'n v. FCC,*
588 F.3d 1095 (D.C. Cir. 2009) ...............................................................................33

*Russell v. United States,*
471 U.S. 858 (1985) ..................................................................................................27

*S. Bay Pentecostal Church v. Newsom,*
140 S. Ct. 1613 (2020) ......................................................................................17, 18

*Sampson v. Murray,*
415 U.S. 61 (1974) ....................................................................................................13

*Smith v. Turner*,
48 U.S. 283 (1849) ........................................................................................2

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .....................................................................................36

*Talleywhacker, Inc. v. Cooper*,
465 F. Supp. 3d 523 (E.D.N.C. June 8, 2020)........................................35

*Tigges v. Northam*,
No. 20-410, 2020 WL 4197610 (E.D. Va. July 21, 2020) ..................35

*TJM 64, Inc. v. Harris*,
No. 20-02498, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) ...........23, 34, 35

*Touby v. United States*,
500 U.S. 160 (1991) ................................................................................29, 30

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018)................................................................................37

*United States v. Baldwin*,
774 F.3d 711 (11th Cir. 2014)...................................................................28

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) ....................................................................................26

*Whitman v. Am. Trucking Associations*,
531 U.S. 457 (2001) ................................................................................29, 30

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ........................................................................................10

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*,
274 F.3d 1085 (6th Cir. 2001)..................................................................12

**Statutes**

5 U.S.C. § 553 .........................................................................................30, 31

5 U.S.C. § 706 .................................................................................................23

42 U.S.C. § 264 ........................................................................................*passim*

Pub. L. No. 96-88, 93 Stat. 695 (Oct. 17, 1979) ....................................3

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ..........................6, 26

**Legislative Materials**

Act of May 27, 1796, 1 Stat. 474 (1796) ............................................................ 2

Act of Feb. 25, 1799, 1 Stat. 619 (1799) ............................................................ 3

Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893) ........................................... 3

H.R. Rep. No. 78-1364 (1944) ...................................................................... 3, 17

New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney), S.8192B/A.10290B (Jun. 30, 2020) ............................................................................................. 6

**Regulations**

42 C.F.R. § 70.2 ................................................................................... *passim*

31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966) ............................................ 3

65 Fed. Reg. 49906 (Aug. 16, 2000) ................................................................. 4

85 Fed. Reg. 15337 (Mar. 13, 2020) ............................................................. 4, 5

85 Fed. Reg. 55292 (Sept. 4, 2020) ........................................................ *passim*

# INTRODUCTION

These are extraordinary times. The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the death of nearly 250,000 people within our borders. *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020). The disease spreads easily between persons within close contact (approximately six feet) via respiratory droplets. *Id.* It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly. *Id.* Despite drastic measures by federal, state, and local governments, including border closures, stay-at-home orders, mask mandates, and travel restrictions, COVID-19 continues to spread. *Id.*

In light of these rare circumstances, the Centers for Disease Control and Prevention (CDC) has exercised its authority under the Public Health Service Act (PHSA) and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 (the Order). *Id.* CDC found that this moratorium is an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. *Id.* at 55295–96. The Order protects some of society's most vulnerable: low-income persons who have lost work or incurred extraordinary medical bills, have made every effort to pay their rent, and would not have available housing options if evicted. *Id.* at 55297. It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure timely to pay rent, such as criminal activity or property damage. *Id.* at 55294.

Plaintiffs are several businesses that own or manage rental properties and a national association of homebuilders, all of which allege that the Order has prevented them from evicting tenants for nonpayment of rent. They seek emergency injunctive relief to invalidate the Order. But Plaintiffs cannot meet any of the elements required to qualify for such extraordinary relief. In particular, as multiple other federal district courts have found in denying preliminary injunctions seeking to enjoin the Order, there is no irreparable harm where a plaintiff's injury is monetary, and the mere incantation of constitutional harm cannot cure this defect. *See Tiger Lily LLC v. U.S. Dep't of Housing & Urban Dev.*, ECF No. 69, No. 20-2692, slip op. at 16–22 (W.D. Tenn. Nov. 6, 2020), Exhibit A; *Brown v. Azar*, No. 20-3702, 2020 WL 6364310, at *17–21 (N.D. Ga. Oct. 29, 2020); *see also* Order, *KBW Inv. Props. LLC v. Azar*, ECF No. 16, No. 20-4852 (S.D. Ohio Sept. 25, 2020), Exhibit B (denying temporary restraining order for failure to show irreparable harm). Moreover, Plaintiffs have not fulfilled their burden to show that any of their many claims is likely to succeed on the merits. And the balance of the harms and public interest overwhelmingly favor the government, which is acting to protect the citizenry at large from a widespread, pervasive, and deadly disease, as opposed to individual economic interests. Finally, the relief Plaintiffs seek—invalidation of a nationwide order issued to protect public health during a global pandemic—is overbroad and disproportionate to their alleged injuries. For all of these reasons, as explained below, Plaintiffs' motion should be denied.

## BACKGROUND

### I. Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease. Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849). Following a subsequent yellow fever outbreak, Congress replaced this Act with a federal

inspection system for maritime quarantines. Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799). And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate. Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws. H.R. Rep. No. 78-1364, at 1 (1944). In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States." *Id.* at 24. For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts. *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264, authorizes the Secretary of Health and Human Services (HHS)[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the

---

[1] Although the statute assigns authority to the Surgeon General, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of HHS. 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966); *see also* Pub. L. No. 96-88, § 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). The Office of the Surgeon General was re-established in 1987, but the Secretary has retained these authorities.

apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—permitting such impositions on a person's physical movement only for diseases specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). In particular, 42 C.F.R. § 70.2 provides the CDC Director (or his or her authorized representative) with discretion to take measures to control contagion. Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among States, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Other regulations authorize CDC to limit interstate travel, *see id.* § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations additionally provide for penalties for violations of these regulations. *Id.* § 70.18.

## II.     The COVID-19 Pandemic

In December 2019, a novel coronavirus dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55292. Severe cases of COVID-19 may be fatal. *Id.* The likelihood of becoming severely ill is greater among certain vulnerable populations. *Id.* at 55295. CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another. *Id.* at 55293. Persons not displaying symptoms are capable of transmitting the virus. *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the United States. *See* 85 Fed. Reg. at 15337. On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country. HHS, Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/ healthactions/phe/Pages/2019-nCoV.aspx. On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic due to the increase in infections throughout the world, including in the United States. 85 Fed. Reg. at 15337. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. *Id.* By late August 2020 the virus had spread to all 50 states. *Id.* at 55292. To date, it has infected more than eleven million and caused the death of nearly 250,000 persons within the United States. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Nov. 19, 2020). New cases continue to be reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health," 85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" to protect the public health. *Id.* These include border closures, travel restrictions, stay-at-home orders, and mask requirements. *Id.* In March 2020, Congress provided a 120-day moratorium on eviction filings based on nonpayment of

rent, as well as other protections, to tenants residing in certain federally financed rental properties. CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar. 27, 2020). Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020. 85 Fed. Reg. at 55294. And while certain states implemented their own temporary eviction moratoria, *see, e.g.*, New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney), S.8192B/A.10290B (Jun. 30, 2020), many such measures have also expired, *see* 85 Fed Reg. at 55296 n.36. Other states provided no separate protection for renters during the pandemic. *Id.*

## III.    The CDC Order

In light of these circumstances, on September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020. 85 Fed. Reg. at 55292. The agency found this moratorium "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread. *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19. *Id.* at 55294. They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness. *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread." *Id.* First, evicted renters are likely to move in with friends or family, leading to potential household crowding with new sources of infection. *Id.* This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts." *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons

6

move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters. *Id.* Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities. *Id.* Indeed, "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco. *Id.* at 55295. These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months. *Id.* at 55296.

