**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Skyworks, Ltd., et al., | Case No. 5:20-cv-02407 |
| Plaintiffs, | Judge John R. Adams |
| v. | |
| Centers for Disease Control and Prevention, et al., | |
| Defendants. | |

**BRIEF OF AMICI CURIAE COMMUNITY LEGAL AID SERVICES, INC.,
AND THE NATIONAL HOUSING LAW PROJECT
IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................... 1

II.     Identity & Interest of Amici Curiae ......................................................... 2

III.    Corporate Disclosure Statements ............................................................ 3

IV.     Certifications ............................................................................................... 4

V.      Argument ..................................................................................................... 4

    A.  Enjoining the CDC's Order would be contrary to the public interest................. 4

        1.  Individual evictions carry devastating impacts to both the displaced
            family and its surrounding community......................................................... 4

        2.  Evictions destabilize and harm neighborhoods, businesses, schools,
            and other community institutions................................................................ 5

        3.  Mass evictions in a condensed time would amplify collective harms.......... 7

        4.  The disproportionate racial impacts of both evictions and COVID-19
            threaten especially devastating outcomes on communities of color............. 8

    B.  The Court need not, and should not, defer to the government's narrow
      reading of the CDC's Order to preserve its constitutionality............................. 10

        1.  The CDC's Order prohibits any action to remove or cause the removal
            of a covered tenant, which must include filing and prosecuting
            eviction lawsuits............................................................................................. 10

        2.  The CDC's Order entitles covered tenants to possession of their
            homes through December 31, 2020, making eviction suits improper
            under Ohio law................................................................................................ 11

        3.  The CDC's Order is constitutional because it is a necessary and
            rational response to the threat of mass evictions and the spread of
            COVID-19........................................................................................................ 13

VI.     Conclusion ................................................................................................... 15

i

## TABLE OF AUTHORITIES

**Cases**

*Armour v. Indianapolis*, 566 U.S. 673 (2012)................................................................ 14

*Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829, 2020 WL 4558682
 (D. Conn. Aug. 7, 2020).......................................................... 15

*Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572
 (D. Mass. Sept. 25, 2020)...................................................... 13, 15

*Boddie v. Connecticut*, 401 U.S. 371 (1971)................................................................ 14

*Brown v. Azar,* No. 1:20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020)..... 2

*Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142 (2012)................................ 11

*Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 38 Ohio App.3d 79
 (10th Dist.1987)...................................................................... 12

*Davis v. Goord,* 320 F.3d 346 (2d Cir. 2003)................................................................ 15

*Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062,
 2020 WL 3498456 S.D.N.Y. June 29, 2020).......................... 14, 15

*Flatford v. City of Monroe,* 17 F.3d 162 (6th Cir. 1994).............................................. 13

*Garb-Ko v. Benderson,* 10th Dist. Franklin No. 12AP-430, 2013-Ohio-1249............ 11-12

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020).................................................................. 14

*Jacobson v. Massachusetts*, 187 U.S. 11 (1905)......................................................... 14

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)...................................................................... 11

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
 814 F. App'x 125 (6th Cir. 2020)......................................... 14

*Rubinovitz v. Rogato,* 60 F.3d 906 (1st Cir. 1995)...................................................... 15

*Tiger Lily, LLC v. U.S. Dept. of Hous. & Urb. Dev.*, No. 2:20-cv-02692
 (W.D. Tenn. Nov. 6, 2020)...................................................... 2

*U.S. v. Choice*, 201 F.3d 837 (6th Cir. 2000).............................................................. 10-11

*U.S. v. Kras*, 409 U.S. 434 (1973)................................................................... 14, 15

*U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989)....................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................. 4

**Statute**

OHIO REV. CODE ANN. § 1923.01(A)............................................................. 10

**Regulations**

24 C.F.R. § 982.551(h)...................................................................................... 7

85 Fed. Reg. 55,292 (Sept. 4, 2020)................................................................ passim

**Secondary Sources**

77 A.L.R. 2d 735, § 6........................................................................................ 13

Emily Benfer et al., *The COVID-19 Eviction Crisis: An Estimated 30-40 Million
   People in America Are at Risk*, ASPEN INSTITUTE (Aug. 7, 2020).................... 1

Neil Bhutta et al., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey
   of Consumer Finances*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE
   SYSTEM (Sept. 28, 2020)................................................................................... 9

Dyvonne Body et al., *A Glimpse into the Eviction Crisis: Why Housing Stability
   Deserves Greater Attention*, ASPEN INSTITUTE (July 24, 2019)....................... 5

