# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SKYWORKS, LTD, *et al.*, | ) | Case No. 5:20-cv-2407 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Carmen E. Henderson |
| CENTERS FOR DISEASE | ) | |
| CONTROL AND PREVENTION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Previously, the Court determined that orders the Centers for Disease Control and Prevention issued implementing a nationwide eviction moratorium exceed the agency's statutory authority in Section 361 of the Public Health Service Act, 42 U.S.C. § 264(a), and are, therefore, invalid.  (ECF No. 54, PageID #1882.)  Shortly after that, another district court within this Circuit reached the same conclusion.  *See Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, ___ F. Supp. 3d ___, ___, 2021 WL 1171887, at *10 (W.D. Tenn. Mar. 15, 2021), *motion for stay pending appeal denied*, 992 F.3d 518, 523–24 (6th Cir. 2021).  So too did another district court.  *See Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*, ___ F. Supp. 3d ___, ___, 2021 WL 1779282, at *9 (D.D.C. May 5, 2021), *stayed pending appeal*, ___ F. Supp. 3d ___, 2021 WL 1946376 (D.D.C. May 14, 2021).  Although the moratorium was set to expire on March 31, 2021, the CDC extended it through

June 30, 2021.  *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 16,731 (Mar. 31, 2021).

Plaintiffs move to alter or amend the earlier judgment in this case seeking to clarify the scope of the judgment the Court issued.  (ECF No. 58.)  Specifically, they seek a ruling on whether the Court's judgment binds only the parties to this action or applies more broadly and, if so, how far.  On these questions, the parties disagree. Plaintiffs, a collection of landlords, property managers, and a trade association representing similar persons, maintain the CDC's order, which sets a nationwide policy, has no validity nationally or, at least, within the Northern District of Ohio. For its part, the CDC reads the Court's ruling narrowly as binding only the parties to this case.  This dispute implicates complex legal issues and doctrines about which much remains unsettled and the subject of debate.

## I.      Threshold Procedural Issues

Before wading into those choppy waters, the Court addresses two procedural matters Defendants raise.

### I.A.     Standing

Defendants maintain Plaintiffs lack standing to seek to expand the relief obtained on the merits for the benefit of those not parties to the litigation.  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotations and citations omitted).  Defendants argue that Plaintiffs lack

standing because they cannot show what injury to *Plaintiffs* a nationwide remedy redresses. (ECF No. 60, PageID 1981.)

This argument misses the mark. Apparently, Defendants construe Plaintiffs' motion as a new request, almost a new lawsuit. But the Court determined Plaintiffs have standing as part of its previous ruling. (ECF No. 54, PageID #1867–69.) That determination analyzed redressability. (*Id.*) Instead of a new claim, Plaintiffs seek to alter or amend the previous judgment, which they had standing to seek through this litigation, to determine or make clear as a matter of law the scope of the remedy ordered. That is not a new inquiry, but part and parcel of the merits of the litigation already addressed.

As a formal matter, the authorities on which Defendants rely trace back to the maxim that "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). By this sound bite, the Supreme Court meant that "the right to complain of *one* administrative deficiency" does not "automatically confer[] the right to complain of *all* administrative deficiencies." *Id.* In this respect, a "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* at 357 (citing *Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995)). In other words, as *Lewis* made clear, a court may not remedy one unlawful administrative action by declaring unlawful another. *Id.* Plainly, Plaintiffs do not seek to do so here. Instead, their motion remains focused on CDC's eviction moratorium. Plaintiffs have standing and, on reconsideration of the record, the Court adheres to this view.

3

**I.B.    Rule 59(e)**

A court may alter or amend the judgment where there is a clear error of law, newly discovered evidence, or an intervening change in controlling law or to prevent manifest injustice.  *GenCorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (citations omitted).  Such relief constitutes an extraordinary remedy reserved for exceptional cases.  *Hines v. Commissioner of Soc. Sec.*, 414 F. Supp. 3d 1080, 1081 (S.D. Ohio 2019) (citations omitted).  It is not an opportunity to re-argue matters or "to raise arguments which could, and should, have been made before judgment issued."  *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (quoting *Federal Deposit Ins. Corp. v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992)).

On the basis of this standard, Defendants urge summary denial of Plaintiffs' motion, arguing they could have raised questions regarding the proper scope of relief before judgment issued.  In fact, they did.  For example, in briefing on Plaintiffs' motion for a preliminary injunction, they argued for a nationwide injunction.  (ECF No. 33, PageID #401 n.1.)  Further, the Court's ruling apparently left an ambiguity regarding the scope of the relief ordered.  In fairness, review of the Court's ruling shows that it did not expressly address how far the remedy ordered extends.  For this reason, the Court determines that this case presents the rare and exceptional case warranting consideration of a motion to alter or amend the judgment.  The Court owes the parties, the public, and the Sixth Circuit at least that much.

## II.    Scope of the Remedy

The parties agree that the Court's ruling declaring the eviction moratorium invalid extends to the parties, including members of the National Association of Homebuilders.  (ECF No. 58, PageID #1958; ECF No. 60, PageID #1982.)  Under the Administrative Procedure Act, a challenge to agency action may take the form of a declaratory judgment.   5 U.S.C. § 703.   Where, as here, an agency exceeds its statutory authority, Congress directs a court to "hold unlawful and set aside" agency action.  *Id.* § 706(2).  Plaintiffs' motion implicates the scope these statutory remedies, each of which the Court addresses in turn.