Finally, evicted persons may experience unsheltered homelessness, which places them at "higher risk for infection when there is community spread of COVID-19." *Id.* at 55295. Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare. *Id.* The risk of unsheltered homelessness has increased during the pandemic, where safety precautions at shelters have reduced their capacities. *Id.*

In addition, research suggests that persons who would be evicted and become homeless as a result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* And among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections. *Id.* at 55295. "A wave of evictions on that scale would be unprecedented in modern times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential

property in any State . . . that provides a level of public-health protections below the requirements listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 (or $198,000 if filing a joint tax return) in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020. *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

Following the Order's issuance, CDC provided further guidance regarding its operation. *See* CDC/HHS Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/ eviction-moratoria-order-faqs.pdf (FAQs). These FAQs confirm that the Order is "not intended to terminate or suspend the operations of any state or local court." *Id.* at 1. "The Order does not," for example, "preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court." *Id.* at 6. "Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT

take place during the period of the Order." *Id.* at 1.

## IV. Plaintiffs' Claims

Plaintiffs are four businesses that own or manage rental properties and a national homebuilders' association. Compl. ¶¶ 12–16, ECF No. 1. Each owner Plaintiff asserts that it has at least one tenant who has fallen behind on rent and submitted a declaration claiming protection from eviction under the Order. *Id.* ¶¶ 42–43, 47, 52; *see also* Cusik Decl. ¶¶ 5–6, ECF No. 12-2; Dibianca Decl. ¶¶ 5–6, ECF No. 12-2; Wohlwend Decl. ¶¶ 12–13, ECF No. 12-2. Plaintiffs allege that these tenants would be evicted but for the operation of the Order. Compl. ¶¶ 44, 48, 53. The association claims that it has "heard from members" that they have received declaration from tenants. Schwanke Decl. ¶¶ 10–11, ECF No. 12-2. Plaintiffs' complaint alleges the Order violates the Administrative Procedure Act (APA) because it purportedly exceeds CDC's statutory and regulatory authority, Compl. ¶¶ 58–77; was not issued pursuant to notice-and-comment rulemaking, *id.* ¶¶ 88–94; and is arbitrary and capricious, *id.* ¶¶ 95–101. Plaintiffs also assert that the Order violates the constitutional nondelegation doctrine. *Id.* ¶¶ 78–87. They seek declaratory and injunctive relief. *Id.* at 19.

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied because they have not carried their burden to demonstrate any of the four elements necessary to warrant the extraordinary remedy of injunctive relief.

## I. Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief.

A preliminary injunction is an "extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Courts consider four factors when determining whether a plaintiff has fulfilled its burden: "(1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on

the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "[T]he proof required for [a] plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), and Plaintiffs fall far short of offering it here.

## A. Plaintiffs Have Not Shown Irreparable Injury.

To start, Plaintiffs fail to show irreparable injury—an "indispensable" part of their burden to obtain preliminary injunctive relief.[2] *Sumner Cty. Sch.*, 942 F.3d at 326–27. "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* at 327. The Sixth Circuit has long held that "[a] district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). Here, each of Plaintiffs' assertions of irreparable harm fails. Indeed, three federal courts have denied motions for expedited relief for failure to show irreparable harm where plaintiffs asserted materially similar claims of harm arising from the Order. *See Tiger Lily*, slip op. at 16–22; *Brown*, 2020 WL 6364310, at *17–21; *see also* Order, *KBW Inv. Props. LLC* (denying temporary restraining order).

### 1. The Mere Assertion of Constitutional Theories Does Not Establish Irreparable Injury.

Plaintiffs contend that because they challenge the Order on constitutional grounds, irreparable

---

[2] The Sixth Circuit has, at times, described the preliminary injunction inquiry as a "balancing test." *See, e.g., Overstreet*, 305 F.3d at 573. But this practice is inconsistent with, and thus does not survive, the Supreme Court's decision in *Winter*, which held "[a] plaintiff seeking a preliminary injunction *must* establish" the four prerequisite factors. *See Sumner Cty. Sch.*, 942 F.3d at 328 (Nalbandian, J., concurring) (quoting 555 U.S. at 20); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring). Although there does appear to be some confusion on this score, *see Sumner Cty. Sch.*, 942 F.3d at 326–27, even where this Circuit has considered a balancing test post-*Winter*, it has made clear that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *Id.* (citation omitted).

harm is automatically established. *See* Mot. for Prelim. Inj. 25-26, ECF No. 12 ("Pls.' Mem."). That is wrong for two reasons. For one, this is chiefly a statutory case, not a constitutional one: the overwhelming bulk of Plaintiffs' motion contends that the Order (1) exceeds CDC's statutory and regulatory authority, *see id.* at 6–19; or (2) violates the APA, *see id.* at 22–23. Plaintiffs' only constitutional claim arises under the nondelegation doctrine, *id.* at 19–22, which the Supreme Court has not applied to invalidate a federal statute since the 1930s. Because this claim is extraordinarily unlikely to succeed, *see infra* pp. 28–30, it cannot support a finding of irreparable harm. *See Overstreet*, 305 F.3d at 578 (because plaintiff failed to show a likelihood of success on the merits "his argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit"); *McNeilly v. Land* 684 F.3d 611, 621 (6th Cir. 2012) (similar).

Regardless, even if Plaintiffs' nondelegation challenge had any hope of success, that would not support a finding of irreparable harm here. While Plaintiffs cite *Winter* for the proposition that courts presume irreparable harm when constitutional claims are asserted, that opinion neither contains the language that Plaintiffs quote nor otherwise stands for that proposition. To the contrary, "[t]he case law is replete with examples of courts finding no irreparable harm despite the allegation of a constitutional violation where the only remedy would be monetary in nature.'" *Bauman v. Twp. of Tittabawassee*, No. 14-12841, 2014 WL 5499285, at *4 (E.D. Mich. Oct. 30, 2014) (quoting *Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.,* 960 F. Supp. 160, 163 (C.D. Ill. 1997)). As two other courts have explained in rejecting similar challenges to the Order, "[m]erely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm," particularly where the alleged injury "involves neither free speech nor invasion of privacy." *Brown*, 2020 WL 6364310, at *18; *see also Tiger Lily*, slip op. at 20–22 (same).