*CDC/HHS Temporary Halt in Residential Evictions to Prevent the Further
   Spread of COVID-19, Frequently Asked Questions*......................................... 10

Centers for Disease Control and Prevention, *Health Equity Considerations
   and Racial and Ethnic Minority Groups* (Jul. 24, 2020)................................... 9

Robert Collinson et al., *The Effects of Evictions on Low-Income Households*
   (Dec. 2018)........................................................................................................ 6

CORELOGIC, *United States Residential Foreclosure Crisis: Ten Years Later*
   (Mar. 2017)........................................................................................................ 8

Matthew Desmond et al., *Eviction's Fallout: Housing, Hardship, and Health*,
   94 SOCIAL FORCES 295 (Feb. 24, 2015)............................................................ 5

iii

Matthew Desmond et al., *Housing and Employment Insecurity Among the Working Poor*, 63 SOCIAL PROBLEMS 46 (2016).................................................. 6, 13

EVICTION LAB, *National Estimates: Eviction in America* (May 11, 2018).................. 7

Paula A. Franzese, *A Place to Call Home: Tenant Blacklisting and the Denial of Opportunity*, 45 FORDHAM URB. L.J. 661 (2018)............................................. 13

Kathryn Howell, *Eviction and Educational Instability in Richmond, Virginia*, RVA EVICTION LAB.......................................................................................... 5

Steven Hwang, *Infectious Disease Exposures and Contact Tracing in Homeless Shelters*, Journal of Health Care for the Poor and Underserved (Jun. 14, 2015)................................................................................................. 6

Marvin J. Kelley IV, *Testing One, Two, Three: Detecting and Proving Intersectional Discrimination in Housing Transactions*, 42 Harv. J. L. & Gender 301 (2019)............................................................................................. 8

Katherine Lucas McKay et al., *20 Million Renters Are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship*, ASPEN INSTITUTE (Jun. 19, 2020)...................................................................... 7

Signe-Mary McKernan et al., *Thriving Residents, Thriving Cities: Family Financial Security Matters for Cities*, URBAN INSTITUTE (Apr. 21, 2016)....... 6

NATIONAL ALLIANCE TO END HOMELESSNESS, *Ending Chronic Homelessness Saves Taxpayers Money* (June 2017)................................................................ 6

Giulia McDonnell Nieto del Rio et al., *Hospitals are Reeling Under a 46 Percent Spike in COVID-19 Patients*, N.Y. TIMES (Oct. 27, 2020)............................... 2

Danyelle Solomon et al., *The Coronavirus Pandemic and the Racial Wealth Gap*, CENTER FOR AMERICAN PROGRESS (Mar. 19, 2020)........................................ 9

Stout Risius Ross, Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction.............................................................................. 8

Brett Theodos et al., *Family Residential Instability: What Can States and Localities Do?* URBAN INSTITUTE 8 (May 2018)............................................. 5

U.S. CENSUS BUREAU, *Week 13 Household Pulse Survey* (Aug. 31, 2020).................. 1

U.S. CENSUS BUREAU, *Week 18 Household Pulse Survey* (Nov. 18, 2020)................. 7, 8

iv

I.        **Introduction**

By the time the Centers for Disease Control and Prevention (CDC) ordered its nationwide "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19" on September 4, communities across the country were bracing for the arrival of an eviction crisis the likes of which the United States has never seen.  Extensive layoffs and income disruptions had occurred, and previous federal assistance measures – such as $1,200 "stimulus" checks, a $600 week boost in unemployment benefits, and a bar on certain non-payment evictions – had run out. Millions of renters had fallen behind in rent, millions more expected to default the following month, and tens of millions lacked confidence in their ability to continue paying, often resorting to credit cards or other unsustainable emergency sources.  Experts predicted 19 million or more evictions – displacing as many as 40 million people – within a matter of weeks.[1]  In Ohio alone, the United States Census Bureau estimated over 287,700 households were behind on rent by August 31, and more than 124,000 would have been evicted by the end of October[2] – more than Ohio typically sees in an entire calendar year.[3]

Evictions on such a scale at any time would profoundly disrupt communities; businesses, local governments, schools, places of worship, and other institutions could hardly weather the sudden loss of so many workers, neighbors, students, and members.  Amid a 100-year pandemic, mass evictions would be even more destructive: undermining the ability of those affected to practice hygiene and social distancing, and exacerbating transmission by driving persons into