### II.A.   Declaratory Judgments

Under 28 U.S.C. § 2201(a), titled "Creation of Remedy," a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." On the face of the statute, a declaratory judgment extends only to an "interested party" and has "the force and effect of a final judgment."  *Id.*

A declaratory judgment is an equitable remedy in the nature of an injunction. Determining what this axiom means and how it applies here requires some discussion of the historical origins of this remedy.  Notwithstanding the vintage of declaratory judgments, much about their basic application and function remains unclear.  *See, e.g., Florida ex rel. Bondi v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 2d 1256, (N.D. Fla. 2011) (rejecting Department of Justice's argument that a declaratory

5

judgment has no effect until the conclusion of appeals), *rev'd on other grounds sub nom. National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).  For this reason as well, some discussion of the jurisprudence developing the remedy is in order and will help explicate the remedial character of a declaratory judgment.

### II.A.1. Non-Traditional Remedy

Enactment of the federal Declaratory Judgment Act traces in part to the seminal case of *Ex parte Young*, 209 U.S. 123 (1908).  Although States enjoy immunity against suit in federal court under the Eleventh Amendment, the Supreme Court ruled in that case that lawsuits alleging violations of federal law may proceed in federal court against State officials.  *Id.* at 143, 145.  Further, the Supreme Court authorized federal courts to enjoin State officials from enforcing laws that violate the Constitution, including by commencing criminal proceedings.  *Id.* at 159–62.  In the "storm of controversy" the ruling stirred up, Congress took steps to cabin the power of the federal courts to enjoin enforcement of State laws.  *Steffel v. Thompson*, 415 U.S. 452, 465 (1974).

In 1919, States began enacting declaratory judgment statutes, largely as a part of legal reform efforts of the day.  10B Wright, Miller & Kane, *Federal Practice and Procedure* § 2752 (4th ed. 2016).  A leading advocate for their adoption described the effect of declaratory judgments as "not . . . creating new legal relations of a secondary or remedial character; they purport merely to declare preexisting relations and create no secondary or remedial ones.  Their distinctive characteristic lies in the fact that they constitute merely an authentic confirmation of already existing relations."

Edwin M. Borchard, *The Declaratory Judgment—A Needed Procedural Reform*, 28 Yale L.J. 1, 5 (1918) (footnotes omitted).  In other words, the advent of the declaratory judgment enabled State courts to resolve disputes by means other than issuing an injunction or awarding monetary damages.

But questions regarding the constitutionality of such judgments under Article III forestalled the adoption of the remedy at the federal level.  *See, e.g.*, *Willing v. Chicago Auditorium Ass'n*, 277 U.S. 274, 284, 289 (1928) (noting in an opinion by Justice Brandeis that a declaratory judgment lies beyond the judicial power under Article III).  In 1933, the Supreme Court reversed course when reviewing a State court declaratory judgment.  *Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 259 (1933).  There, a taxpayer sued State tax officials arguing, among other things, that the tax at issue violated the Constitution.  Rejecting the constitutional challenge, the Supreme Court held that it had jurisdiction over an action for declaratory judgment, which presented a controversy in the constitutional sense even though the plaintiff did not seek a coercive decree.  *Id.* at 264–65.

The year after *Wallace*, Congress enacted the Federal Declaratory Judgment Act of 1934, 48 Stat. 955, in part as a delayed reaction to the antisuit injunction upheld in *Ex parte Young*.  *See Steffel*, 415 U.S. at 466.  When the Supreme Court upheld the Act's constitutionality, it characterized a declaratory judgment as a non-traditional remedy within the power the Constitution delegates to Congress to control the jurisdiction of the federal courts.  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  Indeed, the Act followed quickly on the heels of the Rules Enabling Act,

7

another object of legal reform efforts aimed at judicial administration.  *See, e.g.*, Andrew Bradt, *"Much to Gain and Nothing to Lose":  Implications of the History of the Declaratory Judgment for the (b)(2) Class Action*, 58 Ark. L. Rev. 767, 780 (2005–06).

### II.A.2. Distinct from Injunctions

Distinguishing between declaratory and injunctive relief took some time and development through case-by-case adjudication, much of which involved the complicated interplay between federal judicial power and State proceedings in the long wake of *Ex parte Young*.  As relevant here, a declaratory judgment merits separate consideration from a request for injunctive relief.  In *Zwickler v. Koota*, 389 U.S. 241, 242–45 (1967), a gentleman who distributed literature critical of a congressional candidate in the 1964 elections was convicted of violating a State law that outlawed distributing anonymous leaflets.  On appeal in State court, his conviction was overturned, and he then sought both declaratory and injunctive relief in federal court on the ground that the First Amendment barred his re-trial.  After the lower federal courts abstained, the Supreme Court noted that the injunction sought would restrain the prosecution from proceeding, while the request for a declaratory judgment sought a different remedy—a ruling that the State statute violated the Constitution.  *Id.* at 253.

Accordingly, the Supreme Court determined that an injunction and a declaratory judgment require independent consideration under the separate standards governing each.  *Id.* at 254.  The Supreme Court held "that a federal district

court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Id*.