2. The Order Does Not Interfere With Plaintiffs' Right Of Possession Of Their Property.

Plaintiffs further assert that they are suffering irreparable injury because they cannot regain

possession of their property. *See* Pls.' Mem. 26–27. But while there are cases holding that a *permanent deprivation* of real property may constitute irreparable injury, *see, e.g., Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001) (loss of property through foreclosure) (cited in Pls.' Mem. 26); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011) (permanent loss of oil and gas rights) (cited in Pls.' Mem. 26), those cases do not apply here for at least two reasons.

First, as the *Brown* court explained, such cases "are inapposite because all involve permanent deprivation or destruction of property." *Brown*, 2020 WL 6364310, at *21. Just as in *Brown*, there is "no evidence before the Court" that Plaintiffs "are in danger of losing those properties." *Id.* Instead, the Order merely limits, on a temporary basis, landlords' ability to invoke one remedy for non-payment of rent. It does not preclude evictions for other reasons, nor does it affect Plaintiffs' title to their property. And second, as the Court observed in *Tiger Lily*, "Plaintiffs do not allege, nor is there any evidence before the Court, that any of the Plaintiffs actually reside in their properties or that they seek to reside in a property but have been prevented from doing so because it is occupied by a tenant who is a 'covered person' under the Halt Order." *Tiger Lily*, slip op. at 19; *accord Brown*, 2020 WL 6364310, at *21 ("no evidence before the Court that any of the individual plaintiffs reside in the properties"). As another Court in this Circuit has explained, where property is used as an "investment property," the plaintiff can "recoup its investment through money damages." *Mount Clemens Inv. Grp., LLC v. Borman's Inc.*, No. 10-12679, 2010 WL 3998095, at *5 (E.D. Mich. Oct. 12, 2010). The availability of such damages obviates the need for a preliminary injunction.

3. <u>Plaintiffs' Alleged Economic Losses Are Compensable.</u>

Plaintiffs likewise cannot satisfy their burden by suggesting that it may be difficult to enforce a money judgment against their tenants. *See* Pls.' Mem. 27. Indeed, nothing in the Order prevents Plaintiffs from suing their tenants for unpaid rent. *See Tiger Lily*, slip op. at 18; *see also Elmsford Apt.*

*Assocs., LLC v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020). The Order "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other [contractual] obligation." 85 Fed. Reg. at 55292. Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." *Id.* And as a general rule, "money damages are not irreparable." *Sumner Cty. Sch.*, 942 F.3d at 327; *see also, e.g.*, *Castillo v. Whitmer*, 823 F. App'x 413, 417 (6th Cir. 2020) ("Nor is monetary loss or logistical burden sufficient."); *Tiger Lily*, slip op. at 19 (monetary injury "is the antithesis of the irreparable harm needed to warrant a preliminary injunction"). Even economic injuries that are "substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs' basic contention is that this doctrine does not apply because it may be difficult to collect money judgments against their tenants. *See* Pls.' Mem. 27. But "to merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Sumner Cty. Sch.*, 942 F.3d at 327 (internal quotation marks omitted).[3] The only basis for Plaintiffs' belief that a judgment against their tenants could never be collected, however, is those tenants' alleged current inability to pay rent—in the midst of a global pandemic that has had sweeping economic effects. As in *Brown*, however, Plaintiffs have provided no information about "the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether

---

[3] Plaintiffs' authority is not to the contrary. *Performance Unlimited v. Questar Pubs., Inc.*, 52 F.3d 1373 (6th Cir. 1995), stands for the proposition that financial injury may amount to irreparable harm when it threatens the very existence of the plaintiff's business—a contention that Plaintiffs do not press here. *See id.* at 1382. *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280 (N.D. Ohio 1991), addressed the issue only in dicta, finding insolvency "clearly inapplicable to this case." *Id.* at 1292. Finally, *Economou v. Physicians Weight Loss Center of America*, 756 F. Supp. 1024 (N.D. Ohio 1991), addressed whether plaintiffs, not defendants, would "become insolvent in the near future." *Id.* at 1039.

they qualify for some type of government assistance, whether they could obtain loans to cover their rent or the nature of their credit histories." 2020 WL 6364310, at *20. Nor do Plaintiffs indicate whether their tenants have any illiquid assets against which they might seek to enforce money judgments. Thus, as in *Brown*, "although the tenants may not currently be able to afford their rent," it does not follow that Plaintiffs "will likely never be able to collect a judgment." 2020 WL 6364310, at *20. Indeed, tenants may become eligible for various government benefits, *id.*, or they may find employment in the future. Plaintiffs offer no evidence that there is no "possibility that adequate compensatory or other corrective relief will be available at a later date," *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). The "lack of evidence precludes a finding of irreparable harm." *Brown*, 2020 WL 6364310, at *20.

Moreover, the Order does not bar Plaintiffs from evicting their tenants forever; it merely postpones that remedy for a limited time in furtherance of urgent public health goals. *See Brown*, 2020 WL 6364310, at *16 ("[T]he Order is temporary; therefore, Plaintiffs' ability to evict their tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified or rescinded."). As a court in the Southern District of Ohio recently explained in denying a landlord's motion for a temporary restraining order in a similar challenge, "Plaintiff has not demonstrated that enforcement of the CDC's Order will cause it irreparable harm," because the Order only "postpones Plaintiff's collection of debt until after its expiration." Order, *KBW Inv. Props. LLC*, at 2.

**B. Plaintiffs Have Not Shown A Likelihood of Success on the Merits.**

Although Plaintiffs' complaint raises a number of challenges to the Order, they fail to carry their burden to show a likelihood of success on the merits of any one of them.

1. CDC Acted within Its Statutory and Regulatory Authority.

Plaintiffs first contend that the Order exceeds CDC's statutory and regulatory authority. Pls.' Mem. 6–19. But Congress vested the Secretary of HHS with broad authority to take decisive action

to control the spread of dangerous infectious diseases, which the Secretary has delegated to the public

health experts at CDC. *See* 42 U.S.C. § 264; 42 C.F.R. § 70.2. CDC acted both within the scope of its

delegated authority and in the interest of public health in issuing the challenged Order. *Accord Brown*,

2020 WL 6364310, at *6–10. Plaintiffs' arguments to the contrary fail.

        a.  <u>The Order falls within CDC's broad authority under the PHSA to prevent the spread of disease.</u>

Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in*

*his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases"

from abroad or among the states. 42 U.S.C. § 264(a) (emphasis added). The plain text of the statute

thus evinces a legislative determination to defer to the "judgment" of public health authorities about

what measures they deem "necessary" to prevent contagion, *see id.*—a determination made in the light

of history and experience, given the havoc wreaked by past scourges like yellow fever, *see supra* pp. 2–

4. Indeed, Congress's use of the phrase "such regulations as in his judgment are necessary" shows

that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it

wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of*

*Arlington v. FCC*, 569 U.S. 290, 296 (2013). And the Supreme Court has recognized that similar

congressional delegations of authority that empower agencies to take actions that are "necessary"

provide "broad power to enforce all provisions of [a] statute." *Gonzalez v. Oregon*, 546 U.S. 243, 258–

59 (2006); *see also, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81

(2005) (statute permitting agency to "prescribe such rules and regulations as may be necessary in the

public interest" undisputedly provided agency authority to promulgate order (citation omitted)). As

the *Brown* court explained, "Congress' intent, as evidenced by the plain language of the delegation

provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to

prevent the introduction, transmission or spread of communicable diseases." 2020 WL 6364310,

at *7; *see also Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) ("Congress has granted broad,

flexible powers to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease.").