_____

[1] Emily Benfer et al., *The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America Are at Risk*, ASPEN INSTITUTE (Aug. 7, 2020), https://www.aspeninstitute.org/blog-posts/the-COVID-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk.
[2] U.S. CENSUS BUREAU, *Week 13 Household Pulse Survey* (Aug. 31, 2020), Housing Tables 1b, and 3b, https://www.census.gov/data/tables/2020/demo/hhp/hhp13.html.
[3] Ohio eviction data throughout this brief is from the Ohio Supreme Court's Interactive Data Dashboard, which is available at https://www.supremecourt.ohio.gov/JCS/courtSvcs/dashboards.

shared housing or homelessness. The CDC issued its Order in recognition of these dangers, staving off the anticipated wave of mass evictions for now.

Maintaining the CDC's Order in effect could not be any more important at this moment when community transmission has accelerated far beyond previous levels. The United States is experiencing more than one million new confirmed COVID-19 cases each week[4] and health care systems are under massive stress.[5] Since Plaintiffs filed this action on October 23, Ohio has seen more than 206,000 new COVID-19 cases[6] – more than the entire population of Akron. The number of positive COVID-19 tests in Ohio has doubled since Plaintiffs filed this lawsuit. More than 900 Ohioans have died from COVID-19 during that time.

To enjoin the CDC's Order, and thus allow the wave of mass evictions to spill forth under current circumstances, would devastate families and communities and turbocharge the already uncontrolled spread of COVID-19. As federal courts in Georgia and Tennessee have already observed, the grounds on which Plaintiffs challenge the CDC's Order are dubious on the merits, and an injunction is not necessary to prevent any irreparable harm.[7] But the massive public interest factor should truly make any kind of preliminary injunction a nonstarter.

## II.    Identity & Interest of Amici Curiae

CLAS is a non-profit law firm covering eight counties in Northeast Ohio: Columbiana,

---

[4] JOHNS HOPKINS UNIVERSITY & MEDICINE, *Coronavirus Resource Center, United States*, https://coronavirus.jhu.edu/region/united-states (last visited Nov. 30, 2020).
[5] Giulia McDonnell Nieto del Rio et al., *Hospitals are Reeling Under a 46 Percent Spike in COVID-19 Patients*, N.Y. TIMES (Oct. 27, 2020),
https://www.nytimes.com/2020/10/27/us/coronavirus-hospitals-capacity.html.
[6] All data in this brief regarding COVID-19 in Ohio are from the Ohio Department of Health's COVID-19 Dashboard, available at https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/overview.
[7] *Brown v. Azar,* No. 1:20-CV-03702, 2020 WL 6364310, at *10 (N.D. Ga. Oct. 29, 2020) (appeal pending); *Tiger Lily, LLC v. U.S. Dept. of Hous. & Urb. Dev.*, No. 2:20-cv-02692, *22 (W.D. Tenn. Nov. 6, 2020).

Mahoning, Medina, Portage, Stark, Summit, Trumbull, and Wayne.  A significant portion of CLAS's practice involves rental housing and this work has increased since the onset of the COVID-19 pandemic in early 2020.  CLAS has provided legal assistance to more than 1,200 tenants since the COVID-19 pandemic was declared in March.  More recently, CLAS has directly utilized the "Centers for Disease Control and Prevention's Temporary Halt in Evictions to Prevent Further Spread of COVID-19" in eviction cases to help tenants maintain housing during this global pandemic and to prevent the further spread of COVID-19 in our communities and our state.

The NHLP is a nonprofit organization that works to advance tenants' rights, increase housing opportunities for underserved communities, and preserve and expand the nation's supply of safe and affordable homes.  NHLP pursues these goals primarily through technical assistance and support to legal aid attorneys and other housing advocates.  NHLP coordinates the Housing Justice Network, a collection of more than 1,600 legal services attorneys, advocates, and organizers from around the country that has shared resources and collaborated on significant housing law issues for over 40 years.  Since 1981 NHLP has published *HUD Housing Programs: Tenants' Rights*; commonly known as the "Greenbook," it is seminal authority on the rights of HUD tenants and program participants.

### III. Corporate Disclosure Statements

Amici make the following certifications based on Local Civil Rule 3.13:

1. NHLP is a nonprofit organization; NHLP has no parent corporation or any publicly held corporation that owns 10 percent or more of its stock.

2. CLAS is a nonprofit organization; CLAS has no parent corporation or any publicly held corporation that owns 10 percent or more of its stock.