### II.A.3. Similar Practical Effect

Despite the formally different requirements and standards governing each remedy, the practical effect is similar.  In *Younger v. Harris*, 401 U.S. 37, 41 (1971), the Supreme Court held that principles of equity, comity, and federalism bar the federal courts from enjoining a prosecution in State court absent special circumstances.  The same day, the Court extended this holding to declaratory judgments directed at a State criminal prosecution.  *Samuels v. Mackell*, 401 U.S. 66, 73 (1971).  In doing so, the Supreme Court recognized that a declaratory judgment lays the foundation for subsequent injunctive relief under Section 2202.  *Id*. at 72. Even where no injunction follows, "the declaratory relief alone has virtually the same practical impact as a formal injunction," including application of preclusion doctrine. *Id*.  With an injunction, a federal court may enforce compliance.  In contrast, a declaratory judgment functions through persuasion, but is a step toward coercive means if necessary.  *See* 28 U.S.C. § 2202.

Applying these principles in a third case decided the same day, the Supreme Court reversed a federal district court's grant of an injunction ordering the return of materials seized pursuant to State and local obscenity laws and vacated the balance of the judgment.  *Perez v. Ledesma*, 401 U.S. 82, 88 (1971).  Regarding the part of the ruling vacated, a dissent characterized a declaratory judgment as "a milder

alternative" to an injunction. *Id.* at 111 (Brennan, J., dissenting in part). The dissent went on to observe that "the considerations governing the grant of a declaratory judgment are quite different from those governing the grant of an injunction, even though both forms of relief are discretionary and thus, in the broad sense of the term, 'equitable' in nature." *Id.* at 122 (Brennan, J., dissenting in part). This view shortly later commanded a majority at the Supreme Court. *Steffel*, 415 U.S. at 466–67.

### II.A.4. Judgment and Preclusion Doctrine

Though perhaps milder than an injunction in some respects, a declaratory judgment results in the entry of a *judgment* and all that goes with it. "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). "A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them . . . ." Restatement (Second) of Judgments § 33 (1982). As a judgment, a declaratory judgment has the same binding force as any final judgment in any other type of action. *Id.*; 10B Wright, Miller & Kane, *Federal Practice and Procedure*, § 2771 (2016).

Given the nature of a declaratory judgment, however, one feature of the remedy differs from others—its preclusive effect in other proceedings. Res judicata or claim preclusion bars re-litigating claims and defenses raised in an earlier proceeding. Collateral estoppel or issue preclusion operates similarly, but with respect to particular issues. *See Continental Cas. Co. v. Indian Head Indus., Inc.*, 941 F.3d 828, 835 (6th Cir. 2019). These general principles necessarily apply somewhat

differently to declaratory judgments.  By its nature, a declaratory judgment decides a discrete issue in dispute such that claim preclusion does not and cannot apply to later actions.  *Id.* (citing *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 196 (2d Cir. 2010)) (discussing the declaratory judgment exception to claim preclusion).  In other words, it makes no sense to bar later claims or defenses that go beyond the issue presented in an action for a declaratory judgment.  *Id.*; *see also* 28 U.S.C. § 2202 (contemplating actions or proceedings following a declaratory judgment).

But a declaratory judgment retains its full force and effect when it comes to issue preclusion.  *Continental Cas.*, 941 F.3d at 835 n.1 (citing Restatement (Second) of Judgments § 33).  Again, the nature of the action dictates that logical result.  Significantly, a declaratory judgment does *not* ordinarily preclude (re-)litigation of an issue by one who was not a party to the action seeking the declaratory judgment.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 556 (6th Cir. 2008).  Nor may a non-party attempt to use a judgment from a case to which it was not a party against the federal government or its officials.  *United States v. Mendoza*, 464 U.S. 154, 162 (1984).

### II.A.5. Nationwide Relief

To the extent a declaratory judgment is equitable in nature or has some commonalities with an injunction, Plaintiffs' motion implicates a more immediate subject of controversy in the federal courts, which the parties debate in their briefs: the availability of universal or nationwide injunctions, a more familiar form of equitable relief.

11

In his concurrence in *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–25 (2018), Justice Thomas noted the increasing frequency of such injunctions and expressed skepticism that district courts have the authority to issue them.  Although a full discussion of the issues this ongoing debate implicates is not necessary to resolve the pending motion, a few points from Justice Thomas's concurrence merit brief mention. Historically and "as a general rule, American courts did not provide relief beyond the parties to the case."  *Id.* at 2427 (Thomas, J., concurring).  Complete peace required joining those with common interests as parties.  *Id.*  These traditional limits on equity began to loosen by the second half of the last century when some courts began to conceive of the judicial function as resolving general legal questions, not simply the disputes of particular litigants.  *Id.* at 2428.  Beyond these limits on the equitable powers of the courts, Justice Thomas grounded his skepticism in the need for legal questions to percolate through the federal courts, concerns over forum shopping, and creating national emergencies for the courts and the Executive Branch.  *Id.* at 2425.

In dissent, Justice Sotomayor joined by Justice Ginsburg opined that the district court did not abuse its discretion by issuing a nationwide injunction "[g]iven the nature of the Establishment Clause violation and the unique circumstances of this case."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2446 n.13 (2018) (Sotomayor, J., dissenting).  Although the dissent did not go further in explaining its reasoning, the little it did provide suggests that nationwide injunctions may be appropriate in its veiw in some cases, particularly those that seek to remedy constitutional harms.

Subsequently, Justice Gorsuch joined by Justice Thomas concurred in granting a stay pending appeal of an order enjoining the so-called public charge rule. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 599 (2020) (Gorsuch, J., concurring). Put more plainly, a district court blocked the rule, and the Supreme Court allowed the rule to remain in effect pending resolution of the merits on appeal. Justice Gorsuch criticized the growing use of universal or nationwide injunctions. *Id.* at 600. Noting that "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit," Justice Gorsuch raised "serious questions" whether Article III permits courts to grant such relief. *Id.* Further, he observed that extending a remedy beyond the parties to a case makes courts appear to be acting in a political, not judicial, capacity. *Id.* Additionally, Justice Gorsuch expressed the belief that good judicial decision making counseled against nationwide relief. *Id.* at 600–01.