The examples Congress gave of specific measures the Secretary may take to control infectious disease—which are illustrative, not exhaustive—underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where appropriate to protect the public health. *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619–20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361 [of the PHSA]"). Such measures include the authority to impose restrictions on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." 42 U.S.C. § 264(b)–(c). They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction." *Id.* § 264(a). The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d). *See id.* § 264(a)–(d). The court in *Brown* agreed: "The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary of HHS." 2020 WL 6364310, at *8.

The regulation, which largely paraphrases the statutory language, is consistent with Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2. It allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." *Id.* It further makes clear that, in order to control disease transmission,

intrusions on private property, "including inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.* The *Brown* court correctly observed that, because the statute and the regulation are so similar, "for the same reasons the Secretary of HHS has broad authority to make and enforce regulations as in his judgment are necessary to prevent the spread of disease, the CDC likewise has the same authority."[4] 2020 WL 6364310, at *8.

The expansive language in both the statute and the regulation comports with the Supreme Court's recognition that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Chief Justice Roberts recently reaffirmed this principle in connection with the COVID-19 pandemic. *See S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (observing that "[w]hen [state] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad") (citation omitted). This principle is consistent with legislative history demonstrating that Congress used broad language in section 361 of the PHSA to provide federal health authorities flexibility to respond to novel disease outbreaks. *See* H.R. Rep. No. 78-1364, at 24–25.

Here, CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority. A number of findings underpin CDC's decision. First, "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)." *Id.* at 55293. In addition, research suggests that, in the absence of eviction moratoria, tens of millions

---

[4] The regulation does impose the additional requirement that CDC "determine[] that the measures taken by the health authorities of state or local governments are insufficient to prevent the spread of disease." *Brown*, 2020 WL 6364310, at *8; *see* 42 C.F.R. § 70.2. CDC has made that finding here. *See id.* at *13–14 (citing 85 Fed. Reg. at 55295–96 & n.36).

of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times." *Id.* at 55295. The CDC has also determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

Based on this knowledge, CDC found that, in the context of this pandemic, eviction moratoria are an "effective public health measure utilized to prevent the spread of communicable disease." *Id.* at 55294. Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives"; and by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate settings." *Id.* Evictions, on the other hand, increase the risk of COVID-19 spread by increasing the likelihood that evicted renters will move into "shared housing or other congregate settings" that pose a high risk of transmission, *id.*, or experience unsheltered homelessness, where persons are at a higher risk of infection due to lack of access to hygienic measures, sanitation, and medical care, as well as exposure to the elements, *id.* at 55294–95. These are among the reasons that the Order constitutes a "reasonably necessary" measure under the regulations and is thus within the broad authority of CDC, conferred by the PHSA, to take steps to protect public health by preventing disease transmission.

> b. Canons of construction do not negate Congress's clear intent to provide public health experts with broad authority to prevent the spread of Disease.

Despite the plain text of section 361, which confers broad authority on HHS (which it has delegated to the public health experts at CDC) to regulate for the purpose of preventing the spread of disease, Plaintiffs contend that canons of statutory construction require a constrained reading of the statute and regulation that precludes the issuance of the Order. Pls.' Mem. 8–15.

But the canons of statutory construction that Plaintiffs invoke do not so constrain the measures CDC may take as to preclude a temporary eviction moratorium to prevent the spread of an easily transmissible, potentially deadly disease. Plaintiffs rely upon the canon of ejusdem generis, or the idea that "when a general term follows a specific one, the general term should be understood as a

reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)). They also invoke the noscitur a sociis canon, which "counsels that a word 'gathers meaning from the words around it.'" *Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Pointing to these canons, Plaintiffs urge the Court to find that the list of measures Congress provided that the Secretary of HHS "may" implement to prevent the spread of disease—which the regulation likewise includes—limits CDC's authority such that it cannot issue a temporary eviction moratorium pursuant to section 361. But other federal courts have rejected similar arguments; the structure of the statute does not lend itself to this construction; and even if it did, the temporary eviction moratorium is not so different than the actions listed in the statute or regulation as to exceed CDC's authority.

At the outset, it bears emphasis that the few federal courts to have considered the scope of section 361 have uniformly rejected the contention that the Secretary's regulatory authority is cabined by the list of measures set forth in the statute. For example, in holding that a ban on the sale of baby turtles fell within the scope of authority granted by Congress, a court in the Western District of Louisiana held that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361." *Indep. Turtle Farmers of La.*, 703 F. Supp. 2d at 620. Likewise, the *Brown* court found that "the clear and broad delegation of authority in the first sentence of § 264(a); the context provided by the subsequent subsections; the parroting language of § 70.2, which specifically uses the term including—a term of enlargement; and persuasive authority from the *Independent Turtle Farmers* court" demonstrate that the grant of authority in the first sentence of subsection (a) is not limited by the second sentence so as to preclude issuance of the Order. 2020 WL 6364310, at *9.

Turning to Plaintiffs' statutory construction arguments, it is important to note that "canons are not mandatory rules," and should not be used to "produce an interpretation that . . . would conflict

with the intent embodied in the statute Congress wrote." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Where, as here, congressional intent to empower an agency with wide-ranging authority to regulate for a specific purpose is clear, resort to such "guides" is unnecessary. *Id.*; *accord Brown*, 2020 WL 6364310, at *9 ("the implementing statute (and derivative regulation) demonstrate Congress' unambiguous intent to delegate broad authority to the CDC to enter an order such as the one at issue here").