3

3.  Neither Amici NHLP nor CLAS are aware of any publicly traded corporation that has an interest in the outcome of this case.

## IV.    Certifications

Amici certify the following pursuant to Federal Rule of Appellate Procedure 29(a)(4):

1.  No party's counsel authored this brief in whole or in part;

2.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and

3.  No person other than the amici curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

## V.    Argument

The CDC's Order temporarily halting residential evictions represents a valid exercise of the agency's authority under the Public Health Services Act.  But for that order, the United States would likely be undergoing an unprecedented mass evictions crisis, and the destabilizing impacts on communities would frustrate efforts to control and combat the spread of COVID-19.

### A.  Enjoining the CDC's Order would be contrary to the public interest.

To succeed in its attempt to obtain a preliminary injunction, a plaintiff must, among other things, establish that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs cannot hope to make such a showing because the probable harm to tenants and communities from mass evictions during the COVID-19 pandemic is far more significant than the temporary potential harm to landlords.

### 1.  Individual evictions carry devastating impacts to both the displaced family and its surrounding community.

A single eviction may inflict serious and long-term consequences on a person or family: not only depriving those persons of their home (and often much or almost all of their personal

belongings) but also disrupting employment and child care arrangements, impacting children's education, threatening or resulting in family separation, causing toxic stress and other health effects, and routinely delivering individuals and families into homelessness – frequently for prolonged periods of time.[8]  The effects on families extend to their children; one study noted that evictions occurring "at a crucial developmental phase in children's lives [can be expected] to have a durable impact on children's wellbeing."[9]

> **2.  Evictions destabilize and harm neighborhoods, businesses, schools, and other community institutions.**

The consequences of evictions are not limited to displaced tenants and families but radiate harms and burdens out into the surrounding communities in which they occur.  Evictions reduce the academic achievement of students in households facing eviction and "[h]igh student turnover can spill over onto students who do not move and undermine the school's social climate."[10]  Other adverse effects on schools include an increased need for remedial schoolwork and social services, failure to meet yearly progress goals, increasing chronic absence rates and fail[ure] to meet the demands of accreditation due to failing test scores."[11]  Evictions affect employers, contributing to

---

[8] Dyvonne Body et al., *A Glimpse into the Eviction Crisis: Why Housing Stability Deserves Greater Attention*, ASPEN INSTITUTE (July 24, 2019), https://www.aspeninstitute.org/blog-posts/a-glimpse-into-the-eviction-crisis-why-housing-stability-deserves-greater-attention.
[9] Matthew Desmond et al., *Eviction's Fallout: Housing, Hardship, and Health*, 94 SOCIAL FORCES 295, *23 (Feb. 24, 2015), available at https://scholar.harvard.edu/files/mdesmond/files/desmondkimbro.evictions.fallout.sf2015_2.pdf
[10] Brett Theodos et al., *Family Residential Instability: What Can States and Localities Do?* URBAN INSTITUTE 8 (May 2018), https://www.urban.org/sites/default/files/publication/98286/family_residential_instability_what_can_states_and_localities_do_1.pdf
[11] Kathryn Howell, *Eviction and Educational Instability in Richmond, Virginia*, RVA EVICTION LAB 4, https://cura.vcu.edu/media/cura/pdfs/cura-documents/EvictionandEducationalInstabilityinRichmond.pdf.

job loss and turnover as well as tardiness, absenteeism, and reduced job performance.[12]  Evictions harm local governments through decreased tax and utility bill collection and increased costs social and emergency services.[13]

Evictions lead to homelessness, which burdens shelters and other public services.[14]  One pre-COVID-19 study found that an eviction increases a person's likelihood of applying to a homeless shelter by 19 percent within the first year after eviction and 14 percent within two years.[15] Even in the unlikely event such facilities could manage the demand that millions of evictions would create, an increased reliance on homeless shelters would directly counteract efforts at controlling the pandemic.[16]

As the CDC noted, many people who experience eviction "originally stay with family or friends, but subsequently seek homeless services."  85 Fed. Reg. 55,292, 55,295 (Sept. 4, 2020). In turn, the members of evicted households often place the renter households of their family and friends at risk – not only of catching COVID-19, but of being evicted themselves.  Many residential