Debate among the Justices continued in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.28 (2020) (Ginsburg, J., dissenting). In dissent, Justice Ginsburg joined by Justice Sotomayor reiterated the view the two Justices expressed in their dissent in *Trump v. Hawaii* that a nationwide injunction may be appropriate in certain circumstances. Here, they relied on the text of the Administrative Procedure Act to provide complete relief to the plaintiffs and redress harm not bounded by State lines. *Little Sisters*, 140 S. Ct. at 2412 n.28 (Ginsberg, J., dissenting).

13

Recently, the Sixth Circuit also spoke to the proper scope of an injunction enjoining enforcement of an administrative rule. *Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 474 (6th Cir. 2021).  Because the Sixth Circuit reversed the district court's decision not to issue a preliminary injunction, the court did not have occasion to expound on the issue much more than did Justice Thomas in his concurrence in *Trump v. Hawaii*.  To provide guidance on remand, however, the Sixth Circuit directed that the scope of the injunction "may not exceed the bounds of the four states within the Sixth Circuit's jurisdiction and, of course, encompasses the parties themselves." *Gun Owners of America*, 992 F.3d at 474.  Declining to permit a universal or nationwide injunction, the court noted that other circuits had upheld the rule at issue, and it was reluctant to "create an absurd situation in which the ATF must prevail in every single case brought against the Final Rule in order for its interpretation to prevail." *Id.*  Instead, the court saw value in percolation of the issue in the lower courts. *Id.*

Although the availability of universal or nationwide injunctions remains the subject of ongoing debate among courts, scholars, and the political branches, the Court need not enter the fray.  In their current motion, Plaintiffs do not seek reconsideration of the denial of an injunction.  Nor do they seek the entry of universal or nationwide injunctive relief.  For present purposes, this discussion highlights the considerations animating the Sixth Circuit's recent guidance on the issue that, perhaps, has prudential force in understanding the scope of somewhat analogous equitable relief.

14

## II.A.6. Scope of a Declaratory Judgment

With the benefit of this background, some basic principles regarding declaratory judgments come into focus that bear on the pending motion. "A declaratory judgment is simply a statement of rights, not a binding order supplemented by continuing sanctions." *Steffel*, 415 U.S. at 482 (Rehnquist, J., concurring). Although in some sense equitable in nature, different considerations govern the issuance of an injunction and declaratory relief, making each a distinct remedy. *See, e.g.*, *Zwickler*, 389 U.S. at 254; *American Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 824 (2d Cir. 1968) (describing a declaratory judgment as "a statutory creation" that is "neither legal nor equitable"). A declaratory judgment has full issue-preclusion effect, *Continental Cas.*, 941 F.3d at 835 n.1 (citing Restatement (Second) of Judgments § 33), but does not foreclose later litigation by those who are not parties to the action, *see Scottsdale Ins.*, 513 F.3d at 556, although those non-parties may not bind the federal government to the earlier ruling, *see Mendoza*, U.S. at 162.

Accordingly, the Court concludes that a declaratory judgment binds the parties, but only the parties, wherever they may be. This result tracks the language of the Declaratory Judgment Act, which empowers courts to declare the rights "of any interested *party*." 28 U.S.C. § 2201 (emphasis added). On its face, this statutory language limits the scope of a declaratory judgment to a party. Here, then, declaratory relief extends to Plaintiffs and, as the parties recognize and agree, members of the National Association of Homebuilders.

15

## II.B.  Administrative Procedure Act

While the Administrative Procedure Act authorizes judicial review through an action for a declaratory judgment, 5. U.S.C. § 703, it also empowers courts to "hold unlawful and set aside agency action," *id.* § 706(2).  Plaintiffs maintain that the statute authorizes vacatur (setting aside the agency action) on a nationwide basis. Indeed, they go further and argue the statute requires such a remedy where, as here, the agency has exceeded the authority Congress gave it and taken action that applies nationally, though Plaintiffs point out that the Court has discretion to fashion a remedy that does not reach so far.  Defendants contend the Act does not authorize nationwide relief and that various legal and policy reasons counsel against reading the statute as Plaintiffs urge or extending relief beyond the parties to this dispute. In marshaling their respective positions, the parties draw on a host of competing authorities.  Those authorities show, somewhat surprisingly, that the scope of relief under the Administrative Procedure Act in a case like this remains unsettled and less understood than the nature of a declaratory judgment.

### II.B.1. Plain Language and Structure of the Statute

To resolve the dispute over the proper scope of the remedy on the facts and circumstances of this case, the Court begins with the text of the statute.  In relevant part, the Administrative Procedure Act provides:  "To the extent necessary to decision and when presented, the reviewing court shall . . . hold unlawful and set aside agency action" where, as here, that action exceeds the agency's statutory authority.  *Id.* § 706(2)(C).  Without question, the eviction moratorium constitutes an agency action

under the Act. *See id.* §§ 551(13) (defining "agency action" to include "the whole or a part of an agency . . . order") & 701(b)(2).