Moreover, neither the statute nor the regulation utilizes the type of syntactic structure to which either ejusdem generis or noscitur a sociis is properly applied. *See Ali*, 552 U.S. at 225 (declining to apply ejusdem generis where "[t]he structure of the phrase . . . does not lend itself to application of the canon"). As Plaintiffs recognize, the ejusdem generis canon is applicable only where "a general term follows a specific one." Pls.' Mem. 8 (quoting *Ali*, 552 U.S. at 223). And noscitur a sociis is used to interpret "a string of statutory terms" or "items in a list" harmoniously. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289 (2010) (citations omitted). But Plaintiffs fail to acknowledge that the statute at issue begins with a complete sentence containing a broad grant of authority to the Secretary of HHS "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Only in the subsequent sentence does the statute state that "[f]or the purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."[5] *Id.* Because the general grant of authority to make regulations to

---

[5] The fact that the second sentence of subsection 264(a) places the phrase "as in his judgment may be necessary" at the end of the list of possible measures the Secretary may provide for does not alter this result. As explained, that sentence follows the general grant of authority to regulate, which requires only that regulation be, in the Secretary's judgment, "necessary to prevent the introduction,

prevent disease transmission is separate from and precedes the specific list of measures the Secretary may provide for, canons of construction that guide the interpretation of items in a list do not limit that grant of authority. Moreover, as explained, the statute as a whole makes clear that the authority provided in the first sentence of subsection (a) is not limited to measures closely related to those listed in the second sentence. *See Ali*, 552 U.S. at 226 (looking to "overall statutory context" instead of narrowly focusing on canons of construction). Instead, subsections (b) through (d) focus on apprehension, examination, and detention of individuals, meaning that such powers are included within the authority granted in the first sentence of subsection (a) despite differing significantly from the measures listed in the second sentence. *Accord Brown*, 2020 WL 6364310, at *8 ("The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary.").

The structure of the regulation similarly precludes application of these canons. It provides that the CDC Director "may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, *including* inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." 42 C.F.R. § 70.2 (emphasis added). Thus, the general phrase "such measures" as are "reasonably necessary" sets out the Director's baseline authority. *See id.* The ensuing list of measures are examples of things that fall within this authority, not limits on it. Therefore, as the *Brown* court found, "the [ejusdem generis] canon is not applicable to § 70.2 because that regulation does not contain the requisite list of specific

---

transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. 264(a). This reading is underscored by the fact that, in delegating authority to CDC, the Secretary has purposefully chosen phrasing that makes clear the Director's ability to take measures to prevent the spread of disease according to his public health expertise "includ[es]," but is not limited to, the examples of possible measures listed. 42 C.F.R. § 70.2; *accord Brown*, 2020 WL 6364310, at *9.

terms followed by a general one," but "[i]nstead, the specific terms are preceded by the word 'including,' which signifies a more expansive, non-exhaustive list."[6] 2020 WL 6364310, at *9; *see also id.* at *10 (declining to apply noscitur a sociis where plaintiffs "failed to identify the existing ambiguous *word* that must be defined in reference to other similar enumerated words").

Even if the unequivocally broad grant of authority to issue regulations that are "necessary" in the "judgment" of the CDC Director to prevent the spread of disease were interpreted in light of the canons of construction Plaintiffs cite, however, the temporary eviction moratorium is not so different from the illustrative actions listed in the statute or regulation as to exceed CDC's authority. The canon of ejusdem generis focuses on "the common attribute" of specific items to aid in the interpretation of a "catchall phrase." *Ali*, 552 U.S. at 225. The noscitur a sociis canon likewise looks to surrounding words to inform meaning. *Babbitt*, 515 U.S. at 702. Here, the regulation permits CDC to take a number of actions that intrude upon property rights, including "inspection," "fumigation," and even "destruction," where the Director deems it reasonably necessary to prevent the spread of disease. 42 C.F.R. § 70.2. The temporary moratorium on evictions is a comparable imposition on property in the interest of preventing contagion. The scale of the temporary moratorium is "necessary" to prevent the spread of disease in light of the widespread and "historic" threat to public health COVID-19 poses. *See* 85 Fed. Reg. at 55292. Indeed, this action is entirely consistent with more extensive public health measures taken during this pandemic, such as border closures, travel restrictions, business closures, and stay-at-home orders. *See id.*; *see also, e.g., League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting emergency stay of injunction against state

---

[6] *Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084 (6th Cir. 1981), upon which Plaintiffs rely, is not to the contrary. *See* Pls.' Mem. 8–9. The statute analyzed in *Owen* included a list of specific items followed by a catch-all term. *See id.* at 1087–88. Given this statutory structure, that court applied the principle of ejusdem generis to interpret the general phrase "good cause" in light of specific terms preceding it. *Id.* at 1092. The other cases Plaintiffs cite are distinguishable for the same reason: they analyze general statutory terms that follow a list of specific items. *See* Pls.' Mem. 9.

order closing fitness facilities due to COVID-19); *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (refusing to enjoin state eviction moratorium); *TJM 64, Inc. v. Harris*, No. 20-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local restrictions on businesses).

Plaintiffs' claim that interpreting the statute and regulation to permit a temporary eviction moratorium to prevent contagion during a global pandemic would result in unbounded federal authority, *see* Pls.' Mem. 10, is mistaken. The statute and regulation place clear limits on the agency's authority, requiring that regulation be (1) enacted to "prevent the . . . spread of communicable disease[]," 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; (2) considered "necessary" in the "judgment" of public health experts, 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; and (3) conditioned on a finding that local health initiatives are "insufficient to prevent the spread" of disease "from such State or possession to any other State or possession," 42 C.F.R. § 70.2. These are not empty requirements, but real constraints reviewable by courts under the APA. *See* 5 U.S.C. § 706(2); *Brown*, 2020 WL 6364310, at *12–14. And these limitations have proved meaningful in practice. Although the PHSA has been law since 1944, HHS has rarely utilized the authority granted for disease-control purposes under section 361. The fact that CDC has done so here is a direct reflection of the severity of the once-in-a-century threat posed by COVID-19, which the President has declared a national emergency, *see* 85 Fed. Reg. at 15337; which has altered virtually every aspect of human interaction over the past several months; and which has ended the lives of hundreds of thousands of Americans, *see* CDC COVID Tracker. And the Order's findings reflect the extraordinary circumstances that prompted the CDC Director to determine that—as required by the statute and regulation—its issuance was necessary in his judgment to prevent the spread of disease. *See, e.g.*, 85 Fed. Reg. at 55292 (explaining that "the mortality associated with COVID–19 during the early phase of the outbreak in New York City was comparable to the peak mortality observed during the 1918 H1N1 influenza pandemic," in which "there were

approximately 50 million influenza-related deaths worldwide, including 675,000 in the United States"). Plaintiffs' observation that the risk of disease transmission is frequent in human society does not, therefore, support their hyperbolic assertion that the statue and regulation would permit CDC to regulate all aspects of human interaction. *See* Pls.' Mem. 10. Put simply, the Order was not enacted to combat the common cold. And it is supported by extensive findings that demonstrate why it falls within CDC's broad, but not unlimited, statutory and regulatory authority. *Accord Brown*, 2020 WL 6364310, at *12–14.