---

[12] Matthew Desmond et al., *Housing and Employment Insecurity Among the Working Poor*, 63 SOCIAL PROBLEMS 46, 59 (2016),
https://scholar.harvard.edu/files/mdesmond/files/desmondgershenson.socprob.2016.pdf.
[13] Signe-Mary McKernan et al., *Thriving Residents, Thriving Cities: Family Financial Security Matters for Cities*, URBAN INSTITUTE 14 (Apr. 21, 2016) (finding "[l]ow-income families with savings are more financially resilient than middle-income families without savings"), https://www.urban.org/sites/default/files/publication/79776/2000747-thriving-residents-thriving-cities-family-financial-security-matters-for-cities_0.pdf.
[14] NATIONAL ALLIANCE TO END HOMELESSNESS, *Ending Chronic Homelessness Saves Taxpayers Money* 1 (June 2017), http://endhomelessness.org/wp-content/uploads/2017/06/Cost-Savings-from-PSH.pdf (finding that homeless people "cycle in and out of emergency departments, inpatient hospital stays, psychiatric centers, detoxification programs, and jails," at an average cost to U.S. taxpayers of $35,578 for each chronically homeless person in 2017).
[15] Robert Collinson et al., *The Effects of Evictions on Low-Income Households* 25 (Dec. 2018), https://www.law.nyu.edu/sites/default/files/upload_documents/evictions_collinson_reed.pdf.
[16] 85 Fed. Reg. at 55,295; Steven Hwang, *Infectious Disease Exposures and Contact Tracing in Homeless Shelters*, Journal of Health Care for the Poor and Underserved (Jun. 14, 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4465825/pdf/nihms4738.pdf.

leases limit occupancy to persons identified and screened at the outset, limit the number of days a guest can stay at the property, and consider stays by guests that exceed the number of days permitted by the lease to be a violation of the lease. *E.g.* 24 C.F.R. § 982.551(h) (limiting who can reside in a unit covered by a housing choice voucher).

Combined, the impacts of eviction are incredibly disruptive to communities; conversely, failing to prevent mass evictions could trigger a broad economic and health crisis.

### 3. Mass evictions in a condensed time would amplify collective harms.

While the effects of an eviction on the community are significant and far-reaching under ordinary circumstances, the United States faces a risk of mass evictions occurring in a concentrated time. A study from this summer that the CDC cited in its Order predicted that, without a moratorium, between 19 and 23 million households would have been evicted by September 30, 2020.[17] 85 Fed. Reg. at 55,295. The United States Census Bureau's household pulse survey estimated in late October and early November that 9.2 million households were behind on rent and more than 26 million had less than high confidence in being able to pay rent next month.[18]

As the CDC noted, we face "[a] wave of evictions on that scale would be unprecedented in modern times." 85 Fed. Reg. at 55,295. In a typical year, about 900,000 of the roughly 43 million renter-occupied households experience a judicial eviction and its devastating consequences.[19] Without a moratorium in effect, the United States could see ten times as many evictions in a matter

---

[17] Katherine Lucas McKay et al., *20 Million Renters Are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship*, ASPEN INSTITUTE (Jun. 19, 2020) (predicting 19-23 million U.S. evictions by Sept. 30, 2020), https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-eviction.

[18] U.S. CENSUS BUREAU, *Week 18 Household Pulse Survey* (Nov. 18, 2020), Housing Tables 1b & 2b, https://www.census.gov/data/tables/2020/demo/hhp/hhp18.html.

[19] EVICTION LAB, *National Estimates: Eviction in America* (May 11, 2018), https://evictionlab.org/national-estimates.

of weeks.  While the Great Recession was devastating, with nearly 7.8 million American families losing their homes over the ten-year span from 2007-2016,[20] the COVID-19 eviction crisis threatens to displace two or three times as many families in a significantly shorter time.

These national numbers are similarly reflected in Ohio, which normally sees about 107,000 eviction lawsuits each year.  Over 306,000 Ohio households are currently behind on rent.[21]  One report estimates that an immediate lift of the CDC's Order would result in between 88,900 and 171,700 evictions filed between now and the end of December – in other words, a year's worth of evictions in Ohio could be compressed into the final month of 2020.[22]

With large numbers of evictions happening so quickly, families facing eviction would face fierce competition for the scarce resources available to mitigate the harm.  Schools, businesses, governments, and non-profits cannot be expected to weather the shock of such enormous and sudden involuntary displacement of their students, workers, customers, and neighbors.

### 4. The disproportionate racial impacts of both evictions and COVID-19 threaten especially devastating outcomes on communities of color.