Without more, the statutory text directing a reviewing court to "hold unlawful and set aside agency action" does not directly resolve the parties' disagreement over the scope of the remedy. To the contrary, it begs the question as to whom the agency action shall be set aside—only the parties, all affected by the agency action, or some group in between, perhaps one limited by the geographic limits of the Court's jurisdiction. The broader structure of the statute does not provide much guidance on the issue either.

### II.B.1.a. Section 702

Chapter 7 of Title 5 of the United States Code governs judicial review of agency action. Section 702 provides a general right of review and authorizes entry of judgment against the United States (and the officers at issue). 5 U.S.C. § 702. But "[n]othing herein (1) affects other limitations on judicial review or the power or duty of the court to . . . deny relief on any other appropriate legal or equitable ground[.]" *Id.*

The definition of "relief" sheds some light on the question. Under the Act, it means:

the whole or a part of an agency—

(A)  grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B)  recognition of a claim, right, immunity, privilege, exemption, or exception; or

> (C)  taking of other action on the application or petition of, and
> beneficial to, a person[.]

5 U.S.C. § 551(11).  Although defining relief to include "the whole" of an agency action

implies a broad, even universal, scope for a remedy, the specific subsections of the

statute speak in more limited terms to actions or matters specific to a particular

person or party.  Indeed, the catch-all of subsection (C) goes so far as to mention "a

person" specifically, suggesting a more limited scope than the potential sweep of the

introductory language "the whole . . . of an agency" action.  Overall, Section 702

disclaims limiting judicial review and the scope of equitable relief.  Therefore, those

limits must come from other sources, to the extent there are any.

### II.B.1.b. Section 703

On the surface, Section 703, titled "Form and venue of proceeding," appears to

provide for the issuance of declaratory judgments, writs, or injunctions in review of

an agency action:

> The form of proceeding for judicial review is the special statutory review
> proceeding relevant to the subject matter in a court specified by statute
> or, in the absence of inadequacy thereof, any applicable form of legal
> action, including actions for declaratory judgments or writs of
> prohibitory or mandatory injunction or habeas corpus, in a court of
> competent jurisdiction.  If no special statutory review proceeding is
> applicable, the action for judicial review may be brought against the
> United States, the agency by its official title, or the appropriate officer.
> Except to the extent that prior, adequate, and exclusive opportunity for
> judicial review is provided by law, agency action is subject to judicial
> review in civil or criminal proceedings for judicial enforcement.

5 U.S.C. § 703.  But here the form of legal action refers not to the remedies available

to a reviewing court.  Instead, that language loosely parallels the language in Rule 2

of the Federal Rules of Civil Procedure, which effectively abolishes distinctions

between law and equity in favor "one form of action—the civil action."  Rather than provide remedies, Section 703 points the way into court for a person seeking review of agency action using one of the forms provided in the statute (a declaratory judgment or a writ, for example) or, alternatively, a special statutory proceeding if available.

Consistent with its title, this section also provides that Congress may create a different mechanism for judicial review than the general procedure provided in the Administrative Procedure Act, in which case that special statutory review proceeding controls.  This special statutory review provision may, for example, establish a particular or exclusive venue for challenges to a selected class of agency actions.  *See, e.g.*, 28 U.S.C. § 2342.  But such a provision does not alter the remedial powers of *other* courts reviewing agency actions that fall *outside* the set of suits picked out by a special statutory review provision, as is the case here.

### II.B.1.c. Section 704 and Section 705

These provisions address, respectively, the timing of a challenge to agency action and provisional relief pending entry of a final judgment.  While the former (Section 704) identifies when agency action becomes final and reviewable, the latter (Section 705) allows a reviewing court to preserve the status quo or prevent irreparable injury pending conclusion of the proceedings.  In the title of Section 705, the term "relief" appears again.  5 U.S.C. § 705.  Under this provision, a reviewing court "may issue all necessary and appropriate process to postpone the effective date

19

of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.*

Again, this statutory text points in different directions.  Postponing the effective date of agency action under Section 705 suggests a universal reach for judicial action.  In many cases, taking such a step would affect more than just the parties before the court.  At the same time, preserving "status or rights" under Section 705 tailors provisional relief to those before the court specifically challenging agency action.

### II.B.1.d. Section 706

Finally, Section 706, titled "Scope of review," closes out the provisions of the Administrative Procedure Act addressing judicial review.  This provision lies at the center of the present motion, and the Court already set forth its relevant language.  Neither the Act's text nor its structure provides a definitive answer to the question of how far setting aside agency action extends.

### II.B.2. History

By the time Congress enacted the Administrative Procedure Act in 1946, the Supreme Court had granted equitable relief (injunctive or otherwise) that applied beyond the parties to a case in a handful of relevant suits at best.  In *Lewis Publishing Co. v. Morgan*, 229 U.S. 288, 316 (1913), and *Journal of Commerce & Commercial Bulletin v. Burleson*, 229 U.S. 600, 600 (1913) (per curiam)), newspaper publishers challenged a statute conditioning second-class postal benefits on the disclosure of certain information.  Pending a final ruling in the case, the Supreme Court enjoined

20

enforcement of the statute against the plaintiffs and other newspaper publishers as well. *Burleson*, 229 U.S. at 600. But the issue arose in a somewhat unusual procedural posture because the federal government had agreed not to enforce the statute, and the plaintiffs sought the injunction pending appeal only when the federal officials reneged. *Id.*