Plaintiffs' other arguments—all of which depend on the application of inapposite canons of construction—are similarly flawed. *See* Pls.' Mem. 10–14. For example, Plaintiffs argue that the statute contemplates only "conventional disease mitigation measures," limited to specific places or items that are infected. *See id.* at 10–11. But neither the statute nor regulation so state, and two of the only federal courts to have considered the scope of section 361 have rejected similar arguments. A court in the Eastern District of Louisiana held that a ban on the commercial sale of small turtles was permissible under section 361, despite the fact that the statute does not specifically contemplate restrictions on commercial activity as a disease-prevention measure and that the ban reached both turtles that were infected and those that were not. *Mathews*, 427 F. Supp. at 176. Over 30 years later, the *Independent Turtle Farmers* court reaffirmed *Mathews*, rejecting a plaintiff's argument that the turtle ban was in excess of an agency's authority under section 361 because it was not one of the "measures" specifically included in the statute. 703 F. Supp. 2d at 620–21 (making clear that the agency was permitted "to enact 'other measures, as in his judgment may be necessary,' in addition to the measures suggested in the list" (quoting 42 U.S.C. § 264(a)). The courts in *Mathews* and *Independent Turtle Farmers* likewise both held that, contrary to Plaintiffs' assertion, *see* Pls.' Mem. 13, section 361 allows for regulation of purely intrastate activity. *See Mathews*, 427 F. Supp. at 176 ("the intrastate ban is not only authorized by the law, but, under modern conditions of transportation and commerce is clearly

reasonable to prevent the interstate spread of disease"); *Indep. Turtle Farmers*, 703 F. Supp. 2d at 620 ("the Turtle Ban may encompass purely intrastate transactions under Section 361").

Finally, Plaintiffs' contention that the items listed in the statute do not "contemplate substantial control over human activity or property" is simply wrong. Pls.' Mem. 11. As explained, section 361(a) directly provides for the "destruction of animals or articles"—which are property—and subsections (b) through (d) explicitly contemplate the detention of persons. *See* 42 U.S.C. § 264(a)–(d). And although additional requirements exist for detention of persons, and "destruction" is contemplated for (although not specifically limited to) "infected or contaminated" property, the measure at issue here represents a less intrusive imposition on property rights. Indeed, the Order is a time-limited restriction on one potential remedy for breach of a landlord-tenant agreement. *See Brown*, 2020 WL 6364310, at *15 (explaining that the Order "temporarily curtails the enforcement of an eviction order"). It does not permanently deprive any landlord of his or her property, like destruction would, and it certainly does not impair any person's individual freedom of movement. There is thus no basis for Plaintiffs' claim that heightened findings are required to support the issuance of the Order. *See* Pls.' Mem. 12. But in any event, the Order's findings make plain the connection between evictions and the spread of disease such that a "direct threat to human welfare" is evident. *See id.*

      c.   The interpretive presumptions to which Plaintiffs point do not apply here.

Plaintiffs conclude by arguing that principles of federalism, the constitutional avoidance doctrine, and the rule of lenity counsel against a finding that the Order falls within CDC's statutory and regulatory authority. Pls.' Mem 15–19. None of these interpretive presumptions is properly applied here.

To begin, Plaintiffs' invocation of the "federalism canon" relies entirely upon the faulty premise that the Order alters the balance of power between the states and the federal government. Not so. The Order simply puts into play the settled constitutional principal that federal law preempts

contrary state law.  The Supremacy Clause states that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The Supreme Court has explained that "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States," including by "legislat[ing] in areas traditionally regulated by the States."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Indeed, the federal government has a long history of regulating the rental housing market, including, most recently, in the form of a similar temporary eviction moratorium enacted as part of the CARES Act.  *See* Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar. 27, 2020).  Moreover, the statute at issue here contains a clear statement that regulations enacted thereunder preempt state law "to the extent that such a provision conflicts with an exercise of Federal authority under this section."  42 U.S.C. § 264(e).  And contrary to Plaintiffs' assertions, the Order does not alter existing state law, but only pauses the ultimate execution of one remedy for breach of a rental agreement when certain other conditions are met.  *See* FAQs at 1 ("The judicial process will be carried out according to state and local laws and rules.").  Because the Order does not change the balance between federal and state authority, this interpretive presumption provides no basis for an atextually narrow reading of the statute.

Nor is the constitutional avoidance doctrine applicable.  To start, "the canon of constitutional avoidance has no application in the absence of statutory ambiguity."  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001).  It "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*."  *Clark v. Martinez*, 543 U.S. 371, 385 (2005).  Plaintiffs fail to point to either ambiguous language or two interpretations of the statute between which the constitutional avoidance doctrine could prove the tiebreaker.  The Court should decline to apply the doctrine for this reason alone.  *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 336 (6th

Cir. 2007) (declining to apply constitutional avoidance where "[t]he statute [was] not genuinely susceptible to two constructions" (cleaned up)).

In addition, none of the claimed constitutional issues to which Plaintiffs point has any merit.[7] *See* Pls.' Mem. 16–18. Tellingly, they raise only one as a separate cause of action. But all are easily dispelled. First, as explained further below, Congress may delegate legislative power to the Executive so long as it provides an "intelligible principle" to which the agency must conform. *E.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also infra* pp. 28–30. The statute easily provides that here, requiring that any regulation promulgated thereunder be considered "necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Second, it is well established that, under the Commerce Clause, the federal government may regulate activity that has a "substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). And the Supreme Court has explicitly held that the commercial activity regulated here—"rental of real estate"—is "unquestionably" an activity that substantially affects interstate commerce. *Russell v. United States*, 471 U.S. 858, 862 (1985). Third, as explained, the Order does not create "a federal police power," but instead acts as a straightforward application of the Supremacy Clause. And fourth, as the *Brown* court found, "because [landlords] are still permitted to file breach of contract actions and begin eviction proceedings, and are only merely delayed in enforcing eviction orders," any claim that the Order violates a landlord's access to courts is unlikely to succeed. 2020 WL 6364310, at *14–17; *see also* FAQs at 1 ("The Order is not intended to terminate or suspend the operations of any state or local court. Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the

---

[7] *P.J.E.S. v. Wolf*, No. 20-2245, 2020 WL 5793305 (D.D.C. Sept. 25, 2020), to which Plaintiffs cite, involves a different statute, a different regulation, and different claimed constitutional issues focusing on the federal government's ability to remove persons from the country. *See id.* at *14. It is thus entirely inapposite.

period of the Order.").

Finally, the rule of lenity does not apply here for similar reasons. Even if Plaintiffs were right that the statute could theoretically be given a "narrower construction," or that the statute contained "some ambiguity"—and they are not—the rule of lenity is still not appropriate so long as the asserted ambiguity could be resolved using traditional tools of statutory interpretation. *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014). Plaintiffs have identified no "grievous ambiguity or uncertainty" as to what the statute authorizes, *see United States v. Baldwin*, 774 F.3d 711, 733 (11th Cir. 2014), and Plaintiffs' vague and conclusory statements about ambiguity come nowhere close to triggering the rule of lenity.

For all of these reasons, Plaintiffs are unlikely to succeed on the merits of their argument that the Order exceeds CDC's statutory and regulatory authority.

   2.   Section 361(a) Contains an Intelligible Principle and Is Thus a Valid Delegation.

Plaintiffs next argue that, if the Order is within CDC's statutory and regulatory authority, section 361(a) contains an unconstitutional delegation of authority. Pls.' Mem. 19–22. But the statute easily meets the constitutional requirements for delegation to be valid.