While the impact of mass evictions would undoubtedly be felt in every corner of the United States, the harshest impacts would likely fall on communities of color.  Pre-COVID studies showed that renter households of color, especially Black women with children, faced eviction at substantially higher rates than other groups.[23]  At the same time, the CDC has recognized that "[t]here is increasing evidence that some racial and ethnic minority groups are being

---

[20] CORELOGIC, *United States Residential Foreclosure Crisis: Ten Years Later* 3 (Mar. 2017), https://www.corelogic.com/research/foreclosure-report/national-foreclosure-report-10-year.pdf.
[21] U.S. CENSUS BUREAU, *Week 18 Household Pulse Survey*, *supra* note 18.
[22] This estimate is from the "Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction" tool provided by the global investment bank Stout Risius Ross and available online at https://www.stout.com/en/services/transformative-change-consulting/eviction-right-to-counsel-resources (last visited Nov. 30, 2020).
[23] Marvin J. Kelley IV, *Testing One, Two, Three: Detecting and Proving Intersectional Discrimination in Housing Transactions*, 42 Harv. J. L. & Gender 301, 339 (2019).

disproportionately affected by COVID-19."[24]

These twin harms of housing loss and adverse health outcomes are closely entwined in communities of color because of numerous social determinants of health.  Black and Latino households tend to have less wealth than white households,[25] meaning they are more likely to fall behind in rent or other critical bills if an income disruption occurs.[26]  Black, Asian, and Latino workers "are overrepresented in the restaurant and hotel industry, two industries facing shutdowns in response to the coronavirus.  Furthermore, Black workers often hold occupations that are less stable, such as jobs in retail and home health and jobs as nursing home aids."[27]  These same jobs also tend to pay lower wages, cannot be performed remotely, lack benefits such as paid sick leave, and present higher risks of infection.[28]

These factors help explain why there have already been "more COVID-19 cases, hospitalizations, and deaths in areas where racial and ethnic minority groups live, learn, work, play, and worship."[29]  If the CDC's Order is stricken and mass evictions proceed, evictions will be disproportionately concentrated in these communities of color where overlapping adverse social factors exacerbate outcomes on stability, health, and COVID transmission.

---

[24] Centers for Disease Control and Prevention, *Health Equity Considerations and Racial and Ethnic Minority Groups* (Jul. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[25] Neil Bhutta et al., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (Sept. 28, 2020), https://doi.org/10.17016/2380-7172.2797.

[26] McKernan, *supra* note 13, at 2 (finding "[l]ow-income families with savings are more financially resilient than middle-income families without savings").

[27] Danyelle Solomon et al., *The Coronavirus Pandemic and the Racial Wealth Gap*, CENTER FOR AMERICAN PROGRESS (Mar. 19, 2020), https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coronavirus-pandemic-racial-wealth-gap.

[28] *Id.*

[29] Centers for Disease Control and Prevention, *supra* note 24.

### B. The Court need not, and should not, defer to the government's narrow reading of the CDC's Order to preserve its constitutionality.

Perhaps concerned that its Order could be vulnerable to Plaintiffs' contentions about impermissible infringement upon landlords' access to court, the CDC has asserted that its Order does not prohibit landlords from filing eviction lawsuit but merely blocks the physical execution of eviction writs. *CDC/HHS Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, Frequently Asked Questions*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf; Defendants' Memorandum in Opposition at 8-9. Yet this construction of the CDC's Order is neither reconcilable with its text nor with Ohio law, and is not necessary to preserve its constitutionality.

### 1. The CDC's Order prohibits any action to remove or cause the removal of a covered tenant, which must include filing and prosecuting eviction lawsuits.

The CDC's Order states that a landlord "shall not evict any covered person from any residential property" where the order is in effect, and defines "evict" to include "any action by a landlord . . . to remove or cause the removal of a covered person from a residential property." 85 Fed. Reg. at 55,293. An eviction lawsuit is, by definition, an action "to remove or cause the removal" of the person against whom the suit is filed. *E.g.,* Oʜɪᴏ Rᴇᴠ. Cᴏᴅᴇ Aɴɴ. § 1923.01(A) (2012) (stating, "If, upon the inquiry, it is found that an unlawful and forcible entry has been made and the lands or tenements are detained, or that, after a lawful entry, lands or tenements are held unlawfully and by force, a judge shall cause the plaintiff in an action under this chapter to have restitution of the lands or tenements."). Thus, filing a state eviction suit must surely constitute an "action" to remove or cause the removal of a tenant under the plain meaning of the order. *See U.S. v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) (stating, "The language of the statute is the starting

10

point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.") (citing *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). The CDC's Order also extends to other actions that might be taken to remove, or cause the removal of, covered persons – such as serving notices to vacate, prosecuting filed eviction cases, arranging for physical evictions to be carried out, or engaging in extrajudicial "self-help" – because the CDC's Order prohibits *any* such actions. 85 Fed. Reg. at 55,294.