In other cases in the same general era, the Supreme Court affirmed relief that extended beyond the parties to the dispute. For example, in *Hill v. Wallace*, 259 U.S. 44, 72 (1922), the Supreme Court affirmed an injunction against a federal agricultural statute ruled unconstitutional. During the pendency of the appeal, the Supreme Court gave all those trading on the Chicago Board of Trade, not just the plaintiffs, the benefit of preliminary relief, *Hill v. Wallace*, 257 U.S. 310, 310–11 (1921), before enjoining the statute to prevent a multiplicity of suits, *Hill*, 259 U.S. at 62. And in *United States v. Baltimore & Ohio Railroad Co.*, 293 U.S. 454 (1935), twenty railroads challenged a federal regulation that required the use of certain equipment on steam locomotives. In the Northern District of Ohio, a three-judge court vacated the regulation at issue and enjoined its enforcement against all railroads, not just the plaintiffs. *Baltimore & Ohio R.R. Co.*, 5 F. Supp. 929, 930 (N.D. Ohio 1933) (per curiam). The Supreme Court affirmed. 293 U.S. at 463–64.

Plaintiffs point to one case in particular to bolster their argument. They rely on *Columbia Broadcasting System v. United States*, 316 U.S. 407, 418–19, 425 (1942), where the Supreme Court determined that broadcasters could challenge regulations that prohibited certain kinds of affiliation agreements. In doing so, the Supreme

Court acknowledged that the regulations at issue affected all broadcasters, many of whom were not parties to the action and who conformed their conduct to the agency's rules.  *Id.* at 418.  But the Supreme Court did not expressly speak to the power of a favorable judgment directly to set aside agency action as to those non-parties, even if they benefitted indirectly from such a result.  *Id.* at 418–19.

Additionally, Plaintiffs point to two statutes authorizing lawsuits to set aside orders certain agencies adopted.  *See* Urgent Deficiencies Act of 1913, Pub. L. No. 63-32, 32 Stat. 208, 219 (1913); Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064, 1093 (1934).  Such special statutory proceedings, entirely permissible under Section 703, have limited application in a context outside their respective settings.

Based on these precedents and statutory examples, Plaintiffs argue that Congress incorporated into the Administrative Procedure Act broad power for a court to set aside agency action beyond the parties to an action.  Like the statutory text and structure, in the Court's view, the history against which Congress legislated is equivocal.  On the one hand, it suggests that Congress knew courts at times exercised broad powers that extended beyond the parties to a particular dispute where agencies overstepped their bounds.  On the other hand, these particular cases arose in circumstances involving fairly discrete industries or a limited number of potential plaintiffs.  They also came in challenges to rules and regulations far removed from those involving more sweeping regulatory actions such as the eviction moratorium.

Reliance on cases such as these tends to look at the question from the top down—that is, whether the Supreme Court may fashion (or approve) a remedy that goes beyond the parties.[1]  In the matter at hand, however, the question in the first instance involves the scope of the judicial power of a district court.  More immediately, these older cases arose in a qualitatively different moment in the development and functioning of the administrative state.  Although Congress may have taken some lessons from the experience of judicial review of agency action when it enacted the Administrative Procedure Act, translating those historical experiences through text that does not directly address the issue fails to provide a clear answer to the scope of the remedy available under Section 706 on the facts and circumstances of this case.

### II.B.3. Precedent

In the face of this unclear statutory language, structure, and history, Plaintiffs rely on a more recent pronouncement of the Supreme Court to support their position that vacatur of the eviction moratorium applies more broadly.

### II.B.3.a. Supreme Court

In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 900 (1990) (5-4 decision), Justice Blackmun dissented from the majority's determination that the plaintiff lacked standing to challenge 1,250 land-use designations the Bureau of Land

---

[1] In cases where a lower court granted broader relief, it was appropriate to do so because, for example, the regulation in controversy concerned non-parties such as those doing business at the Chicago Board of Trade that still fell within the lower court's territorial jurisdiction.  *See Hill*, 259 U.S. at 72.  The three-judge district court in *Baltimore & Ohio Railroad Co.* stands as a notable exception.  But such a panel provided something of a procedural check in the wake of *Ex parte Young* that has since fallen into far less frequent use.

Management made.  In the course of his dissent, Justice Blackmun agreed with the majority's discussion of the type of relief that might be available to the plaintiffs if they had standing.  In certain circumstances, the dissent explained, a single plaintiff may obtain relief that extends beyond the parties before the court.  In the view of Justice Blackmun and the three other Justices who joined his dissent, invalidation of an agency action of broad applicability goes beyond the particular parties to the dispute:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.  Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.  On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Id.* at 913 (Blackmun, J., dissenting).

Because Justice Blackmun characterized his dissent as agreeing with the majority on the scope of relief available under the Administrative Procedure Act, Plaintiffs rely on this language—as do various courts—to uphold the practice of nationwide vacatur of administrative action in an appropriate case.  But the broader context and discussion is not so clear.  This view relies on a single footnote in the majority's opinion spelling out that a person with standing could challenge the program at issue "and the *entire* 'land withdrawal review program,' insofar as the

24

content of that particular action is concerned, would thereby be affected." *Id*. at 890 n.2 (emphasis added).

But reading this footnote expansively overlooks the context and the limitation the majority wrote into its dictum.  In context, the plaintiffs in *Lujan* sought to challenge a series of agency decisions they argued constituted a complete program (or, in the language of the statute, an agency action).  So, the word "entire" in the footnote refers not to a facial challenge leading to nationwide vacatur, but to how in theory the plaintiffs in *Lujan* could challenge all of the administrative land-use designations with which they took issue.  It also ignores that the hypothetical challenge the majority describes still turns on the "the content of that particular action."  Put another way, the Supreme Court in *Lujan* was concerned with what sort of agency actions Section 704 subjects to review, not the scope of the remedy available under Section 706.