Congress may delegate legislative power to the Executive so long as it provides an "intelligible principle" to guide the agency. *E.g.*, *Mistretta*, 488 U.S. at 372. A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73. Congressional delegations of power have been struck down as unconstitutional only twice in United States history—both in 1935— and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion) (emphasis added). That is not the case here.

Instead, the Supreme Court has recognized on multiple occasions that the protection of public health and safety are intelligible principles sufficient to make a delegation constitutional. For example,

the Court found an intelligible principle in a statute permitting the Environmental Protection Agency to set primary ambient air quality standards "requisite to protect the public health." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 475–76 (2001) (statute "requiring the EPA to set air quality standards at the level that is 'requisite'[—]that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety, fits comfortably within the scope of discretion permitted by our precedent."). Similarly, a statute permitting the Attorney General to temporarily schedule a drug where he finds that doing so is "necessary to avoid an imminent hazard to the public safety" had an intelligible principle. *Touby v. United States*, 500 U.S. 160, 166 (1991) ("one cannot plausibly argue that § 201(h)'s 'imminent hazard to the public safety' standard is not an intelligible principle"); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (statute empowering the Secretary of Labor to determine what constituted a "safe" place of employment did not violate nondelegation principles when statutory language was viewed in light of principles of statutory construction and legislative history). And the Court has, on multiple occasions, "approved delegations to various agencies to regulate in the 'public interest.'" *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943) and *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932)). In contrast, the only two acts ever struck down for violating nondelegation principles either "provided literally no guidance for the exercise of discretion" or "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

The statute at issue here clearly passes muster under this precedent. The "general policy" articulated in subsection (a) is "to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). This disease-prevention authority is delegated to the Secretary of HHS. *Id.* And the requirement that a regulation must be "necessary" in the

"judgment" of the HHS Secretary for the purpose of preventing the spread of disease from outside the United States or among the states provides meaningful, judicially reviewable boundaries on this grant of authority. *Id.*

Plaintiffs' contentions are not focused on the intelligible-principle standard, but rather rehash their argument regarding the alleged breadth of the authority granted to HHS (and CDC) to regulate for disease-control purposes. But that is not the standard: "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby*, 500 U.S. at 165. To the contrary, "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. And the Supreme Court has noted that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)). Here, Congress has permissibly chosen to delegate broad authority, within specified bounds, to public health experts regarding regulations in a fast-moving, complex, and technical area. And, as explained, there is no support for Plaintiffs' supposition that the requirement that regulations be "necessary" to prevent the spread of communicable disease provides a regulatory blank check to CDC. Instead, these boundaries are meaningful, as the fact that the agencies have not sought to utilize them except where "necessary"— such as here, in the case of a global pandemic—demonstrates.

3. The Order Does Not Violate the APA's Notice-and-Comment Requirements.

Plaintiffs next argue that the Order is void because CDC failed to comply with the notice-and-comment requirements that apply to legislative rules under the APA. *See* Pls.' Mem. 22–23. That argument fails because the Order is not a rule to which those requirements apply—and even if it were, there was "good cause" to proceed without notice and comment given the urgent circumstances. *See* 5 U.S.C. § 553(b)(B).

First, the APA's notice-and-comment requirements apply to "rule making," *see* 5 U.S.C. § 553, with the term "rule" defined to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy," *id.* § 551(4)). But the Order is not a rule; it is an "an emergency action taken under the existing authority of 42 CFR 70.2," 85 Fed. Reg. at 55296, a regulation that expressly authorizes CDC to take "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to prevent the further spread of disease. 42 C.F.R. § 70.2. Given that the very purpose of these regulations is to enable the CDC to take swift steps to prevent contagion, it cannot be that the actions they authorize are *also* rules that require *yet another* round of notice and comment before they can take effect.

Second, even if the Order were a rule, notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception excuses notice and comment in emergency situations, or where delay could result in serious harm. *See Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). The agency's finding here more than meets that standard; as CDC explained, a "delay in the effective date of the Order . . . would defeat the purpose of the Order and endanger the public health. Immediate action is necessary." 85 Fed. Reg. at 55296. CDC acted quickly given the "life-saving importance" of the Order, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981), just as the APA permits.

Plaintiffs properly concede that "COVID-19 represents a serious public health threat." Pls.' Mem. 23. Their only real argument is that CDC could have started a rulemaking earlier, leaving time for a full notice-and-comment process. Yet CDC could not propose an eviction moratorium without first determining that such a moratorium was necessary and that state and local measures were insufficient. *See* 42 C.F.R. § 70.2; *see also, e.g., Air Transport Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C.

Cir. 1999) (holding that "critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation" (emphasis omitted)). And Congress and many states implemented similar eviction moratoria early in the pandemic; the expiration of these measures directly informed CDC's determination as to the inadequacy of state measures and the necessity of the Order. *See* 85 Fed. Reg. at 55294 & n.14 (explaining that the CARES Act "helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic" but that the effects of its expiration were "expected to manifest" by August 27, 2020); *see also id.* at 55296 & n.36 (indicating that state and local eviction moratoria "have expired and are set to expire in many jurisdictions"). By the time CDC made its determination, it had further determined that a delay would impede its critical public health goals. More than a thousand Americans are now dying of COVID-19 every day, and if "the circumstances of this case do not justify employment of the good cause exception, we will be hard put to find any justification for its use." *Republic Steel Corp. v. Costle*, 621 F.2d 797, 804 (6th Cir. 1980).

### 4. The Order Is Not Arbitrary or Capricious.

Plaintiffs are further unlikely to succeed on their claim that the Order is arbitrary and capricious. "This standard of review is deferential and accords agency action a presumption of regularity." *Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 855 (6th Cir. 1988). Agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency "is making predictions, within its area of special expertise, at the frontiers of science, . . . a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiffs' claims cannot overcome that deferential review.

First, Plaintiffs contend that there is insufficient support for the proposition that, absent CDC action, landlords would evict tenants en masse. Yet CDC specifically found that "[i]n the absence of State and local protections, as many as 30–40 million people in America could be at risk of eviction." 85 Fed. Reg. at 55295 & n.17 (citing Emily Benfer, et al., *The COVID–19 Eviction Crisis: An Estimated 30–40 Million People in America are at Risk*, available at: https://www.aspeninstitute.org/blog-posts/ the-covid-19-eviction-crisis-an-estimated-30-40-million-peoplein-america-are-at-risk). It is an entirely commonsense proposition that a significant number of landlords would exercise their legal rights, as they do under ordinary circumstances—and as Plaintiffs here are adamant they wish to do, *see id.* at 55295 n.18 (observing that 900,000 people are evicted in a typical year). And while Plaintiffs would require CDC to demonstrate, to a scientific certainty, how all landlords across the country would act in the future, on arbitrary-and-capricious review courts should not "insist upon obtaining the unobtainable." *FCC v. Fox Television Stations*, 556 U.S. 502, 519 (2009); *see also, e.g.*, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (the "'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments").