This Court need not defer to CDC's own interpretation here because the text of its Order is not genuinely ambiguous and falls outside CDC's area of expertise. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (stating, "the possibility of deference can arise only if a regulation is genuinely ambiguous" and deference is unwarranted when not based on "an agency's authoritative, expertise-based" judgment). Deference to an agency's interpretation of its own regulation is also not appropriate where, as here, it reflects merely a "convenient litigating position" or to "a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties [or] substitutes one view of a rule for another." *Kisor* at 2417-8 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). State landlord-tenant and eviction matters fall outside CDC's area of expertise entirely. *Kisor* at 2414.

### 2. The CDC's Order entitles covered tenants to possession of their homes through December 31, 2020, making eviction suits improper under Ohio law.

Even if the text of the CDC's Order could be construed only to prevent physical execution of eviction writs, the effect would still entitle a tenant to possession of her dwelling unit through December 31, 2020, if that tenant presents a signed declaration and becomes a covered person. 85 Fed. Reg. 55,296. Under Ohio law, a landlord may not bring a summary eviction action unless the landlord has the immediate right to possession. *See Garb-Ko v. Benderson,* 10th Dist. Franklin

No. 12AP-430, 2013-Ohio-1249, ¶ 54 (stating, "To prevail in a forcible entry and detainer action, plaintiff must prove: (1) that the plaintiff met the procedural requirements and properly served the tenant with notice of the eviction, (2) the plaintiff has the right to possess the premises, and (3) the tenant does not have the right to possession.").

During the pendency of the CDC's Order, landlords may pursue an eviction only against non-covered persons, or against covered persons based on one of five enumerated exceptions involving non-financial lease violations.  85 Fed. Reg. at 55,294.  An eviction suit may also be permissible where the landlord asserts grounds for challenging the tenant's covered person status, or for disputing the applicability of the CDC's Order to the property type.  Otherwise, the tenant – not the landlord – would have the immediate right to possession at all times through December 31, and no plausible basis would exist for a landlord to file an eviction suit.  Only if a tenant failed to vacate after expiration of the CDC's Order would an eviction lawsuit be proper.

Interpreting the CDC's Order to allow eviction case filings and only stay physical evictions would further lead to a host of practical difficulties and potential due process violations in state eviction proceedings because tenants would remain in premises for weeks or even months after an eviction judgment was entered.  Within such time periods, tenants might enter into new leases or other agreements with their landlords, need critical repairs or maintenance in the premises, or otherwise interact with their landlords in ways that implicate the legal rights and duties of landlord and tenants, and which may create new facts affecting the tenants' ongoing status in the housing. *E.g. Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 38 Ohio App.3d 79, 81 (10th Dist.1987) (stating, "When a tenant holds over beyond the lease term and pays rent according to the former terms, the law implies a contract on the tenant's part to hold over for an additional term under the same conditions . . . .") (citations omitted).  Yet a landlord who already holds a judgment or writ

of restitution can often cause that judgment to be executed with no further notice to the tenant or opportunity to contest the removal – a circumstance implicating serious due process concerns in this context. *See Flatford v. City of Monroe,* 17 F.3d 162, 167 (6th Cir. 1994) (finding that due process requires notice and hearing before eviction).

Another problem is that, in some states, a tenant may face liability for a landlord's legal fees in an eviction action, payment of which may be necessary to reinstate or preserve a tenancy. 77 A.L.R. 2d 735, § 6.  These legal fees may then become a drain on governmental rental assistance funds, which tenants who invoke the protection of the CDC's Order are obligated to pursue.  85 Fed. Reg. at 55,293.  Indeed, some tenants may simply move out to avoid such liability or to avoid acquiring an eviction case record – both of which can deeply restrict the tenant's rental housing opportunities long into the future.[30]  Such moves would frustrate the CDC's reason for issuing its Order.  85 Fed. Reg. at 55,294 (stating, "Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID-19 spread.").

### 3. The CDC's Order is constitutional because it is a necessary and rational response to the threat of mass evictions and the spread of COVID-19.