Additionally, the majority opinion makes plain that it did not contemplate the sort of global relief the dissent outlines, at least as a routine matter.  For example, the majority speaks of a controversy of "manageable proportions" that depends on "some concrete action applying the regulation to the claimant's situation . . . ." *Id*. at 891.  Further, the majority conceives of a "case-by-case approach" that would result in more modest challenges to administrative action. *Id*. at 894.  Even where Congress provides for judicial review at a higher level of generality, courts will intervene only to avoid an unlawful result from a regulation. *Id*. "Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a

whole 'program' to be revised by the agency . . . ." *Id.*  In this last category the majority identifies, the judiciary does not have the last word—the agency does.

Only in this very narrow sense do the majority and dissent in *Lujan* agree (albeit in dicta), and only in the most limited of circumstances with proper assurances that courts adhere to their proper role under Article III.

### II.B.3.b. Circuit Courts

Beyond this discussion in *Lujan*, the Supreme Court has yet to address definitively—one way or the other—the issue of the scope of relief where a court sets aside agency action as beyond the power Congress delegated to the agency.  Lower courts have, appropriately and of necessity, stepped into that void.

Notwithstanding the broader context of the discussion between the majority and the dissent in *Lujan*, some courts rely on the dissent's agreement with the majority to hold that, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *National Mining Ass'n v. United States Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up); *see also Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 886 (9th Cir. 2020) (relying on *National Mining* to conclude that universal vacatur is the "ordinary result when an agency action is found unlawful").

Recent cases tend to rely on *National Mining* for this proposition.  For example, earlier this year the Ninth Circuit interpreted Section 706 as extending the remedy for unlawful agency action nationwide.  In *East Bay Sanctuary Covenant v. Garland*,

994 F.3d 962, 987 (9th Cir. 2021), the court noted that the statute "does not tell a circuit court to 'set aside' unlawful agency action only within the geographic boundaries of that circuit.  Vacatur of an agency rule prevents its application to all those who would otherwise be subject to its operation."  Ultimately, this view traces back to *National Mining*.  *East Bay*, 994 F.3d at 987 (citing, among other cases, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), which relies on *National Mining*).

*National Mining*, in turn, relied on *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989).  *Harmon* made a slightly different point:  "When a court finds that an agency regulation is invalid in substantial part, and that the invalid portion cannot be severed from the rest of the rule, its typical response is to vacate the rule and remand to the agency."  *Id.* (footnotes omitted).  This result keeps with the fundamental principle that the agency has responsibility for fashioning policy in the first instance, not the courts.  *Id.*  In fairness, however, that policy—and the remand specifically contemplated in *Harmon*—applies where an agency has discretion to determine how to correct a legal error.  *Id.* at n.18 (quoting *Global Van Lines, Inc. v. ICC*, 804 F.2d 1293, 1305 n.95 (D.C. Cir. 1986)).  Defendants here have not suggested that they have any interest in correcting their legal error of issuing orders that exceed the scope of the statutory authority Congress gave them, and repeated extension of the order shows they likely will not.  Nonetheless, they conceivably could do so.  Whether they can and act consistent with the current state of the science presents a different question on which the Court expresses no opinion.

27

In addition to relying on *National Mining* or cases that do, the Ninth Circuit has also affirmed broad relief, effectively nationwide injunctive relief. *See Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). In *Bresgal*, the appellate court determined that the district court did not abuse its discretion by ordering relief that would have the effect of extending beyond the parties to the case. Specifically, the injunction at issue directed the Secretary of the Department of Labor to apply the Farm Labor Contractor Registration Act to commercial forestry workers. In doing so, the *Bresgal* Court went on to note that an injunction can direct the secretary of the agency, who is a party to litigation, to take certain action even if that action affects those who are not parties. *Id.* at 1170. Doing so, however, is appropriate only where "*such breadth is necessary to give prevailing parties the relief to which they are entitled.*" *Id.* at 1170–71 (citations omitted). This analysis came in discussion of *Califano v. Yamasaki*, 442 U.S. 682, 702–03 (1979), about the proper reach of remedies in a class action. In this respect, *Bresgal* owes more to the due-process considerations underlying *Califano* than the scope of judicial review under the Administrative Procedure Act.

Unlike the Ninth and D.C. Circuits, the Sixth Circuit is not among those that have adopted a rule like *National Mining* or otherwise provided a precedential interpretation of Section 706.[2]

---

[2] Some authorities cite *Mason General Hospital v. Secretary of Department of Health & Human Services*, 809 F.2d 1220, 1231 (6th Cir. 1987), to claim otherwise. But the Medicare reimbursement rule in dispute there, the issue of its retroactivity, and the relief ultimately ordered offer little guidance beyond its specific context and have little bearing on the issue before the Court in this case.

28

### II.B.4. Analysis

For all the debate and lack of clarity in the law the foregoing discussion reveals, a leading treatise on administrative law has little doubt on the proper scope of judicial review under the Administrative Procedure Act.  It flatly declares:  "There is no bar to class-wide and nationwide relief where appropriate."  Charles H. Koch, Jr. and Richard Murphy, *Administrative Law and Practice* § 8.31 (Feb. 2021 update) (footnotes omitted).