Second, Plaintiffs speculate that, because of the Order, some landlords may hesitate to rent to tenants with poor credit history, leaving units vacant instead. This theory is entirely unsupported by evidence, which is reason enough to reject it. But even if Plaintiffs' speculation were accurate, CDC's goal was to keep *existing* renters from being dislocated and moving into settings where they could spread COVID, not to reduce nationwide vacancy rates to the lowest possible level. *See supra* pp. 6–7. The goal was to protect public health by keeping people living where they already live, reducing the opportunity for COVID to spread further.

Third, Plaintiffs contend that the moratorium is unlikely to be effective because it is currently set to expire at the end of the year. *See* Pls.' Mem. 24. For all the reasons given above, CDC disagreed,

explaining why, in its expert judgment, a temporary moratorium on residential evictions was in fact likely to slow the spread of COVID-19. But in any case, if CDC determines in the future that the Order should be extended, it retains the right to extend it. *See* 85 Fed. Reg. at 55297 (Order expires December 31, 2020, "unless extended, modified, or rescinded"). Plaintiffs provide no authority whatsoever for the proposition that, because the Order may lapse at the end of the year, this Court should simply strike it down now.

For all of these reasons, Plaintiffs have not fulfilled their burden to show a likelihood of success on the merits on any of their claims.

### C. The Injunction Plaintiffs Seek Is Contrary to the Public Interest.

Finally, the balance of the harms overwhelmingly favors the government, and the injunction Plaintiffs seek is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (observing that "[t]hese factors merge when the Government is the opposing party"). CDC issued the Order to prevent the spread of an easily transmissible, potentially serious, and sometimes fatal disease that has infected more than eleven million and killed nearly 250,000 persons within the United States. *See* 85 Fed. Reg. at 55292; *see also* CDC COVID Data Tracker. As the *Brown* Court held,

> In evaluating whether the threatened injury of various state-mandated COVID-19 restrictions would outweigh the damage to the public's interest if they were overturned, federal courts across the country have routinely concluded that undoing orders deemed necessary by public health officials and experts to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community.

2020 WL 6364310, at *22.

Indeed, in balancing the equities and considering the public interest, courts have consistently declined to second-guess the judgments of public health officials. *See, e.g.*, *TJM 64*, 2020 WL 4352756, at *8 (refusing to enjoin local COVID-19 ordinance because such an injunction would "present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus"); *Auracle Homes*, 2020 WL 4558682, at *21 ("given the nature of this pandemic, the balance of the equities and the

public interest favor denying a preliminary injunction"); *Tigges v. Northam*, No. 20-410, 2020 WL 4197610, at *10 (E.D. Va. July 21, 2020) ("The public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by enjoining state officials from taking executive action designed to slow the spread of COVID-19."); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. June 8, 2020) (finding that "the public interest does not weigh in favor of injunctive relief" where the government takes "intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic," and "neither the court nor plaintiffs are better positioned to second-guess those determinations").

Plaintiffs, on the other hand, are asserting only economic interests. As demonstrated above, these interests will not be irreparably harmed by the temporary restrictions in the Order. But even if they would, the public interest in protecting health outweighs even serious economic harm.[8] *TJM 64*, 2020 WL 4352756, at *7 (denying injunction despite finding that plaintiffs would suffer "devastating economic injury" as a result of COVID-19 closure orders); *see also, e.g.*, *League of Indep. Fitness Facilities*, 814 F. App'x at 129 (finding that "[t]hough Plaintiffs bear the very real risk of losing their businesses, the Governor's interest in combatting COVID-19 is at least equally significant"); *Tigges*, 2020 WL 4197610, at *10 (although plaintiff "suffered significant economic hardship due to the COVID-19 pandemic," economic loss did not outweigh the "urgent need to act to protect . . . health and safety").

As the *Brown* court found in weighing arguments similar to those Plaintiffs advance here, any "economic harm pales in comparison to the significant loss of lives that Defendants have demonstrated could occur should the Court block the Order." 2020 WL 6364310, at *23. And

---

[8] This is not to discount that the cost of life-saving measures such as the Order may not be "borne evenly." *See League of Indep. Fitness Facilities*, 814 F. App'x at 130. But as other courts have recognized, "[t]he decision on how to impose and allocate those costs rests with the other branches of government," and not with courts. *Brown*, 2020 WL 6364310, at *23 n.14 (cleaned up).

although that court found that plaintiffs there were unlikely to succeed on their constitutional claims, it observed that "[e]ven if Plaintiffs did show a constitutional violation, the showing would not be enough to outweigh the public interest." *Id.*; *accord Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-4844, 2020 WL 6120167, at *11 (E.D.N.Y. Oct. 16, 2020) (denying preliminary injunction where plaintiff was likely to suffer irreparable constitutional harm because "the balance of the equities[] cuts in favor of the State, which is trying to contain a deadly and highly contagious disease"). The balance of the harms and the public interest thus tilt decisively in favor of the government.

## II.    Any Relief Granted Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, any relief should be no broader than necessary to provide Plaintiffs with relief and therefore should extend only to plaintiffs who have standing to sue. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).[9]

---

[9] The presence of the National Association of Home Builders (NAHB) as a plaintiff in this case does not affect the analysis. At the outset, NAHB has not established standing at all, for associational standing requires that it "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also, e.g., Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 660 (6th Cir. 2011) ("To retain associational standing, then, NATCA must identify a member . . . ."). While NAHB's declaration indicates that the declarant has "spoken to a member landlord in Ohio," Schwanke Decl. ¶ 11, it provides no identifying information whatsoever about this landlord—and certainly not enough information for the Court to evaluate whether this member would have standing to sue in his or her own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997) (members must "otherwise have standing to sue in their own right"). Even if NAHB had associational standing generally, it does not have standing to seek a nationwide injunction, since it offers only hearsay about its members outside of Ohio. *See* Schwanke Decl. ¶ 10 ("I have heard from members around the country . . . ."); *id.* ¶ 13 (describing "reports I have received from other landlord members around the country"). Such hearsay cannot justify nationwide relief, for "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000).

Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). The CDC Order at issue here has been challenged in at five other districts, underscoring why this Court should not attempt to decide its legality for all parties and for all time. *See Brown*, No. 20-3702 (N.D. Ga.) (preliminary injunction denied Oct. 29, 2020); *KBW Inv. Props. v. Azar*, No. 20-1852 (S.D. Ohio) (federal defendants dismissed by stipulation after TRO denied); *Tiger Lily*, No. 20-2692 (W.D. Tenn.) (preliminary injunction denied Nov. 6, 2020); *Terkel v. CDC*, No. 20-564 (E.D. Tex.) (preliminary injunction motion pending); *Chambless Ents. v. CDC*, No. 20-1455 (W.D. La.) (preliminary injunction motion pending).

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated: November 19, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

Tel:  (202) 305-0727
Fax:  (202) 616-8470
E-mail:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated: November 19, 2020

/s/ Leslie Cooper Vigen
Trial Attorney