Even though the CDC's Order prohibits landlords from proceeding with certain eviction lawsuits, it does not impermissibly infringe upon Plaintiffs' access to court.  The CDC's Order imposes only a temporary restriction on access to eviction procedures, leaves other judicial mechanisms available to adjudicate bona fide disputes, and serves a rational basis in stopping mass evictions that would contribute to the spread COVID-19.  *Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *25 (D. Mass. Sept. 25, 2020) (rejecting access to court claims against state eviction moratorium under takings, contracts clause, and due process theories);

---

[30] Desmond, *supra* note 12, at 49; Paula A. Franzese, *A Place to Call Home: Tenant Blacklisting and the Denial of Opportunity*, 45 FORDHAM URB. L.J. 661, 666-68 (2018).

*Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456, at *16 (S.D.N.Y. June 29, 2020) (finding that state eviction moratorium did not violate Petition Clause because the restriction was temporary and other kinds of lawsuits were available).

Restrictions on civil court access require only a rational basis. *See U.S. v. Kras*, 409 U.S. 434, 445 (1973). This means the CDC's Order need only have a "'real or substantial relation' to public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (quoting *Jacobson v. Massachusetts*, 187 U.S. 11, 31 (1905)). The CDC's Order easily survives under this standard because preventing mass evictions, and the corresponding displacements and of movements of people, reduces the spread of COVID-19. 85 Fed. Reg. 55292 (finding, among other things, that "housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19."). The CDC's Order also gives health officials more time to bring the spread of COVID-19 under control and gives researchers more time to develop vaccines and treatments. Note that, in the context of emergency health measures in public crises, the Supreme Court has long held that courts should not second-guess the wisdom or efficacy of the measures taken to protect the public. *Jacobson* at 38. The CDC's Order is presumed constitutional and defeating it would require Plaintiffs to negate "'every conceivable basis which might support it.'" *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting *Armour v. Indianapolis*, 566 U.S. 673, 681 (2012)).

In addition, heightened scrutiny applies to a restriction on court access only where access to a judicial procedure is the "only effective means" of protecting a fundamental interest. *Kras* at 455 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)). A landlord's interest in evicting a non-paying tenant from rental property does not meet this standard. An eviction involves a

14

business relationship, not a fundamental human condition.  *Baptiste* at *25 (stating, "Even assuming that a right to evict a tenant would be a protected property interest . . . for purposes of a due process claim, it does not follow that there is a fundamental right to evict . . . .  In fact, the Constitution establishes no such fundamental right.") (citing *Rubinovitz v. Rogato,* 60 F.3d 906, 910-11 (1st Cir. 1995)); *see Kras* at 445-46 (finding that "Government's role with respect to the private commercial relationship is qualitatively and quantitatively different from its role in the establishment, enforcement, and dissolution of marriage.").  And an eviction lawsuit is not the only judicial means by which a landlord can vindicate a legal claim.  *Elmsford Apartment* at *16 (finding, "Although nonpayment proceedings have been suspended, Plaintiffs can still sue their tenants for arrearages through a breach of contract action . . . and the fact that is not their preferred remedy is of no moment.").

Finally, mere delay in bringing an eviction suit "cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process."  *Id*. (citing *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)); *accord Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829, 2020 WL 4558682, at *20 (D. Conn. Aug. 7, 2020) (finding that moratoria that "only delay Plaintiffs' ability to initiate evictions; they do not eradicate all future opportunity for Plaintiffs to pursue evictions" and, thus, did not violate the Due Process Clause of the Fourteenth Amendment).  The CDC's Order is temporary and landlords will regain use of state judicial eviction procedures upon its expiration.

## VI.      Conclusion

For the foregoing reasons, CLAS and NHLP respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

/s/ Andrew D. Neuhauser

15

Andrew D. Neuhauser (#0082799)
Ryan W. Maxwell (#0091926)
James W. Yskamp (#0093095)
Community Legal Aid Services, Inc.
50 South Main Street, Suite 800
Akron, OH  44308
Telephone:     (330) 535-4191
Facsimile:      (330) 535-0728
aneuhauser@communitylegalaid.org
rmaxwell@communitylegalaid.org
jyskamp@communitylegalaid.org


/s/ Eric Dunn                                        
Eric Dunn, *seeking admission pro hac vice*
National Housing Law Project
919 East Main Street, Suite 410
Richmond, VA  23219
Telephone:     (415) 546-7000
Facsimile:      (415) 546-7007
edunn@nhlp.org

Counsel for Amici Curiae Community Legal
Aid Services, Inc., and the National Housing
Law Project

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record by electronic means via the Court's ECF system on November 30, 2020.

/s/ Andrew D. Neuhauser
Andrew D. Neuhauser (#0082799)