The Court has far less certainty than that about the correct interpretation of Section 706.  On the one hand, reading the statutory text as extending a remedy to all persons, even those who are not parties, where, as here, an agency exceeds congressional authorization offers an elegantly simple solution to a thorny problem. If an agency exceeds it authority, its action is unlawful regardless of which parties are formally before the court.  Indeed, the CDC's action applies nationwide, as does Section 361 of the Public Health Service Act.  As one district court noted:  "the Court cannot, in an intellectually honest manner, limit vacatur of the rules to the state of New Mexico.  The Court does not know how a court vacates a rule only as to one state, one district, or one party."  *New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 340 F. Supp. 3d 1112, 1183 (D.N.M. 2018).  If an order of this type does not merit nationwide vacatur, it is difficult to conceive of one that does.

Moreover, the agency's orders here are not the subject of a challenge as applied to Plaintiffs.  On the facts and circumstances presented, there is no particular or concrete action directed at these Plaintiffs for the Court to set aside.  Their injury

arises from the CDC's actions in excess of the authority Congress gave it. In this regard, this case resembles the historical cases where non-parties incidentally benefit from a broader remedy that is appropriate and tailored to the particular harm. Additionally, the eviction moratorium has a particular feature that mitigates any potential overbreadth of nationwide vacatur—namely, a landlord who agrees with the policy embodied in the CDC's orders can simply decline to evict a tenant. Finally, as noted above, such broad relief enjoys some support in precedent, tenuous though it may be.

On the other hand, the lack of a firm foundation for nationwide vacatur in the language, structure, and history of the Administrative Procedure Act is striking. Some textual clues suggest that judicial review of agency action is more circumscribed, consistent with the aim of leaving the agency as the central actor when crafting administrative policy. *See, e.g.*, 5 U.S.C. §§ 551(11) & 702. Such a reading leaves the agency at the center of policymaking, consistent with fundamental principles of administrative law. Further, the principle of standing at the heart of Article III and its discussion in *Lujan*, among other cases, serves as a reminder that the judicial power remains fundamentally limited, with few, circumscribed exceptions, to cases and controversies between particular litigants. In this way, Article III promotes the separation of powers by limiting the exercise of the judicial power so that the federal courts do not become a super-legislature (or, in this case, a super-agency). Further, the recent increase in the use of nationwide or universal remedies suggests a break from historical practices and understandings about the

30

proper role of the judiciary.  In an understandable sense, the increasingly expansive actions agencies themselves undertake prompt such judicial remedies in response. But two constitutional wrongs do not make a right.

Based on the lack of clear answer in the language, structure, and history of the Administrative Procedure Act and the absence of clear precedent, the Court is not prepared to extend the remedy as far as Plaintiffs request.  They may well be correct that the Act and Article III permit or even require such a result.  If so, reaching that conclusion will require greater analysis of the judicial power under Article III, which the parties have not fully developed.  That task also more properly falls to the Sixth Circuit or the Supreme Court.  *See* 28 U.S.C. § 2112(a)(3) (creating a procedure to consolidate multiple petitions for review in appellate courts, suggesting a broader remedial scope for circuits and implying a more limited role for district courts).  And given the state of the law, one can only hope that Congress and the Supreme Court will provide some much-needed clarity and guidance.

Finally, Rule 57 makes clear that the Administrative Procedure Act does not preclude declaratory relief.  Fed. R. Civ. P. 57 ("[A]nother adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").  Therefore, reading Section 706 in tandem with Rule 57 defines the bounds of the vacatur in this case.

## CONCLUSION

In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952), the Supreme Court famously upheld an injunction restraining the President from seizing steel mills to prevent a nationwide strike during the Korean War.  Generally

31

forgotten as the case has entered our constitutional consciousness are the particular facts.  President Truman issued an executive order directing his Secretary of Commerce to seize and operate "all or such of the plants, facilities, and other property" of the companies identified on a list consisting of basically all steel companies in the nation.  Directing the Secretary of Commerce to Take Possession and Operate the Plants and Facilities of Certain Steel Companies, Executive Order 10340, 17 Fed. Reg. 3139, 3141 (Apr. 10, 1952).  When the Secretary carried out the order by taking possession of most companies on the list, *see* 17 Fed. Reg. 3242, 3243 (Apr. 12, 1952), seven companies filed suit, and the district court granted a preliminary injunction, *see Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 571 (1952).  On appeal, the Supreme Court affirmed the injunction, concluding that the President acted without statutory or constitutional authority.  343 U.S. at 585.

Of relevance here, in affirming the injunction, the Supreme Court did not set aside or vacate the executive order at issue in its entirety—that is, on a national or universal basis.  Instead, the injunction restrained executive action as applied to the companies which filed suit—and not even all of them.  103 F. Supp. at 577.  Following the Supreme Court's ruling, President Truman respected the decision, abandoned his order, and immediately returned all the businesses seized—not just those that had prevailed in the litigation.  *See Steel Strike Laid to Federal Action*, N.Y. Times, Sept. 25, 1952, at 16.  In other words, not long after enactment of the Administrative Procedure Act, the judiciary fulfilled its constitutional role of saying what the law is

with respect to the parties before the courts and stopped short of ordering a broader remedy.  Certainly, the analogy is not perfect.  But as nationwide injunctions and other forms of universal relief become more common, it is easy to lose sight of this historical example.

For all the foregoing reasons, the Court will enter an amended judgment clarifying its earlier ruling.  Specifically, the Court concludes that the declaratory judgment it entered binds the parties and their members, wherever they may be.

**SO ORDERED.**

Dated:  June 3, 2021

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio